UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BLACKWATER SECURITY CONSULTING, LLC, a Delaware Limited Liability Company; and BLACKWATER LODGE AND TRAINING CENTER, INC., a Delaware Corporation, | CIVIL ACTION NO. 05-CV-06020 |
| Plaintiffs, | |
| v. | |
| WESTCHESTER SURPLUS LINES INSURANCE COMPANY, a Georgia Corporation; EVANSTON INSURANCE COMPANY, an Illinois Corporation; FIDELITY AND CASUALTY COMPANY OF NEW YORK, a South Carolina Corporation; and LIBERTY INSURANCE UNDERWRITERS, a Massachusetts Corporation, | |
| Defendants. | |

## LIBERTY INTERNATIONAL UNDERWRITERS' BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

John C. Sullivan, Esquire
Pa. I.D. No. 32262
Post & Schell, P.C.
Four Penn Center
1600 John F. Kennedy Boulevard
Philadelphia, PA 19103
(215) 587-1000
*Attorneys for Defendant, Liberty International Underwriters improperly named as Liberty Insurance Underwriters*

Dockets.Justia.com

## TABLE OF CONTENTS

| | | | |
|---|---|---|---|
| | TABLE OF AUTHORITIES | | ii |
| I. | INTRODUCTION | | 1 |
| II. | FACTUAL BACKGROUND | | 2 |
| | A. | The Underlying Actions. | 2 |
| | B. | Federal Recognition Of The Iraq War. | 2 |
| | C. | Blackwater's Admission That The Decedents Were Killed In War. | 4 |
| | D. | The Insurance Policy. | 9 |
| III. | ARGUMENT | | 11 |
| | A. | Summary Judgment Is Appropriate In This Case Because There Are No Genuine Issues Of Material Fact And Liberty International Underwriters Is Entitled To Judgment As A Matter Of Law That It Owes No Coverage Under Its Policy For The Underlying Litigation. | 11 |
| | B. | There Is No Material Difference Between North Carolina And Massachusetts Law With Respect To Issues Presented In This Matter; Therefore, There Is No Conflict Of Law, And So, The Court Should Apply Either Law. | 11 |
| | | 1. Courts In Massachusetts And North Carolina Interpret Insurance Contracts Similarly; Therefore, There Is No Conflict Of Law And The Court May Apply Either Jurisdiction Interchangeably. | 13 |
| | | 2. While Neither Jurisdiction Has Interpreted A Similar Commercial War/Terrorism Exclusion, Courts In Both Jurisdictions Have Held That War Risk Exclusions In Life Insurance Policies Exclude Benefits To Those Killed In War. | 15 |
| | C. | There Are No Genuine Issues Of Material Fact That The Decedents Died As A Result Of The Iraq War; Therefore, The War Exclusion Must Be Applied And Coverage Should Be Denied. | 17 |
| | | 1. Comparing The Policy To The Complaint, Coverage Should Be Denied Because Decedents Died As A Result Of Both The Defined And Ordinary Meaning Of War. | 18 |
| | | 2. The Federal Government Recognizes The Iraq War. | 19 |
| | | 3. Blackwater Admitted The Decedents Died During War. | 20 |
| IV. | CONCLUSION | | 21 |

# TABLE OF AUTHORITIES

## UNITED STATES SUPREME COURT CASES

*Ashwander v. Tennessee Valley Auth.*, 297 U.S. 288 (1936)..............................................20

*Heath v. Wallace*, 138 U.S. 573 (1891) ...........................................................................20

*Montoya v. United States*, 180 U.S. 261 (1901) ...............................................................19

*Tempel v. United States*, 248 U.S. 121 (1918)...................................................................20

## FEDERAL CASES

*Canal Ins. Co. v. Underwriters at Lloyd's London*, 435 F.3d 431 (3d Cir. 2005)..............11

*Hammersmith v. TIG Ins. Co.*, 480 F.3d 220 (3d Cir. 2007) ..................................11, 12, 15

*Liberty Mut. Ins. Co. v. Treesdale, Inc.*, 418 F.3d 330 (3d Cir. 2005) ...............................11

## STATE COURT CASES

*Andover Newton Theological School, Inc. v. Continental Cas. Co.*, 930 F.2d 89
    (1st Cir. 1991) ..............................................................................................................14

*Barnstable County Mut. Fire Ins. Co. v. Lally*, 373 N.E2d 966 (Mass. 1971 1978).........14

*Cody v. Connecticut Gen. Life Ins. Co.*, 439 N.E.2d 234 (Mass. 1982) ............................14

*Cohen v. Monumental Life Ins. Co.*, 194 S.E.2d 867 (N.C. App. 1973)................16, 18, 19

*Continental Cas. Co. v. Gilbane Building Co.*, 461 N.E.2d 209 (Mass. 1984) .................14

*Eatman Leasing, Inc. v. Empire Fire & Marine Ins. Co.*, 550 S.E.2d 271 (N.C.
    App. 2001) .......................................................................................................13, 18

*Gagliormella v. Met. Life Ins. Co.*, 122 F. Supp. 246 (D.C. Mass.1954) ..............17, 18, 19

*Integon Indem. Corp. v. Universal Underwriters Ins. Co.*, 507 S.E.2d 66 (N.C.
    App. 1998) .....................................................................................................................14

*Jefferson Ins. Co. v. Holyoke*, 503 N.E.2d 474 (Mass. App. 1987)...................................14

