# STATE OF NORTH CAROLINA

**WAKE COUNTY**    FILED

File No. _____

In the General Court of Justice
☐ District  ☒ Superior Court Division

*Name Of Plaintiff.*
RICHARD P. NORDAN, as Ancillary Administrator 2005 JAN -5 PH 4: 05  GENERAL CIVIL ACTION

for the separate Estates of

STEPHEN S. HELVENSTON,

MIKE R. TEAGUE,

JERKO GERALD ZOVKO  and

WESLEY J. K. BATALONA

WAKE COUNTY C.S.C.

**COVER SHEET**

BY _____

☒ INITIAL FILING    ☐ SUBSEQUENT FILING

Rule 5(b) Rules of Practice for Superior and District Courts

*Name And Address Of Attorney, Or Party If Not Represented (complete for initial appearance or change of address)*

**See attached.**

**VERSUS**

*Name Of Defendants*
BLACKWATER SECURITY CONSULTING, LLC    *Summons Submitted*

BLACKWATER LODGE AND
TRAINING CENTER, INC.·    *Summons Submitted*

JUSTIN L. McQUOWN    *Summons Submitted*

THOMAS POWELL    *Summons Submitted*

*Attorney Bar No.* _____

☒ Initial Appearance in Case    ☐ Change of Address

*Name.Of Firm*

| Tax ID No. | Telephone No. | FAX No. |
|---|---|---|
|  |  |  |

*Counsel for*
☒ All Plaintiffs  ☐ All Defendants  ☐ Only *(List party(ies) represented)*

☒ Jury Demanded in Pleading
☐ Complex Litigation

☐ Amount in controversy does not exceed $15,000
☐ Stipulate to arbitration

| **TYPE OF PLEADING** | **CLAIM FOR RELIEF FOR** |
|---|---|
| *(check all that apply)* | ☐ Administrative Appeal (ADMA) |
| ☐ Amended Answer/Reply (AMND-Response) | ☐ Appointment of Receiver (APRC) |
| ☐ Amended Complaint (AMND) | ☐ Attachment/Garnishment (ATTC) |
| ☐ Answer/Reply (ANSW-Response) | ☐ Claim and Delivery (CLMD) |
| ☒ Complaint (COMP) | ☐ Collection on Account (ACCT) |
| ☐ Confession of Judgment (CNFJ) | ☐ Condemnation (CNDM) |
| ☐ Counterclaim vs. (CTCL) | ☐ Contract (CNTR) |
| ☐ All Plaintiffs  ☐ Only *(List on back)* | ☐ Discovery Scheduling Order (DSCH) |
| ☐ Crossclaim vs. *(List on back)* (CRSS) | ☐ Injunction (INJU) |
| ☐ Extend Statute of Limitations, Rule 9 (ESOL) | ☐ Medical Malpractice (MDML) |
| ☐ Extend Time for Answer (MEOT-Response) | ☐ Minor Settlement (MSTL) |
| ☐ Extend Time For Complaint (EXCO) | ☐ Money Owed (MNYO) |
| ☐ Rule 12 Motion In Lieu Of Answer (MDLA) | ☐ Negligence - Motor Vehicle (MVNG) |
| ☐ Third Party Complaint *(List Third Party Defendants On Back)* (TPCL) | ☐ Motor Vehicle Lien G.S. 44A (MVLN) |
|  | ☐ Limited Driving Privilege - *Out-of-State Convictions* (PLDP) |
| ☐ Other *(specify)* | ☐ Possession of Personal Property (POPP) |
|  | ☐ Product Liability (PROD) |
|  | ☐ Real Property (RLPR) |
|  | ☐ Specific Performance (SPPR) |
|  | ☒ Other *(specify)* **Wrongful Death** |

NOTE: *Small claims are exempt from cover sheets.*

*Date*
January 5, 2005

*Signature Of Attorney/Party*

NOTE: *All papers filed in civil actions· special proceedings and estates shall include as the first page of the filing a cover sheet summarizing the critical elements of the filing in a format prescribed by the Administrative Office of the Courts. The Clerk of Superior Court shall require a party to re-file any paper which does not include the required cover sheet.*

AOC-CV-751
Rev. 11/96    *(Over)*

LIU - BSC - 000067

Dockets.Justia.com

**Name and Address of Attorneys for Plaintiff:**
(initial appearances)

David F. Kirby, State Bar #7841
William B. Bystrynski, State Bar #20883
Kirby & Holt. L.L.P.
P. O. Box 31665
Raleigh. NC  27622
(919) 881-2111    FAX:  (919) 781-8630

Daniel J. Callahan
Brian J. McCormack
Marc P. Miles
Callahan & Blaine, A.P.L.C.
3 Hutton Centre Drive, Suite 900
Santa Ana, CA  92707
(714) 241-4444    FAX:  (714) 241-4445

LIU - BSC - 000068

NORTH CAROLINA

WAKE COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
FILE NO. _____

RICHARD P. NORDAN, as Ancillary          )
Administrator for the separate Estates of  )
STEPHEN S. HELVENSTON, MIKE R.        )
TEAGUE, JERKO GERALD ZOVKO and      )
WESLEY J.K. BATALONA,                  )
                                       )
          Plaintiffs,                   )
                                       )
     v.                                 )
                                       )
BLACKWATER SECURITY                    )
CONSULTING, LLC, a Delaware Limited    )
Liability Company; BLACKWATER          )
LODGE AND TRAINING CENTER, INC.,      )
a Delaware Corporation, JUSTIN L.       )
MCQUOWN, an individual; and THOMAS    )
POWELL, an individual,                  )
                                       )
          Defendants.                   )
                                       )

**COMPLAINT**
**(Jury Trial Demanded)**

Plaintiff RICHARD P. NORDAN, as the Ancillary Administrator of the Estate of

STEPHEN S. HELVENSTON, the Estate of MIKE R. TEAGUE, the Estate of JERKO

GERALD ZOVKO, and the Estate of WESLEY J.K. BATALONA, allege against Defendants,

BLACKWATER SECURITY CONSULTING, LLC, a Delaware Limited Liability Company;

BLACKWATER LODGE AND TRAINING CENTER, INC., a Delaware Corporation, JUSTIN

L. MCQUOWN, an individual; and THOMAS POWELL, an individual, and each of them, as

follows:

1

LIU - BSC - 000069

## PARTIES

1.    RICHARD P. NORDAN, a resident of Wake County, North Carolina, was duly appointed ancillary administrator of the estate of Stephen S. Helvenston, by the Superior Court of Wake County, North Carolina, on December 6, 2004. He is acting as ancillary administrator in the institution of this wrongful death action, which is filed within two years of the death of Stephen S. Helvenston.