*Lamar v. John Hancock Mut. Life Ins. Co.*, 107 S.E.2d 65 (N.C. 1959)...............15, 18, 19

*North Carolina Farm Bureau Mut. Ins. Co. v. Allen*, 553 S.E.2d 420 (N.C. App. 2001) ................................................................................................................13

*Rouse v. Williams Realty Bldg. Co., Inc.*, 544 S.E.2d 609 (N.C. App. 2001) ...................13

*Save-Mor Supermarkets, Inc. v. Skelly Detective Serv., Inc.*, 268 N.E2d 666 (Mass. 1971 1971) .......................................................................................................14

*Stankus v. New York Life Ins. Co.*, 44 N.E.2d 687 (Mass. 1942) ..............16, 17, 18, 19, 20

## FEDERAL RULES OF CIVIL PROCEDURE

Fed. R. Civ. P. 56(c) ........................................................................................................11

## FEDERAL STATUTES

50 U.S.C. § 1541 (2007) ...................................................................................................3, 4

## MISCELLANY

H.R. Rep. No. 107-300(I), 2001 WL 1477653 (Nov. 19, 2001)........................................10

## I.    INTRODUCTION

This brief is submitted on behalf of Liberty International Underwriters ("Liberty") in support of its motion for summary judgment that Blackwater Security Consulting, LLC and Blackwater Training Center, Inc. ("Blackwater") are not entitled to insurance coverage for the underlying action pursuant to the unambiguous War/Terrorism Exclusion contained in the commercial umbrella liability policy, no. LQ1-B71-200233-014 ("Liberty policy").    The War/Terrorism Exclusion of the Liberty policy clearly excludes any coverage for "bodily injury [or] personal injury . . . related in any way, directly or indirectly, to war and military action." On March 31, 2004, four Blackwater independent security contractors, Stephen S. Helvenston, Mike R. Teague, Jerko Gerald Zovko and Wesley J.D. Batalona (the "Decedents"), were killed during the Iraq War by Iraqi insurgents near Fallujah, Iraq.    There is no legitimate dispute that the Decedents deaths were related to war and military action.    The United States Congress ("Congress") authorized President George W. Bush ("President Bush") to exercise the Executive War Powers in Iraq and declared the combat in Iraq to be war.    Blackwater admits that the Decedents were in Iraq as part of the "Total Force" fighting the Iraq War, as classified by the Department of Defense ("DOD").    The DOD stated that the Total Force accounts for its total "warfighting capability and capacity."    Various Blackwater briefings and contracts underscore its acknowledgment that the Decedents were killed in a "war zone" while performing "military duties on the battlefield" as "battlefield contractors" who were part of "war effort" during a "state of war, whether declared or undeclared."    Because there is no dispute the Decedents were killed in war, Liberty respectfully submits that is entitled to summary judgment that Blackwater is not entitled to coverage for the underlying action pursuant to the War/Terrorism exclusion contained in the Liberty policy.

## II.    FACTUAL BACKGROUND

### A.    The Underlying Actions.

On January 5, 2005, Richard P. Nordan, as Ancillary Administrator of the Estates of the

Decedents, filed *Nordan v. Blackwater Security Consulting, LLC*, Dkt. No. 05 CV 000173 in the

Superior Court of North Carolina, Wake County against Blackwater, Justin McQuown and

Thomas Powell ("*Nordan I*"). A true and correct copy of the *Nordan I* Complaint is attached to

the Declaration of Christopher J. Tellner ("Tellner Decl.") as Exhibit 1. *Nordan I* seeks damages

for the wrongful deaths of the Decedents when they were killed by Iraqi insurgents outside of

Fallujah, Iraq, on March 31, 2004 while working as security contractors for Blackwater. (*Id.*,

¶12). *Nordan I* also seeks to rescind the service contracts between Blackwater and the

Decedents. (*Id.*, ¶¶ 80-96). This action presently is before a panel of the American Arbitration

Association. *See* Demand for Arbitration (Tellner Decl., Ex. 2); Petition for Directing

Arbitration (Tellner Decl., Ex. 3). Richard Nordan filed a second suit seeking declaratory relief

in the Superior Court of North Carolina, Wake County, which was removed by Blackwater and

subsequently dismissed on June 11, 2007, by the United States District Court for the Eastern

District of North Carolina ("*Nordan II*"). (Tellner Decl., Ex. 4).

### B.    Federal Recognition Of The Iraq War.

President Bush and members of Congress have declared that the Nation was at war with

Iraq when the Decedents were killed. According to the War Powers Resolution:

> [t]he constitutional powers of the President as Commander-in-Chief to introduce United States Armed Forces into hostilities, or into situations where imminent involvement in hostilities is clearly indicated by the circumstances, are exercised only pursuant to (1) a declaration of war, (2) specific statutory authorization, or (3) a national emergency created by attack upon the United States, its territories or possessions, or its armed forces.