2.    RICHARD P. NORDAN, a resident of Wake County, North Carolina, was duly appointed ancillary administrator of the estate of Mike R. Teague, by the Superior Court of Wake County, North Carolina, on December 6, 2004. He is acting as ancillary administrator in the institution of this wrongful death action, which is filed within two years of the death of Mike R. Teague.

3.    RICHARD P. NORDAN, a resident of Wake County, North Carolina, was duly appointed ancillary administrator of the estate of Jerko Gerald Zovko, by the Superior Court of Wake County, North Carolina, on December 6, 2004. He is acting as ancillary administrator in the institution of this wrongful death action, which is filed within two years of the death of Jerko Gerald Zovko.

4.    RICHARD P. NORDAN, a resident of Wake County, North Carolina, was duly appointed ancillary administrator of the estate of Wesley J.K. Batalona, by the Superior Court of Wake County, North Carolina, on December 7, 2004. He is acting as ancillary administrator in the institution of this wrongful death action, which is filed within two years of the death of Wesley J.K. Batalona.

5.    At all relevant times, Defendant BLACKWATER SECURITY CONSULTING,

2

LIU - BSC - 000070

LLC has been and is a limited liability company duly organized and existing under the laws of the State of Delaware, with its principal place of business in Moyock, North Carolina.

6.     At all relevant times, Defendant BLACKWATER LODGE AND TRAINING CENTER, INC. has been and is a corporation duly organized and existing under the laws of the State of Delaware, with its principal place of business in Moyock, North Carolina.

7.     Defendants BLACKWATER SECURITY CONSULTING, LLC and BLACKWATER LODGE AND TRAINING CENTER, INC. are referred to herein collectively as "BLACKWATER."

8.     Plaintiff is informed and believes and thereon alleges that at all relevant times, Defendant JUSTIN MCQUOWN is an individual, currently residing in Virginia Beach, Virginia.

9.     Plaintiff is informed and believes and thereon alleges that at all relevant times, Defendant THOMAS POWELL is an individual, currently residing in Lynn Haven, Florida.

10.     Plaintiff is informed and believes, and thereon alleges that at all times relevant, each Defendant, was the agent, servant, representative and/or employee of each of the other Defendants, and that in doing the things hereinafter alleged, each Defendant was acting within the course and scope of his or her authority as such agent, servant, representative and/or employee, with the permission, knowledge, consent and ratification of each of the other Defendants. Unless otherwise indicated, all Defendants are collectively referred to herein as the "Defendants."

11.     Plaintiff is informed and believes and thereon alleges that all contracts and agreements herein involved were to be performed in Iraq, and the surrounding regions and countries.

3

LIU - BSC - 000071

## FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

### OVERVIEW

12.    On March 31, 2004, Stephen Scotten ("Scott") Helvenston, Mike R. Teague, Jerko Gerald ("Jerry") Zovko, and Wesley J.K. Batalona were murdered by Iraqi insurgents while working as security contractors for BLACKWATER. These individuals were executed, burned, beaten, and two of them were strung up on a bridge over the Euphrates River. The fact that these four Americans found themselves located in the high-risk, war-torn City of Fallujah without armored vehicles, automatic weapons, and fewer than the minimum number of team members was no accident. Instead, this team was sent out without the required equipment and personnel by those in charge at BLACKWATER.

13.    When these four individuals signed on with BLACKWATER to be security contractors in Iraq, they did so with the understanding that BLACKWATER would provide them with certain protections, tools and information to allow them to perform their job.

a.    They were told that each security mission would be handled by a team of no less than six (6) members.

b.    They were told that each security mission would be performed in armored vehicles.

c.    They were told that these security teams would be comprised of at least two armored vehicles, with at least three security contractors in each vehicle, which would provide for a driver, a navigator, and a rear-gunner.

d.    They were told that the rear-gunner would have a heavy automatic weapon, such as a "SAW Mach 46," which could fire up to 850 rounds per minute, allowing the

4

LIU - BSC - 000072

gunner to fight off any attacks from the rear.

      e.     They were told that they would be given at least 24-hours notice prior to any security mission.

      f.     They were told that each security detail mission would be subject to a Risk Assessment completed prior to the mission, and that if the threat level was too high, they would have the option of not performing the mission.

      g.     They were told that they would be afforded the opportunity to review the travel routes, gather intelligence about each mission, do a pre-trip inspection of the route and determine the proper logistics to carry out the security detail.

      h.     They were told that they would arrive in the Middle East and have at least 21 days prior to any operations to become acclimated to the area, learn the lay of the land, gather intelligence, and learn safe routes through the area.

    14.     All of these representations are what these individuals relied upon in deciding to become security contractors for BLACKWATER. Unfortunately, BLACKWATER's representations were untrue and BLACKWATER cut corners in the interest of higher profits, which ultimately resulted in the deaths of these four Americans.

    15.     On March 30, 2004, Helvenston, Teague, Zovko and Batalona were sent out on a security mission by BLACKWATER. However, BLACKWATER intentionally and knowingly failed to provide them with the protections, tools and information that it initially represented.

      a.     BLACKWATER did not provide them with the minimum number of six (6) members on the security detail team.

      b.     BLACKWATER did not provide them with armored vehicles.