50 U.S.C. § 1541 (2007).   Pursuant to the War Powers Resolution, President Bush sought authority from Congress to invade Iraq.   On October 16, 2002, Congress authorized President Bush to "use the Armed Forces of the United States as he determines to be necessary and appropriate in order to . . . defend the national security of the United States against the continuing threat posed by Iraq . . . ." *See* Authorization for Use of Military Force Against Iraq Resolution of 2002 ("AUMF"), Pub. L. No. 107-243, 116 Stat 1498, 1501 (Tellner Decl., Ex. 5). The AUMF was consistent with the "War Powers Resolution." *Id.*

Congress recognized that the Decedents were killed during war while working for Blackwater.   United States Representative, Henry Waxman, Chairman of the Committee on Oversight and Government Reform, recognized "that the war in Iraq has given private contractors an unprecedented role in providing security services. . . . On March 31, 2004, four Americans working as private security personnel for Blackwater, all of whom were military veterans, were ambushed and killed in Fallujah while on a protection mission. Their tragic death became a turning point in public opinion about the war and directly resulted in a major U.S. military offensive, which is known as the First Battle of Fallujah.   Twenty-seven American soldiers and over 800 insurgents and Iraqi civilians died in that battle, and military observers believe it helped fuel an escalation of the insurgency." 2007 WL 417425 (Feb. 7, 2007) (Tellner Decl., Ex. 6).   United States Senator Elizabeth Dole was questioning former Deputy Secretary of Defense, Paul Wolfowitz after he discussed the Decedents' deaths, when she stated "that the war in Iraq is the central battleground in the war on terror." *See* Senate Armed Services Committee, Committee Hearing, 2004 WL 1427510 (June 25, 2004) (Tellner Decl., Ex. 7).

**C.   Blackwater's Admission That The Decedents Were Killed In War.**

Through Congressional testimony, security services contracts and briefs submitted to state and federal courts in *Nordan I* and *Nordan II*, Blackwater repeatedly stated that it was a

member of the Total Force deployed in a "war zone" while performing "military duties on the

battlefield" as "battlefield contractors" who were part of the "war effort" during a "state of war,

whether declared or undeclared." On June 13, 2006, Chris Taylor, Vice President of Blackwater

USA testified before the Committee on House Government Reform, Subcommittee on National

Security, Emerging Threats, and International Relations. 2006 WL 1646976. (Tellner Decl., Ex.

8). Mr. Taylor recognized that Blackwater is considered to be a member of the "Total Force" on

the global war on terror, as indicated in the 2006 Quadrennial Defense Review Report ("QDR")

of the DOD. *Id. See also*, 2006 QDR, at 75. (Tellner Decl., Ex. 9). Noting the "federal nature

of the 'battlefield,'" it is critical for Blackwater to abide by wartime laws such as the "Military

Extraterritorial Jurisdiction Act (MEJA), War Crimes Act of 1996, . . . Anti-Torture Statute,

Defense Trade Controls Act, . . . Defense Base Act (DBA), . . . and the General Orders of

Central Command (CENTCOM), Multi-National Corps - Iraq (MNC-I), and Combined Joint

Task Force (CJTF) 76." 2006 WL 1646976. (Tellner Decl., Ex. 8).

Briefs submitted to courts in *Nordan I* and *Nordan II* echo the determination made by

President Bush and Congress that Blackwater was engaged in combat operations in prosecution

of the Iraq War.[1] Blackwater first acknowledged that the Decedents would be in a war zone

---

[1] In its Federal Rule of Civil Procedure 26(a)(1) Initial Disclosure Statement, Blackwater stated it intends to rely on "[a]ll documents and filings, including exhibits, in the action captioned *Nordan v. Blackwater Security Consulting, LLC*, No. 05-cv-00048 (E.D.N.C.)" as part of its defense of this case. (Tellner Decl., Ex. 10). Blackwater also stated it will rely on "the agreements entered into between Blackwater and the *Nordan* Decedents" as part of its defense. (*Id.* at ¶5, 5) A copy of the Independent Contractor Service Agreement signed by the Decedent, Stephen S. Helvenston, is attached as Exhibit 11 to the Tellner Declaration (LIU-BSC-000348-365). Blackwater also intends to rely on "[a]n agreement underlying the security mission the *Nordan* decedents were performing at the time of their deaths" in asserting its defense. A copy of the Agreement for Security Services between Blackwater and Regency Hotel & Hospital Company ("Regency") is attached as Exhibit 12 to the Tellner Declaration (LIU-BCS-000366-389). Thus, Blackwater introduced the briefs, exhibits and agreements from the underlying action, and they are properly relied on in this summary judgment brief.

when it contracted to provide security services for Regency on March 12, 2004. (Tellner Decl.,

Ex. 12, LIU-BSC-000366). Within the Force Majeure provision of the agreement, Blackwater

and Regency indicated:

> [b]oth parties acknowledge that the Security Services are taking place in an area defined as a **'War Zone'** as defined by the parties, therefore the Force Majeure is defined in principle as acts of God, or action **taken by ruling authorities or military forces** in charge of the Territories [-Iraq-] where operations are taking place.

(*Id*. at LIU-BSC-000375, Article 13) (emphasis added). Blackwater not only recognized the war

in Iraq in general but also recognized the then "current threat in the Iraqi theater of operations as

evidenced by the recent incidents against civilian entities in Fallujah, Ar Ramadi, Al Taji and Al

Hillah . . . . The current and foreseeable future threat will remain consistent and dangerous."

(*Id*. at LIU-BSC-000380).