5

LIU - BSC - 000073

c.    BLACKWATER did not permit them to have three team members in each vehicle, which resulted in each vehicle containing only a driver and a navigator, but no rear-gunner to quell any attacks.

d.    BLACKWATER did not provide them with heavy automatic machine guns, but instead merely with semi-automatic rifles (which had not even been tested or sighted).

e.    BLACKWATER did not provide them with 24-hours notice of the security mission.

f.    BLACKWATER did not conduct a Risk Assessment prior to the March 30, 2004 security mission, and the Plaintiff is informed and believes and thereon alleges that it actually created one after these four Americans were killed.

g.    BLACKWATER did not provide them with the opportunity to gather intelligence concerning the travel route, do a pre-route inspection, and even refused to give them maps of the area.

h.    BLACKWATER did not send them to the Middle East 21 days prior to any operations to become acclimated to the area, learn the lay of the land, gather intelligence, and learn safe routes through Iraq, but instead they were sent over only a few days before they became operational.

16.    As such, BLACKWATER intentionally and knowingly sent Helvenston, Teague, Zovko and Batalona into known harm's way without the needed and promised protections.

17.    On March 31, 2004, Helvenston, Teague, Zovko and Batalona were attempting to carry out a security mission for BLACKWATER. Without having any information about the route or even a map of the area, they became lost and ended up driving through the center of the

6

LIU – BSC – 000074

City of Fallujah. While stopped in traffic, several armed Iraqi insurgents walked up behind these two unarmored vehicles and repeatedly shot these four Americans at point blank range, dragged them from their vehicles, beat, burned and disfigured them and desecrated their remains. Had they been provided with the protections, tools and information that they were promised when they signed up for their job at BLACKWATER, Helvenston, Teague, Zovko and Batalona would be alive today.

## THE CONTRACTS

18.    ESS Support Services Worldwide, Eurest Support Services (Cyprus) International, Ltd. ("ESS") is a business with two divisions: one which provides catering support services and the other which provides design and building services to U.S. Armed Forces and other U.S. contracting agencies in Iraq and Kuwait.

19.    Regency Hotel and Hospital Company ("REGENCY") is a Kuwaiti company that entered into an agreement with ESS to support its services in the Middle East. REGENCY is headquartered in Kuwait City and is run by an American businessman, Tim Tapp, and a Kuwaiti National, Jameel A.R. Al Sane.

20.    Initially, the security detail for the ESS operations was provided by a company called Control Risk Group ("CRG").

21.    One of the owners of REGENCY, Jameel A.R. Al Sane, developed a business relationship with a BLACKWATER employee, John Potter. Based upon this relationship, Mr. Al Sane proposed that BLACKWATER and REGENCY join forces and submit a bid to ESS to replace CRG as the provider of security services for the food convoys. Ultimately, REGENCY

7

LIU - BSC - 000075

and BLACKWATER prevailed on their bid to ESS, and were awarded the security contract for

ESS's catering operations in the Middle East.

22.    Initially, REGENCY and BLACKWATER partnered together and entered into a

contract with ESS to provide security services for ESS's operations. On March 8, 2004, this

contract (the "PRIMARY CONTRACT") was entered into by ESS, on the one hand, and

REGENCY and BLACKWATER, on the other.

23.    Plaintiff is informed and believes and thereon alleges that BLACKWATER

immediately became concerned about its partnership with REGENCY in the PRIMARY

CONTRACT, because it wanted complete control over the security detail, without input from

REGENCY. Pressure was applied by BLACKWATER's headquarters to resolve the problems

so that the PRIMARY CONTRACT could be implemented quickly. To remedy this issue, the

PRIMARY CONTRACT was duplicated into another almost identical sub-contract between

REGENCY and BLACKWATER (the "SUB-CONTRACT"), which was entered into on March

12, 2004.

24.    Due to the hostile environment of the Iraqi theater, the PRIMARY CONTRACT

mandated that each security detail consist of a minimum team size of six (6) operators, with a

minimum of two vehicles, to support ESS movements at all times. In addition, the PRIMARY

CONTRACT required that all of those vehicles were to be armored vehicles.

25.    However, when the SUB-CONTRACT between REGENCY and

BLACKWATER was drafted, the armored vehicle provision was surreptitiously omitted.

Plaintiff is informed and believes and thereon alleges that this was done so as to allow

BLACKWATER to save $1.5 million on the cost of armored vehicles. Prior to the

8

LIU - BSC - 000076

implementation of this SUB-CONTRACT, John Potter brought to the attention of

BLACKWATER's managing agents, including Mike Rush, who is the Director of

BLACKWATER, the fact that the SUB-CONTRACT did not contain the requirement for

armored vehicles.

26.    Plaintiff is informed and believes and thereon alleges that since Mike Rush had

already informed BLACKWATER's president, Gary Jackson, that the contract problems had

been resolved, he refused to redraft and renegotiate the SUB-CONTRACT, all the while knowing

that this failure would seriously jeopardize the health and safety of BLACKWATER's security

contractors in Iraq.

27.    Due to the absolute necessity of armored vehicles in the hostile Iraq theater,

BLACKWATER's initial Program Manager for the ESS project, John Potter, insisted that the

SUB-CONTRACT include armored vehicles, not only to comply with the PRIMARY

CONTRACT, but more importantly to protect the security contractors who would be working in

the area. However, obtaining armored vehicles would not only be an expense to

BLACKWATER, but would also cause a delay in commencing operations. Thus, on March 24,

2004, BLACKWATER fired Potter as Program Manager and replaced him with another

BLACKWATER employee, JUSTIN MCQUOWN.

28.    Plaintiff is informed and believes and thereon alleges that MCQUOWN seriously

lacked the education, training and experience to be the Program Manager of the ESS project.

Nonetheless, MCQUOWN hurried preparations along to achieve an early implementation of the

contract. MCQUOWN failed to provide adequate training and intelligence data to the security

contractors hired by BLACKWATER for the ESS project. MCQUOWN even denied the

9

contractors the opportunity to properly test and sight their weapons before becoming operational or to review the travel routes with the security contractors from CRG before taking over the ESS project.

29.    At no time did BLACKWATER advise ESS that the support vehicles would not be armored; nor did BLACKWATER advise the security contractors of the falsity of its representations and promises, especially concerning the armored vehicles.