Blackwater again acknowledged that the Decedents were being deployed in a war zone

when entering into agreements with the Decedents. At Paragraph 10 of the Independent

Contractor Service Agreement, Blackwater stated the Decedents would perform the following:

> 10. PERFORMACE DURING HOSTILITIES. Contractor agrees and acknowledges that the Services performed in the Duty Station, pursuant to this Agreement have been identified as being essential to [Blackwater's] complete performance under the terms of the contract between [Blackwater] and the Customer and notwithstanding the existence of hostilities or a **state of war, whether declared or undeclared**, Contractor agrees to preform his or her assigned duties until released from such duties by the Contractor's supervisor or the supervisor's designated representative.

(Tellner Decl., Ex. 11 at ¶10, LIU-BSC-000353) (emphasis added). In its release paragraph,

Blackwater again acknowledged the Iraq War by stating, "Contractor understands and

acknowledges that the Duty Station is volatile, hostile and extremely dangerous and in some

instances, military may be conducting continuing military operations in the region." (*Id*. at ¶11,

LIU-BSC-000353).    In dictating the conduct of the Decedents while deployed in Iraq, Blackwater stated, "Contractor has been briefed on the rules of engagement and has reviewed and understands such rules and regulations pertaining to the use of force." (*Id.* at ¶13, LIU-BSC-000355).

From the first Notice of Removal of *Nordan I*, Blackwater recognized the Decedents were operating in a state of war by stating, "[e]ven aside from the preemptive effect of the [Defense Base Act], Plaintiff's claims directly implicate unique federal interests in the utilization of and reliance on contractors and subcontractors, residents of all states, who support the United States Armed Forces and other United States agencies in a foreign war zone." *See* Notice of Removal at 6-7, ¶ 36. (Tellner Decl., Ex. 13).

In its appellate brief to the Fourth Circuit, Blackwater acknowledged the role the Decedents played in the Iraq War.  Examples include:

> Federal contractors, with tens of thousands of employees, accompany U.S. Armed Forces overseas as a critical component of the war effort.   They provide a range of security, logistics, engineering, construction, intelligence and other vital support for the war effort as a significant part of the Total Force mix. . . . The question whether contractors may be sued, in any court, for war casualties while the military services may not . . . could determine whether the President, as Commander-in-Chief, will be able to deploy the Total Force decades into the future.

*See* Brief for Appellants [Blackwater], Oct. 31, 2005, 2005 WL 3783349, at *6-7 (4th Cir., Oct. 31, 2005) (Tellner Decl., Ex. 14).  Blackwater continued, "[t]he use of battlefield contractors to protect the U.S. Armed Forces' supply lines may be relatively new military doctrine . . . . The Decedents were persons engaged in employment covered by the DBA because they were engaged in public work connected with war activities . . . ." *Id.* at *9. "[T]he Decedents were in a war zone protecting the supply lines of the U.S. Army, and hence, under the military chain of command leading to the President." *Id.* at *14 (emphasis added). "Decedents' mission was to

provide war zone escort for trucks to U.S. Army Camp Ridgeway in Iraq." *Id.* at *22. The "Decedents were performing a classic military function-providing an armed escort for a supply convoy under orders to reach an Army base-with an authorization from the Office of the Secretary of Defense that classified their mission as 'official duties[.]'" *Id.* at *28.

Blackwater made similar statements in it Petition for a Writ of Certiorari before the United States Supreme Court. *See* Petition for a Writ of Certiorari to the United States Court of Appeals for the Fourth Circuit (U.S., Dec. 20, 2006). (Tellner Decl., Ex. 15). "Petitioners [Blackwater] are United States military contractors carrying out profoundly dangerous missions in various theaters of battle, including in Iraq and Afghanistan." (*Id.* at 3, ¶1). Blackwater framed the Petition with the phrase, "as here and as so frequently happens in times of war, tragedy strikes." (*Id.* at 4, ¶ 1). "War-risk liability . . . is inherently unknowable and uninsurable, and thus incompatible with this Total Force policy, which provides for a war-fighting capability that includes commercial contractors." (*Id.* at 4, ¶ 1).

In its Demand for Arbitration to the American Arbitration Association, Blackwater filled in the area for "Type of Business" with "Claimant Contractor [Blackwater] supporting U.S. Armed Forces & other U.S. Government clients in war zones." (Tellner Decl., Ex. 2). In its Supplemental Petition for Order Directing Arbitration, Blackwater stated, "[o]n March 31, 2004, in the course of performing services for BSC under the Service Agreements in Iraq, the Decedents were attacked and killed by enemy insurgents in Fallujah as they escorted a convoy of catering trucks bound for U.S. Army Camp Ridgeway." (Tellner Decl., Ex. 16 at 3-4, ¶ 8). "Each of the Decedents acknowledged in the Service Agreements, among other things, that he would be performing duties during a state of War (Service Agreements ¶ 10); acknowledged and agreed to assume all the risks of death and injury including, among other things, the risks of

shooting, explosion, terrorism, an civil unrest ([Service Agreements] ¶ 11.1) . . . ." (*Id.* at 4, ¶ 15).

From the Notice of Removal of *Nordan II*, Blackwater stated that it performs security services under contracts with the United States "in war zones in Iraq." *See* Notice of Removal of *Nordan v. Blackwater Security Consulting, LLC,* No. 07-CVS-7061 (N.C. Super. Ct., Wake Co.) (Tellner Decl., Ex. 17 at 4, ¶ 17). Blackwater noted that the Service Agreements the Decedents entered into with Blackwater "envisage performance in areas abroad where military operations are ongoing, and where the Decedents would be subject to enemy attack." (*Id.* at 7, ¶ 31). For being killed in war, Blackwater recognized that "Decedents posthumously received Defense of Freedom medals from the United States Department of Defense for their services in support of the U.S. Army in Iraq." (*Id.* at 8, ¶ 32).