30.    Prior to entering into their individual Independent Contractor Service Agreements with BLACKWATER, Helvenston, Teague, Zovko and Batalona were all advised of the requirements of the PRIMARY CONTRACT, which mandated that the security detail teams would be comprised of no less than six (6) members and that each team would be operating with no less than two armored vehicles. They were never told that BLACKWATER deleted the requirement of armored vehicles from the SUB-CONTRACT. This fact was intentionally concealed from them by BLACKWATER.

31.    On or about March 25, 2004, Helvenston, Teague, Zovko and Batalona entered into their individual Independent Contractor Service Agreements in reliance upon the representations that BLACKWATER was affording them certain protections, tools and information as set forth in the PRIMARY CONTRACT. Helvenston, Teague, Zovko and Batalona, and each of them, were hired by BLACKWATER as independent contractors, and were at no relevant time employees of BLACKWATER. By the express terms of the Independent Contractor Service Agreements, they incorporate the terms of the SUB-CONTRACT, which in turn incorporates the terms of the PRIMARY CONTRACT. BLACKWATER, choosing the path of maximizing its profits over the protection of its security

10

LIU - BSC - 000078

security detail in advance of the April 2, 2004 start date, while at the same time refusing to allow

the security contractors that had arrived in Kuwait to learn the routes from CRG. In doing so,

they jeopardized the training, intelligence and protections needed for Helvenston, Teague, Zovko

and Batalona to perform their jobs.

35.    When Mr. Potter helped negotiate the original contracts, they called for a 30-day

implementation after the signing of the contracts. The PRIMARY CONTRACT was entered into

on March 8, 2004. The SUB-CONTRACT was not entered into until March 12, 2004. Under

the *original* terms of these agreements, BLACKWATER would not have been operational until

the middle of April 2004. However, the contracts were modified to provide for operational status

within 21 days, resulting in the April 2, 2004 start date.

36.    Plaintiff is informed and believes and thereon alleges that BLACKWATER's

Mike Rush was supposed to send all 30 BLACKWATER contractors to the Middle East

immediately, so that there could be a smooth transition with the CRG team, and so they could

perform all the necessary training prior to becoming operational. However, Mike Rush did not

immediately send the BLACKWATER contractors, thereby jeopardizing their training and

preparation. This delay in sending the BLACKWATER contractors to the Middle East was done

purposely to save expenses and increase profits. Under the contracts, BLACKWATER was

being paid up front, regardless of the amount of people that it had in Iraq. Therefore, every day

that BLACKWATER held the contractors back in the United States, it would not have to pay the

contractors their high-risk detail salaries, but would still reap the benefit of obtaining money for

those contractors pursuant to the contracts with ESS and REGENCY.

12

LIU - BSC - 000079

37.    Plaintiff is informed and believes and thereon alleges that even after the security contractors arrived in the Middle East, they were denied the ability to gather intelligence, become acclimated to the territory, travel the routes and learn local customs. As CRG was phasing out its security details for ESS, it continually contacted BLACKWATER to arrange for the new security contractors to accompany CRG on their security missions. This was designed to allow the BLACKWATER security contractors to become familiar with the area, learn the safe routes, interact with the ESS personnel and acquire the logistical information and intelligence to protect them on future security details. JUSTIN MCQUOWN intentionally refused to allow the BLACKWATER security contractors to conduct these ride-alongs with the CRG teams.

38.    Per the contracts, Helvenston, Teague, Zovko and Batalona were supposed to be supplied with "SAW Mach 46" weapons, which are heavy automatic machine guns that had the capacity of firing up to 850 rounds per minute. Instead, they were provided with Mach 4 semi-automatic weapons, because BLACKWATER's managing agents, Mike Rush and Brian Berrey, refused to purchase the more expensive heavy automatic weapons. In fact, the Mach 4 weapons did not even arrive in Kuwait until March 18, 2004, where they still needed to be assembled.

39.    The contractors never had an opportunity to test, fire or sight their weapons before their security details. MCQUOWN told them that there was no time for them to be able to shoot their weapons to determine their accuracy and make necessary adjustments. This basic act of security preparation was not permitted, despite a BLACKWATER policy in place in Kuwait which provided for vehicle driving, training and weapons sighting to be performed prior to the commencement of any security detail.

13

LIU - BSC - 000080

## ANIMOSITY TOWARD THE CONTRACTORS

40.    Plaintiff is informed and believes and thereon alleges that JUSTIN MCQUOWN

harbored extreme animosity toward Scott Helvenston relating to Helvenston's superior

credentials, abilities, training, education, experience and knowledge. This animosity dated back

to the training program at BLACKWATER's facility in North Carolina, prior to their deployment

under the ESS project. MCQUOWN was a BLACKWATER instructor of classes that

Helvenston attended. However, MCQUOWN seriously lacked the education, training and

experience to be a competent instructor. On the other hand, Helvenston had been a Navy SEAL

for many years and had acquired a vast amount of expertise.

41.    Plaintiff is informed and believes and thereon alleges that during training,

MCQUOWN would often improperly instruct the class or provide erroneous information, tactics

or techniques. On occasion, Helvenston would attempt to politely assist MCQUOWN by

offering his expertise on the correct manner of the particular training exercise. The fact that

MCQUOWN's lack of education and experience was being exposed infuriated him and ignited

his hatred toward Helvenston. Ultimately, MCQUOWN caused derogatory comments to be

placed in Helvenston's BLACKWATER personnel file.

42.    Originally, John Potter was the Program Manager for the ESS project; however,

once he complained that the BLACKWATER contractors were insufficiently protected because

they were not receiving the promised armored vehicles and heavy weapons (as required by the

PRIMARY CONTRACT), he was removed from his position as Program Manager. JUSTIN

MCQUOWN was then promoted and replaced John Potter as the Program Manager for the ESS

project.