### D.    The Insurance Policy.

Liberty issued Commercial Umbrella Liability Policy, number LQ1-B71-200233-014, to Blackwater Lodge and Training Center, Inc. at the business address 850 Puddin Ridge Road, Moyock, NC 27958 for the policy period January 27, 2004 to January 23, 2005. (Tellner Decl., Ex. 18, LIU-BSC-000001-000040). The Declarations schedule of the Liberty policy provides a $15,000,000 per occurrence limit for each occurrence. (*Id.*, LIU-BSC-000001). This limit is subject to a self-insured retention of $10,000. *Id.* The Liberty policy contains a War/Terrorism Exclusion Endorsement. (*Id.*, LIU-BSC-000028-29). The exclusion provides:

> This insurance does not apply to "bodily injury", "property damage" , "personal injury" or "advertising injury" caused by, arising from or related in any way, directly or indirectly, to:
>
> A)    "War and Military Action" which included without limitation the following:
>
> 1)    War, including undeclared or civil war;

2)      Warlike action by military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; and

3)      Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

B)      Any actual or threatened act of domestic or international "terrorism" committed by a person or persons acting: 1) alone or on behalf of or in connection with any organization; and 2) with the goal of furthering any political, social, or religious objective.

This exclusion also applies to "bodily injury", "property damage" and "advertising injury" liability caused by action taken to prevent or defend against an act of "terrorism".

"Terrorism" means an act or acts:

1)      that are violent in nature or are dangerous to human life:

a)      that are a violation of the criminal laws of the United States or any State or that would be a criminal violation if committed within the jurisdiction of the United States or any State; and

b)      that have the apparent intent of:

i)      intimidating or coercing any civilian population;

ii)     influencing the policy of any government by intimidation or coercion; or

iii)    affecting the conduct of any government by mass destruction, assassination, or kidnapping,....

(*Id*.).   For perspective, the United States House of Representatives noted that "[t]raditionally, acts of war have been excluded as covered perils" in commercial general liability insurance policies.  *See* H.R. Rep. No. 107-300(I), 2001 WL 1477653, at *13 (Nov. 19, 2001) (discussing the legislative history of the Terrorist Risk Insurance Act of 2002).

## III.    ARGUMENT

### A.    Summary Judgment Is Appropriate In This Case Because There Are No Genuine Issues Of Material Fact And Liberty International Underwriters Is Entitled To Judgment As A Matter Of Law That It Owes No Coverage Under Its Policy For The Underlying Litigation.

Summary judgment is appropriate if there are no genuine issues of material fact presented and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The Third Circuit has recognized that "[d]isposition of an insurance action on summary judgment is appropriate when, as here, there are no material underlying facts in dispute." *Liberty Mut. Ins. Co. v. Treesdale, Inc.*, 418 F.3d 330, 333 n.5 (3d Cir. 2005) (quotation omitted). This is because the interpretation of the scope of coverage of an insurance contract is a question of law properly decided by the court. *Id.* In this case, there are no material facts in dispute. To the contrary, the principal factual sources for this summary judgment motion are plaintiff's own pleadings and the judicial admissions from the underlying lawsuits that are the basis for this coverage action. Therefore, Liberty is entitled to judgment as a matter of law that it has no obligation under its policy to pay any judgment or settlement on behalf of its insureds under the circumstances of this case.

### B.    There Is No Material Difference Between North Carolina And Massachusetts Law With Respect To Issues Presented In This Matter; Therefore, There Is No Conflict Of Law, And So, The Court Should Apply Either Law.

Where federal jurisdiction is based on diversity of citizenship, as it is here, the court applies the choice-of-law rules of the state in which it sits. *Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 226 (3d Cir. 2007); *Canal Ins. Co. v. Underwriters at Lloyd's London*, 435 F.3d 431, 434 (3d Cir. 2005). Accordingly, Pennsylvania choice of law rules apply. Pennsylvania applies a "flexible conflicts methodology approach to insurance contract cases." *Hammersmith*, 480 F.3d at 228 (citation omitted). The first step is to determine whether "there is an *actual* or real

conflict between the potentially applicable laws." *Id.* at 230 (emphasis in original). The two states whose laws might potentially apply are North Carolina (the location of Blackwater's headquarters and the place to which the Liberty insurance contract was delivered) and Massachusetts (the location of Liberty's headquarters).

Previously, Pennsylvania courts found a false conflict to exist when there were "no relevant differences between the laws of the two states, or the laws would produce the same results [wherein the court would] not have to engage in a choice of law analysis, and may refer to the states' laws interchangeably." *Hammersmith*, 480 F.3d at 229. Now, though, if the laws of the two jurisdictions are the same or there are no relevant differences then there is no conflict, and the choice of law inquiry ends. *Id.* at 229-30. Where the laws of the potentially applicable jurisdictions would produce the same result then "there is no conflict at all, and a choice of law analysis is unnecessary. " *Id.* at 230. Thus, if no conflict exists then either of the jurisdictions' laws can be applied. *Id.* at 230.