14

## THE CHANGE IN MISSION

43.    When Helvenston originally arrived in Kuwait on or about March 18, 2004, he was placed on a six (6) man security detail team.  On or about March 27, 2004, Helvenston and his team were advised that they would be leaving in two days for Baghdad to start their first mission.  However, on March 28, 2004, at approximately 10:00 p.m. that evening, while Helvenston and other teammates were at dinner in a local restaurant, MCQUOWN called Helvenston and informed him that he needed to pack up immediately and that he would be leaving at 5:00 a.m. the next morning on a security mission to Baghdad with a different team, with which he had no prior experience or training.

44.    At that time, Helvenston was feeling physically ill and informed MCQUOWN that he was not in a condition to be able to leave early the following morning.  Helvenston discussed the situation with his teammates at dinner, and another Blackwater contractor, Chris Wyse, who had been operating in the Middle East for some time, offered to take Helvenston's place on the mission the next morning.

45.    Helvenston and his teammates then returned to their rooms as Helvenston was feeling physically ill.  Shortly thereafter, JUSTIN MCQUOWN and Jim Graham burst into Helvenston's bedroom and aggressively approached Helvenston while he was lying in his bed.  While it appeared that MCQUOWN was going to physically attack Helvenston, he did not, but instead screamed at and berated him—calling Helvenston a "coward" and other demeaning and derogatory names.  MCQUOWN then threatened to fire Helvenston if he did not leave early the next morning with the new team.

15

LIU - BSC - 000082

46.    Helvenston reiterated that he was physically ill and was simply not able to leave on his first mission into Iraq in his present condition. At that time, yet another Blackwater contractor offered to replace Helvenston in the following day's mission. However, due to MCQUOWN's animosity toward Helvenston, he refused to replace him with any other contractor, despite these two willing offers.

47.    Eventually, Helvenston was forced to defend himself as MCQUOWN became more hostile and combatant toward him, which culminated in Helvenston chasing MCQUOWN and Graham out of his bedroom. As MCQUOWN was leaving, he told Helvenston that he was fired.

48.    Shortly thereafter, MCQUOWN returned to Helvenston's bedroom and confiscated his weapons. At that time, MCQUOWN also told Helvenston that he would still be leaving at 5:00 a.m. the following morning with a new team to go to Baghdad. Helvenston had never met any of these team members, did not know where he was going, was physically ill and tired, and did not have his bags prepared to be leaving early the following morning. It was virtually unheard of to take a single person, like Scott Helvenston, and place him on a different group with whom he had never trained or even met.

49.    That night, Helvenston drafted an e-mail to the "Owner, President and Upper-Management" of BLACKWATER. In this e-mail, he exposed JUSTIN MCQUOWN's erratic behavior and plot against him, and requested their intervention—which unfortunately never came. This was one of Scott Helvenston's very last communications.

16

LIU - BSC - 000083

## THE INCIDENT

50.     Once Helvenston and his new team arrived in Baghdad, they were under the direction of Blackwater employee, TOM POWELL (the Site Manager in Baghdad), who answered directly to JUSTIN MCQUOWN (the Program Manager of the entire ESS project).

51.     Plaintiff is informed and believes and thereon alleges that at that time, TOM POWELL had six (6) Blackwater contractors in Baghdad to perform the security detail which was required by ESS.  However, at the direction of JUSTIN MCQUOWN, TOM POWELL sent only four contractors on the security detail, in direct violation of all of BLACKWATER's policies and agreements.  Those four security contractors were Scott Helvenston, Mike Teague, Jerry Zovko and Wesley Batalona.  The other two contractors were kept behind at the team house to perform menial, clerical work.

52.     Sending out a security team of only four individuals was contrary to the provisions of all of the contracts, which required a minimum of six (6) team members on each and every security detail, and was contrary to the promises made to these men upon their hire with BLACKWATER.  Moreover, the U.S. State Department also has policies for personnel security details and require a six-man detail working in the threat level of Iraq.  The ESS contracts specifically provided that the training and standard operating procedures would be consistent with the State Department.  However, all of these requirements for six-man teams were completely disregarded by MCQUOWN and POWELL.

53.     The two vehicles that this four-man team drove were not armored vehicles.  This was contrary to the express terms of the PRIMARY CONTRACT, which were incorporated into the SUB-CONTRACT and the Independent Contractor Service Agreements, and was contrary to

17

what was told to the security contractors in inducing them to execute their Independent

Contractor Service Agreements.

54.    Sending four men on the security mission, instead of the required six, essentially

took away the team's ability to defend itself. Not having one driver, one navigator and a rear-

gunner with a 180 degree field of fire, the team never had a chance. By placing only two

individuals in the car without the rear-gunner, the insurgents were able to literally walk up behind

the vehicles and open fire upon them at close range. Also, since the four-man team was not

traveling in armored vehicles, they had no protection against the small arms fire that they

encountered.

55.    In Baghdad, Helvenston, in the very short amount of time that he had before being

sent out on this mission, attempted to obtain maps of the area where they were supposed to be

traveling. Plaintiff is informed and believes and thereon alleges that a BLACKWATER

employee, Mark Furrad, refused to give him maps of the area, and instead callously told him that

it was too late for maps and to just do his job with what he had. The team had no knowledge of

where they were going, no maps to review, and had nothing to guide them to their destination.

56.    Plaintiff is informed and believes and thereon alleges that JUSTIN MCQUOWN

and TOM POWELL knew that sending Scott Helvenston and the three other team members out

on a mission into Fallujah in this condition—without a six-member team, without armored

vehicles, and without directions or maps—could result in death to the entire team.

57.    On March 30, 2004, JUSTIN MCQUOWN and TOM POWELL sent this team

out, without the required six-members, without armored vehicles and without even a map for

directions, to escort three ESS flatbed trucks from the City of Taji to a U.S. Army base in Iraq,

18

commonly referred to as Camp Ridgeway. Because this team was not given the time to properly

prepare, was not able to plot out the route and destination and was denied the opportunity to even

see maps of the area, they became lost during their transport of these ESS trucks.

58. As night was falling in Iraq on March 30, 2004, the four-man security team and its

convoy were still lost. They were able to find a nearby U.S. Marine base, commonly referred to

as Camp Fallujah. They decided to stay the night at this Marine base and attempt to find their

way in the morning.