As discussed below, there is no conflict between the laws of North Carolina and Massachusetts. Because there is no relevant difference between the laws of Massachusetts and North Carolina "there is no conflict at all, and a choice of law analysis is unnecessary." *Hammersmith*, 480 F.3d at 230; therefore, the Court "may refer to the states' laws interchangeably." *Id.* at 229. In addition, both states are silent with respect to the application of war risk exclusions in commercial general liability policies; however, both states are in agreement regarding the validity of such. Furthermore, both states have found such exclusions to apply in life insurance policies for military combat in undeclared wars, the Korean War and Viet Nam War, respectively.

11

1.    **Courts In Massachusetts And North Carolina Interpret Insurance Contracts Similarly; Therefore, There Is No Conflict Of Law And The Court May Apply Either Jurisdiction Interchangeably.**

With respect to the general rules of contract construction, there is no real conflict between North Carolina law and the law of Massachusetts, the two states whose law might arguably apply. The general rules applied by courts interpreting insurance policies under North Carolina and Massachusetts law are substantively identical. In interpreting an insurance contract, the goal of the court in both jurisdictions is to ascertain the intent of the parties as manifested by the language of the written instrument and apply the unambiguous policy provisions.

In North Carolina, the terms of an insurance policy are enforced according to their plain and ordinary meaning. "The interpretation of language used in an insurance policy is a question of law, governed by well-established rules of construction." *North Carolina Farm Bureau Mut. Ins. Co. v. Allen*, 553 S.E.2d 420, 423 (N.C. App. 2001) (citations omitted). "The language used in such policies is subject to judicial construction only where it is ambiguous and reasonably susceptible to more than one interpretation." *Id.*

When the policy language is unambiguous, [North Carolina] courts have a duty to construe and enforce insurance policies as written, without rewriting the contract or disregarding the express language used." *Eatman Leasing, Inc. v. Empire Fire & Marine Ins. Co.*, 550 S.E.2d 271, 273 (N.C. App. 2001); *Rouse v. Williams Realty Bldg. Co., Inc.*, 544 S.E.2d 609, 612 (N.C. App. 2001) (finding the duty to be "a solemn one, for it seeks to preserve the fundamental right of freedom of contract"). Furthermore, if an insurance policy defines a word or term "that definition should be used. However, when no definition is provided in the policy, the nontechnical words have the same meaning as they would in ordinary speech." *Eatman*, 550 S.E.2d at 273. "The meaning of specific language used in a policy of insurance is a question of

12

law" that can be determined by a court at the summary judgment stage. *Integon Indem. Corp. v. Universal Underwriters Ins. Co.*, 507 S.E.2d 66, 68 (N.C. App. 1998).

Similar to North Carolina, in Massachusetts, the terms of an insurance policy are enforced according to their plain and ordinary meaning. Massachusetts courts have held that "insurance contracts are to be construed according to the fair and reasonable meaning of the words in which the agreement of the parties is expressed." *Cody v. Connecticut Gen. Life Ins. Co.*, 439 N.E.2d 234, 237 (Mass. 1982) (citation omitted). "Words in common use . . . must [be] giv[en] . . . the meaning intended when they are used by ordinary men." *Save-Mor Supermarkets, Inc. v. Skelly Detective Serv., Inc.*, 268 N.E.2d 666, 669 (Mass. 1971). If the terms of an exclusionary clause are plain and free from ambiguity, they must, therefore, be interpreted in their usual and ordinary sense. *See Barnstable County Mut. Fire Ins. Co. v. Lally*, 373 N.E.2d 966, 968 (Mass. 1978).

For an ambiguity to be found, the language of the policy must bear more than one reasonable reading after all appropriate tools of textual construction have been applied. *Andover Newton Theological School, Inc. v. Continental Cas. Co.*, 930 F.2d 89, 93 (1st Cir. 1991) (holding "clear [contract] provisions should not be strained to suggest ambiguity") (applying Massachusetts law); *Continental Cas. Co. v. Gilbane Building Co.*, 461 N.E.2d 209, 212 (Mass. 1984) (stating courts must "read the policy as written [and] are not free to revise it."). The mere existence of a controversy between parties as to the meaning of a policy provision does not render that provision ambiguous. *Jefferson Ins. Co. v. Holyoke*, 503 N.E.2d 474, 477 (Mass. App. 1987).

Because there is no relevant difference between the laws of Massachusetts and North Carolina "there is no conflict at all, and a choice of law analysis is unnecessary." *Hammersmith*, 480 F.3d at 230; therefore, the Court "may refer to the states' laws interchangeably." *Id.* at 229.

> **2.      While Neither Jurisdiction Has Interpreted A Similar Commercial War/Terrorism Exclusion, Courts In Both Jurisdictions Have Held That War Risk Exclusions In Life Insurance Policies Exclude Benefits To Those Killed In War.**

Courts in North Carolina and Massachusetts have previously given effect to war risk exclusions. War risk exclusions with provisions substantively identical to the exclusion in the Liberty policy have been found to clearly exclude coverage for death related to wars in Korea and Vietnam and cause by torpedo attacks that preceded World War II. Under this precedent, the War/Terrorism exclusion in the Liberty policy clearly applies to the Decedents' claims against Blackwater.