59. On March 31, 2004, the team made another attempt to transport the ESS trucks to

Camp Ridgeway. Camp Ridgeway was located approximately forty-five minutes away from

Camp Fallujah, provided a route was taken directly through the center of the City of Fallujah. At

that time, Fallujah was universally known to be extremely hostile territory in control of Iraqi

insurgents. In fact, as on March 31, 2004, the U.S. military and coalition forces had not yet

attempted to enter the center of Fallujah.

60. However, because this four-man BLACKWATER team had not been able to

perform a pre-trip analysis of their route and was denied maps and logistical information

concerning the area, they set out toward Camp Ridgeway on a road which led directly through the

heart of the hostile Fallujah. Unbeknownst to them, there was an alternative, safer route which

led around the outskirts of Fallujah and would have only taken them approximately two and a

half hours longer to get to Camp Ridgeway.

61. As this four-man BLACKWATER team escorted the three ESS flatbed trucks

through the center of Fallujah, they were ambushed by hostile Iraqi insurgents. Since the team

was driving without a rear-gunner and did not have armored vehicles, the insurgents were able to

19

literally walk up behind the vehicles and shoot all four men with small arms at close range. Their bodies were pulled into the streets, burned and their charred remains were beaten and dismembered. Ultimately, two of the burnt bodies were strung up from a bridge over the Euphrates River for all of the world to see.

62.    After the March 31, 2004 ambush occurred, TOM POWELL conducted an investigation and prepared an After Action Report. This After Action Report has never been revealed outside of BLACKWATER. In fact, shortly after preparing this After Action Report, which began to reveal JUSTIN MCQUOWN's actions toward Scott Helvenston and the other team members, TOM POWELL was dismissed from his employment with BLACKWATER.

63.    Plaintiff is informed and believes and thereon alleges that BLACKWATER has attempted to cover-up this deadly ambush to hide the fact Helvenston, Teague, Zovko and Batalona were all killed two days prior to the already-expedited April 2, 2004 start date for the BLACKWATER contractors to first become operational in Iraq. At the time they were killed, the BLACKWATER contractors were merely supposed to be training, gathering intelligence and riding along with the CRG teams.

64.    Plaintiff is informed and believes and thereon alleges that as a further attempt to cover-up this incident, BLACKWATER fabricated critical documents. A Risk Assessment of each security detail was supposed to be done prior to the security missions, and was to be signed off by the security detail leader. Based upon the Risk Assessment, BLACKWATER was to have determined whether to perform the mission as requested by ESS. With respect to the March 31, 2004 incident, no Risk Assessment was ever done prior to the dispatch of the mission. Plaintiff is informed and believes and thereon alleges that BLACKWATER instead created one after this

LIU - BSC - 000087

deadly ambush occurred.

65.     Ultimately, BLACKWATER, JUSTIN MCQUOWN and TOM POWELL were responsible for sending this four-man team out without the sufficient amount of team members, without armored vehicles, without the proper weapons, and without any logistics or maps concerning the routes to be taken. Nonetheless, after the March 31, 2004 ambush, wherein these four contractors were murdered, POWELL attempted to credit himself with saving two lives, by proudly claiming that if he had sent a six-man team, there would have been six deaths.

66.     Plaintiff is informed and believes and thereon alleges that BLACKWATER continued the pattern and practice of insufficiently training its contractors, and sending them into high-risk areas without the proper weapons, armored vehicles and logistics. In addition to the four BLACKWATER security contractors killed on March 31, 2004, five other BLACKWATER security contractors assigned to the ESS project were also killed in Iraq.

67.     More specifically, on June 2, 2004, a BLACKWATER security contractor was killed in Iraq. On June 5, 2004, four more BLACKWATER security contractors were killed in Iraq. As such, in just a few weeks, BLACKWATER lost 9 of its 30 security contractors, which constitutes an incredibly high 30% death rate, which could have been avoided with proper training and equipment.

## FIRST CAUSE OF ACTION

### [Damages for Wrongful Death Against All Defendants]

68.     Plaintiffs repeat and replead Paragraphs 1 through 67, inclusive, and incorporate the same herein by reference.

21

LIU - BSC - 000088

69. BLACKWATER, JUSTIN MCQUOWN, and TOM POWELL intentionally, deliberately and with reckless disregard for their health and safety, sent Helvenston, Teague, Zovko and Batalona, and each of them, into the very high-risk area of Fallujah without the required six (6) man team, without a minimum of two (2) armored vehicles, without a rear-runner, without heavy automatic machine guns, without 24 hours notice prior to the security mission, without having conducted a Risk Assessment to determine the threat level of the mission, without the opportunity to review the travel routes, gather intelligence regarding the mission, perform a pre-trip inspection of the route, determine the proper logistics or even review a map of the area, and without permitting them to test and sight the weapons they were actually given.

70. When the Defendants sent Helvenston, Teague, Zovko and Batalona out on this security mission in this condition, without the proper protections, tools and information, they knew that they were sending them into the center of Fallujah with very little chance that they would come out alive.

71. As a proximate result of the Defendants' intentional conduct, willful and wanton conduct, and/or negligence, as alleged herein above, Helvenston, Teague, Zovko and Batalona, and each of them, were killed March 31, 2004.

72. Prior to his death, Scott Helvenston was a provider of love, support, comfort, guidance, advice and companionship to his two minor children, Kyle J. Helvenston and Kelsey E. Helvenston, as well as financial support to their mother and his.

73. Prior to his death, Mike Teague lived with his wife Rhonda Teague and his minor son Brandon Teague to whom he was a provider of love, support, comfort, guidance, advice and

LIU - BSC - 000089

companionship, as well as being a faithful and dutiful husband.

74.    Prior to his death, Jerry Zovko was a provider of love, support, comfort, guidance, advice and companionship to his mother and father, Danica Zovko and Jozo Zovko, respectively.

75.    Prior to his death, Wesley Batalona lived with his wife June Batalona to whom he was a faithful and dutiful husband, as well as a provider of love, support, comfort, guidance, advice and companionship to her and his daughter Kristal Batalona.