The Supreme Court of North Carolina determined that the war risk exclusion in a life insurance policy was valid and applicable despite the lack of a formal declaration of war. *Lamar v. John Hancock Mut. Life Ins. Co.*, 107 S.E.2d 65 (N.C. 1959). The exclusion at issue stated that the policy did not apply if "death results directly or indirectly, wholly or partly, from war or any act of war, declared or undeclared." *Id.* at 65. The decedent was killed in what was then known as the "Korean Conflict." *Id.* War was never declared against Korea, but the United States was involved in combat on the Korean peninsula. Because the decedent was "killed in action during . . . armed conflict," the court found that his death clearly fell under the definition of "war" by being a casualty of an "undeclared" war. *Id.* Thus, the court applied the ordinary meaning of the word "war" to find the exclusion applied when the decedent was a casualty of the Korean Conflict.

Similarly, the Court of Appeals of North Carolina found a war risk exclusion to apply to a life insurance policy when the decedent was killed in combat during the Vietnam Conflict, when war was never declared. *Cohen v. Monumental Life Ins. Co.*, 194 S.E.2d 867 (N.C. App. 1973). The war risk exclusion at issue was substantively identical to the exclusion at issue in *Lamar*. *Cohen*, 194 S.E.2d at 867. Similar to *Lamar*, the decedent was killed while "the United States of America was engaged in armed hostilities in and around Vietnam." *Id.* at 868. The court ruled that such hostilities "constituted an undeclared war or act of war within the meaning of the insurance policy" at issue in *Cohen*. *Id.*

Like North Carolina, Massachusetts courts have given effect to war exclusions similar to the one found in the Liberty policy. *See, e.g., Stankus v. New York Life Ins. Co.*, 44 N.E.2d 687 (Mass. 1942). In *Stankus*, the Supreme Judicial Court of Massachusetts found a war risk exclusion in a life insurance policy to apply even though the death at issue occurred before the United States declared war. There, the insured was a Navy seaman whose destroyer was sunk by a torpedo while on patrol near Iceland prior to the attack on Pearl Harbor, but at a time when many Navy vessels were attacked in the North Atlantic. *Id.* at 688.

The court determined that the decedent death occurred due to "an act that arose out of the prosecution of . . . war." *Id.* at 689. It is important to note that the exclusionary language at issue in *Stankus* did not distinguish between "declared" or "undeclared" war, but merely "war or any act incident thereto." *Id.* at 687-88. In reaching its decision the court stated "the existence of a war is not dependent upon a formal declaration of war. Wars are being waged today that began without any declaration of war. . . [F]or it has been said that from out of one hundred eighteen wars that occurred between 1700 and 1872, in hardly ten did formal declarations precede the commencement of hostilities." *Id.* at 688. The court found that "war as used in the

15

policy cannot be restricted to one that was being waged by the United States and in which the insured was actively engaged as the plaintiff contends." *Id.* Because "war" was not defined in the policy, unlike the current Liberty policy, it "applie[d] in general to every situation that ordinary people would commonly regard as war. There is nothing in the policy that indicates that the word was used in any vague, indefinite or ambiguous sense." *Id.* at 688-89.

In bolstering its decision, the court looked at the circumstances surrounding the death. The court was compelled to adhere to the statements of President Roosevelt that the ships were sunk by "vessels of war" because the "proclamations were public acts of which [the] court [was] bound to take judicial notice." *Id.* at 689. Furthermore, the Lease-Lend Act of 1941 was enacted to enable the President to supply war materials to any country whose defense was vital to the safety of America. *Id.* Thus, the circumstances clearly indicated war was occurring and the decedent was a casualty of the same. *See also Gagliormella v. Met. Life Ins. Co.*, 122 F. Supp. 246, 249 (D.C. Mass.1954) (holding the war risk exclusion – "as a result of war" – applied when the insured died in combat in the Korean Conflict and any "ambiguity" in the word "war" "is the creation of lawyers not laymen").

**C.    There Are No Genuine Issues Of Material Fact That The Decedents Died As A Result Of The Iraq War; Therefore, The War Exclusion Must Be Applied And Coverage Should Be Denied.**

When the above rules of interpretation are applied to the Liberty policy language at issue, this Court must find that the War/Terrorism Exclusion endorsement excludes coverage for *Nordan I* under the Liberty policy. The plain language of the policy, application of North Carolina and Massachusetts law, Federal Statements that the Nation was at war and Blackwater's admissions leave no genuine issue of material fact to be resolved. Therefore, Liberty is entitled to summary judgment in its favor that coverage is not afforded for the Decedent's claims against Blackwater.

**1.    Comparing The Policy To The Complaint, Coverage Should Be Denied Because Decedents Died As A Result Of Both The Defined And Ordinary Meaning Of War.**

Presently, the Liberty policy excludes coverage for losses arising from "War and Military Action." (Tellner Decl., Ex. 18, LIU-BSC-000028-29). "War and Military Action" is defined; therefore, that definition should be used. *See Eatman Leasing, Inc. Co.*, 550 S.E.2d at 273; *Stankus*, 44 N.E.2d at 687-88. Even if the term were not defined, ordinary speech would dictate that the Decedents were killed during the Iraq War. *See id.*

Under the Liberty policy, "War and Military Action" is:

> 1)    War, including undeclared or civil war;
>
> 2)    Warlike action by military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; and
>
> 3)    Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

(*Id.*).    Under either the defined terms of the Liberty policy or under ordinary speech the allegations of *Nordan I* clearly fall within this exclusion.    The Complaint alleges that the Decedents were killed outside of the "war-torn City of Fallujah" by "Iraqi insurgents" while "escort[ing] three ESS flatbed trucks from the City of Taji to a U.S. Army base in Iraq, commonly referred to as Camp Ridgeway.". (Tellner Decl., Ex. 1, ¶¶ 12, 56).    Thus, the Decedents were in Iraq and on a mission to support the United States Army during military combat.    This is similar to *Lamar, Cohen, Stankus* and *Gagliormella* in that the deaths occurred in an area of ongoing combat at the hands of enemy combatants.