76.    As a proximate result of the aforementioned wrongful conduct of the Defendants, and the deaths of Helvenston, Teague, Zovko and Batalona, those persons described herein, and each of them, sustained the loss of society, companionship, comfort, guidance, kindly offerings, advice, services, protection, care and assistance, as well as the net incomes of the decedents, and each of them.

77.    The wrongful acts committed by BLACKWATER, as herein alleged, were condoned, approved and ratified by its officers and directors, such as Brian Berrey and Mike Rush, and were participated in by its managing agents, such as JUSTIN MCQUOWN and THOMAS POWELL, and were the result of the Defendants' fraud, malice and willful and wanton conduct, in the conscious disregard for the health and safety of others, so as to justify an award of punitive damages.

78.    At all relevant times alleged herein, JUSTIN MCQUOWN and THOMAS POWELL were managers of BLACKWATER SECURITY CONSULTING, LLC and/or BLACKWATER LODGE AND TRAINING CENTER, INC., and as such BLACKWATER is liable for their acts of fraud, malice and willful and wanton conduct.

23

LIU - BSC - 000090

79.     At all relevant times alleged herein, Brian Berrey and Mike Rush were officers and/or directors of BLACKWATER SECURITY CONSULTING, LLC and/or BLACKWATER LODGE AND TRAINING CENTER, INC., and as such BLACKWATER is liable for their acts of fraud, malice and willful and wanton conduct.

## SECOND CAUSE OF ACTION

**[Rescission of Written Instrument for Fraud Against BLACKWATER Defendants]**

80.     Plaintiffs repeat and replead Paragraphs 1 through 79, inclusive, and incorporate the same herein by reference.

81.     On or about March 8, 2004, ESS, on the one hand, and REGENCY and BLACKWATER, on the other, entered into a written contract (the PRIMARY CONTRACT) for REGENCY and BLACKWATER to provide security services to ESS's catering operations in the Middle East.

82.     On or about March 12, 2004, REGENCY and BLACKWATER entered into an near identical written contract (the SUB-CONTRACT) solely to support the security services provided for under the PRIMARY CONTRACT. The SUB-CONTRACT expressly incorporates by reference the terms and conditions of the PRIMARY CONTRACT.

83.     On or about March 25, 2004, Helvenston, Teague, Zovko and Batalona individually entered into separate Independent Contractor Service Agreements with BLACKWATER. At all times during the negotiation of each of these Independent Contractor Service Agreements, BLACKWATER made certain representations regarding the PRIMARY CONTRACT and the SUB-CONTRACT, and expressly incorporated by reference the terms and

24

LIU - BSC - 000091

conditions of the PRIMARY CONTRACT and the SUB-CONTRACT into each and every

Independent Contractor Service Agreement.

84.    BLACKWATER made representations of material facts to Helvenston, Teague,

Zovko and Batalona that they would receive the protections, tools and information guaranteed by

the PRIMARY CONTRACT and SUB-CONTRACT if they entered into the Independent

Contractor Service Agreements, all the while intentionally concealing from them, and failing to

disclose to them, the fact that BLACKWATER had no intention of and would not provide

Helvenston, Teague, Zovko and Batalona these protections, tools and information once they

entered into the Independent Contractor Service Agreements and began working for

BLACKWATER in the Middle East.

85.    More specifically, to induce Helvenston, Teague, Zovko and Batalona to each

enter into their respective Independent Contractor Service Agreements, the Directors of

BLACKWATER, Brian Berrey and/or Mike Rush, assured them that they would be afforded the

protections set forth in the PRIMARY CONTRACT and the SUB-CONTRACT, and made the

following representations of material facts:

a.    That each of their security missions would be comprised of a team of no

less than six (6) members;

b.    That each of their security missions would be performed in armored

vehicles;

c.    That each of their security teams would be comprised of the two armored

vehicles, with at least three security contractors in each vehicle, which would provide for a

driver, a navigator, and a rear-gunner;

25

d.    That each of their security missions would have a rear-gunner with a heavy automatic weapon, such as a "SAW Mach 46," which could fire up to 850 rounds per minute, allowing the gunner to fight off any attacks from the rear;

e.    That they would be given at least 24-hours notice prior to any security mission;

f.    That each of their security missions would be subject to a Risk Assessment completed prior to the mission, and that if the threat level was too high, they would have the option of not performing the mission;

g.    That they would be afforded the opportunity to review the travel routes, gather intelligence about each mission, do a pre-trip inspection of the route and determine the proper logistics to carry out the security missions; and

h.    That they would arrive in the Middle East and have at least 21 days prior to any operations to become acclimated to the area, learn the lay of the land, gather intelligence, and learn safe routes through area.

These representations, as well as others, were made to induce Helvenston, Teague, Zovko and Batalona to each enter into their respective Independent Contractor Service Agreements.

86.    These representations of material facts by BLACKWATER concerning the protections which would be afforded to Helvenston, Teague, Zovko and Batalona, if they executed their individual Independent Contractor Service Agreements, were false. The true facts were as follows:

a.    BLACKWATER did not provide them with the minimum number of six (6) members on their security mission:

26

LIU - BSC - 000093

b.      BLACKWATER did not provide them with armored vehicles for their security mission;

c.      BLACKWATER did not permit them to have three (3) team members in each vehicle, which resulted in each vehicle containing only a driver and a navigator, but no rear-gunner to quell any attacks;

d.      BLACKWATER did not provide them with heavy automatic machine guns, but instead merely with semi-automatic rifles;

e.      BLACKWATER did not provide them with 24-hours notice of their security mission;

f.      BLACKWATER did not conduct a Risk Assessment prior to their security mission;

g.      BLACKWATER did not provide them with the opportunity to gather intelligence concerning the travel routes, do a pre-route inspection, and even refused to give them maps of the area; and

h.      BLACKWATER did not transport them to the Middle East 21 days prior to any operations to become acclimated to the area, learn the lay of the land, gather intelligence, and learn safe routes through Iraq, but instead they were sent over only a few days before they became operational.