In addition, the terms "undeclared" war and "warlike action by military force" clearly apply.    The decedents were killed by Iraqi insurgents.    Insurgents clearly fall under either the

terms "warlike action by a military force" or "insurrection, rebellion, revolution." Furthermore, this is not unlike *Cohen* in which the Nation was engaged in war against the Viet Cong. Thus, it cannot be said that the Decedents were killed in any other manner than in a war through "warlike action by a military force."

Furthermore, the Liberty policy has language similar to the exclusions found in *Lamar*, *Cohen*, *Stankus* and *Gagliormella*. Those cases and the current Liberty policy used the terms "declared or undeclared war," "directly or indirectly." Not of those cases found the term "war" to be anything other than clear, despite the fact that the insureds died from undeclared wars. Put simply, the United States was at war in Iraq; should an ambiguity attempted to be found in the Liberty policy exclusion, it would be from "the creation of lawyers not laymen." *See Gagliormella*, 122 F. Supp. at 249.

Regardless of whether the United States was engaged in declared or undeclared war, the exclusionary language is clear, and it applies. The United States Supreme Court once stated, "we recall no instance where Congress has made a formal declaration of war against an Indian nation or tribe; but the fact that Indians are engaged in acts of general hostility to settlers, especially in the government has deemed it necessary to dispatch a military force for their subjugation, is sufficient to constitute a state of war." *Montoya v. United States*, 180 U.S. 261, 267 (1901). Iraqi insurgents clearly were engaged in hostilities towards United States military professionals and security contractors, which "is sufficient to constitute a state of war."

### 2.    The Federal Government Recognizes The Iraq War.

The statements addressed in Section II.A.1 supra clearly establishes this Nation was at War with Iraq when the decedents were killed. It is appropriate for and the Court should take judicial notice of the AUMF and statements of members of Congress and the DOD and find that the Decedents were killed during war. The Court should take judicial notice of international

situations underlying the passage of federal defense acts such as the AUMF, authorizing military force against Iraq. *Ashwander v. Tennessee Valley Auth.*, 297 U.S. 288, 327 (1936) (taking judicial notice of the international situation spurring the passage National Defense Act of 1916 authorizing the construction of Wilson Dam to provide energy for the production of war munitions). Furthermore, the Court should take judicial notice of the numerous statements made by members of Congress and the DOD that the United States was at war with Iraq. *Heath v. Wallace*, 138 U.S. 573, 584 (1891) (taking "judicial notice of such official statements made by the head of one of the branches of the executive department [-Secretary of the Interior-], especially as they relate to the public records under his control."); *see also Tempel v. United States*, 248 U.S. 121, 130 (1918) (taking judicial notice of reports by the Secretary of War); *Stankus*, 44 N.E.2d at 689 (Mass. 1942) (taking judicial notice of reports to the Congress from the President of the United States regarding war between the United Kingdom and the Axis powers of which the United States had not yet entered).

### 3.    Blackwater Admitted The Decedents Died During War.

Blackwater is estopped from denying the Decedents are casualties of war. Blackwater cannot deny that the Decedents are casualties of war because Blackwater has made such statements in testimony to Congress and in numerous briefs to federal and state courts. In those briefings, Blackwater acknowledged and utilized the following terms: "enemy insurgents," (Petition for Order Directing Arbitration, Tellner Decl., Ex. 3 at 3-4, ¶ 8), "state of War" (*Id.* at 4, ¶ 15), "war zones." (Demand for Arbitration, Tellner Decl., Ex. 2), "war zones" (Notice of Removal of *Nordan II,* Tellner Decl., Ex. 17 at 4, ¶ 18), and "enemy attack" (*Id.* at 7, ¶ 31). Furthermore, the services contract between Blackwater and Regency and Blackwater and the Decedents clearly envisages Blackwater's acknowledgment that it was sending the Decedents into a war zone. As well, on March 12, 2004, Blackwater recognized the threat posed to

19

civilians especially in Fallujah, Iraq because of the war.  (Tellner Decl., Ex. 12, LIU-BSC-000380).  Thus, there is no genuine issue of material fact that the decedents died as a result of war.

## IV.    CONCLUSION

For all of the foregoing reasons, this Court should grant Liberty International Underwriters' Motion for Summary Judgment and determine that there is no coverage under the Liberty International Underwriters Policy for the underlying litigation.

Dated:  July 27, 2007                               **POST & SCHELL, P.C.**

By:    */s/ John C. Sullivan*
JOHN C. SULLIVAN, ESQUIRE
Attorney ID # 32262
Signature Validation Code: JCS7648
CHRISTOPHER J. TELLNER, ESQUIRE
Attorney ID # 204204
Signature Validation Code: CJT6757
Four Penn Center
1600 John F. Kennedy Boulevard
Philadelphia, PA  19103-2808
(215) 587-1000
***Attorneys for Defendant,***
***Liberty International Underwriters***
***improperly named as Liberty Insurance***
***Underwriters***