87.     When the Defendants made these representations of material facts, the Defendants knew that they were false, or made them recklessly without any knowledge of their truth or falsity, as a positive assertion. The Defendants knew these representations to be false at all times herein mentioned and concealed and suppressed the true facts, although the true facts were known to them.

27

LIU – BSC – 000094

88.    These false representations, suppressions and concealment by the Defendants were made with the intent to induce the Helvenston, Teague, Zovko and Batalona, and each of them, to rely on them, and with the intention that they would be acted upon by Helvenston, Teague, Zovko and Batalona, and each of them, in entering into their respective Independent Contractor Service Agreements with BLACKWATER.

89.    Helvenston, Teague, Zovko and Batalona, and each of them, in fact relied upon the misrepresentations of materials facts and non-existence of the facts suppressed and concealed by the Defendants, and acted upon them by entering into their respective Independent Contractor Service Agreements with BLACKWATER. Had the true facts been known by Helvenston, Teague, Zovko and Batalona, each and every one of them would not have entered into their respective Independent Contractor Service Agreements. This reliance by Helvenston, Teague, Zovko and Batalona was reasonable and justified, in that they were told about the protections, tools and information guaranteed by the PRIMARY CONTRACT and the SUB-CONTRACT, were told that the same would be afforded to them, and they were completely unaware that the Defendants were going to denying them those protections, tools and information once they entered into their respective Independent Contractor Service Agreements and traveled to the Middle East.

90.    In or about March 2004, BLACKWATER committed the aforementioned fraud, deceit, suppression and/or concealment of material facts known to them by failing to provide the protections, tools and information represented to these contractors in inducing them to enter into their respective Independent Contractor Service Agreements and accept employment with BLACKWATER for the ESS project. This cause of action for rescission of the written

28

instruments for fraud relating to the Helvenston's, Teague's, Zovko's and Batalona's

Independent Contractor Service Agreements arose prior to their deaths, and Helvenston, Teague,

Zovko and Batalona would have been the plaintiffs of this cause of action had they lived.

91.     Helvenston, Teague, Zovko and Batalona suffered damages as a proximate cause

of the Defendants' fraudulent conduct in inducing them to enter into their respective Independent

Contractor Service Agreement, in that they traveled to Iraq and attempted to perform their

services under the contracts, but because the Defendants denied them the promised protections,

tools and information, Helvenston, Teague, Zovko and Batalona were all killed.

92.     Plaintiffs seek rescission of each and every Independent Contractor Service

Agreement entered into with BLACKWATER by Helvenston, Teague, Zovko and Batalona, in

that each and every contract was entered into as the result of BLACKWATER's fraud, deceit and

misrepresentation.

93.     Alternatively, Plaintiffs seek recovery of damages suffered by Helvenston,

Teague, Zovko and Batalona, and each of them, in an amount currently unascertained, but

according to proof at trial, resulting from, *inter alia*, BLACKWATER fraudulently and

deceptively luring them away from their families and loved ones for employment under the ESS

project, their mental anguish, fear and terror of being forced to travel into the center of Fallujah

without the promised protections, tools and information, and the physical pain and suffering of

being shot, beaten, burned, tortured and dismembered.

94.     The aforementioned wrongful conduct of the Defendants constitutes fraud, malice,

and/or willful and wanton conduct, depriving Helvenston, Teague, Zovko and Batalona of their

lives, their property and/or their legal rights or otherwise causing damage, injury and death, in

conscious disregard of their health and safety, so as to justify an award of punitive damages.

29

95.    At all relevant times alleged herein, JUSTIN MCQUOWN and THOMAS

POWELL were managers of BLACKWATER SECURITY CONSULTING, LLC and/or

BLACKWATER LODGE AND TRAINING CENTER, INC., and as such BLACKWATER is

liable for their acts of fraud, malice and willful and wanton conduct.

96.    At all relevant times alleged herein, Brian Berrey and Mike Rush were officers

and/or directors of BLACKWATER SECURITY CONSULTING, LLC and/or BLACKWATER

LODGE AND TRAINING CENTER, INC., and as such BLACKWATER is liable for their acts

of fraud, malice and willful and wanton conduct.


## PRAYER

WHEREFORE, Plaintiff prays that:

1.    Plaintiff RICHARD P. NORDAN, as ancillary administrator of the Estate of

Stephen S. Helvenston, have and recover of the defendants, jointly and severally, compensatory

damages in excess of $10,000 for the wrongful death of Steven S. Helvenston.

2.    Plaintiff RICHARD P. NORDAN, as ancillary administrator of the Estate of Mike

R. Teague, have and recover of the defendants, jointly and severally, compensatory damages in

excess of $10,000 for the wrongful death of Mike R. Teague.

3.    Plaintiff RICHARD P. NORDAN, as ancillary administrator of the Estate of Jerko

Gerald Zovko, have and recover of the defendants, jointly and severally, compensatory damages

in excess of $10,000 for the wrongful death of Jerko Gerald Zovko.

4.    Plaintiff RICHARD P. NORDAN, as ancillary administrator of the Estate of

Wesley J.K. Batalona, have and recover of the defendants, jointly and severally, compensatory

damages in excess of $10,000 for the wrongful death of Wesley J.K. Batalona.

LIU - BSC - 000097

5.     Each and every Independent Contractor Service Agreement entered into with

BLACKWATER by Helvenston, Teague, Zovko and Batalona be rescinded.

6.     The estate of Stephen S. Helvenston recover from each of the Defendants punitive

damages in the discretion of the jury.

7.     The estate of Mike R. Teague recover from each of the Defendants punitive

damages in the discretion of the jury.

8.     The estate of Jerko Gerald Zovko recover from each of the Defendants punitive

damages in the discretion of the jury.

9.     The estate of Wesley J.K. Batalona recover from each of the Defendants punitive

damages in the discretion of the jury.

10.     Plaintiff be granted a trial by jury on all issues so triable.

11.     Plaintiff recover the attorneys' fees and costs of this action, and that those costs be

taxed against the Defendants, including prejudgment interest as of the date of the filing of this

complaint.

31

LIU - BSC - 000098