BLACKWATER SECURITY CONSULTING, LLC et al v. WESTCHESTER SURPLUS LINES INSURANCE COMPANY et al Doc. 55 Att. 10

2007 WL 417425 (F.D.C.H.) Page 1
2007 WL 417425 (F.D.C.H.)

Federal Document Clearing House
Copyright (c) 2007 CQ Transcriptions, LLC

Testimony
February 07, 2007

House of Representatives
Oversight and Government Reform

Waste, Fraud and Abuse: Part 2 Iraq Reconstruction

Opening Statement of Henry A. Waxman
Chairman,
Committee on Oversight and Government Reform
Committee on House Oversight and Government Reform
February 07, 2007

Today the Committee will investigate potential fraud, waste, and abuse in the almost indecipherable world of contractors and subcontractors.

For the last two years I have tried to get a clear answer to what I thought was a simple question: How much money a Halliburton subsidiary named KBR and private security subcontractors were making under the Army's troop support contract called LOGCAP.

We know that the war in Iraq has given private contractors an unprecedented role in providing security services. Almost $4 billion in taxpayer funds has been paid for private security services in the reconstruction effort alone. But sorting out overhead, subcontracts, sub subcontracts, profit, and performance has been nearly impossible.

For over 18 months, the Defense Department wouldn't even respond to my inquiry. When it finally replied last July, it didn't supply the breakdown I requested. In fact, it denied that private security contractors did any work at all under the LOGCAP contract.

We now know that isn't true, and today we will try to understand the layers of subcontractors, with a particular emphasis on the Blackwater company.

On March 31, 2004, four Americans working as private security personnel for Blackwater, all of whom were military veterans, were ambushed and killed in Fallujah while on a protection mission. Their tragic death became a turning point in public opinion about the war and directly resulted in a major U.S. military offensive, which is known as the First Battle of Fallujah.

Twenty-seven American soldiers and over 800 insurgents and Iraqi civilians died in that battle, and military observers believe it helped fuel an escalation of the insurgency.

It is now almost three years later, and we still don't know for sure the identity of the prime contractor under which the four Blackwater employees were working. What we do know is that Blackwater was providing security services under a contract with a Kuwaiti company called Regency, and that Regency was itself a subcontractor for ESS Support Services Worldwide, which in turn was a subcontractor providing dining services and construction services for other contractors such as KBR and Fluor Corporation.

We also know that both Blackwater and Regency were adding significant markups to the cost of providing the security services.

And on top of that, the prime contractor - whomever it was - was making its own percentage off the contract. Blackwater initially

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Dockets.Justia.com

2007 WL 417425 (F.D.C.H.)

indicated that it believed KBR was the prime contractor under the LOGCAP contract. Three months ago, however, ESS told the Committee that the Fluor Corporation was actually the prime contractor for Blackwater's work in Fallujah. The Fluor Corporation disputes this, and the Defense Department doesn't seem to be sure what's going on.

It's remarkable that the world of contractors and subcontractors is so murky that we can't even get to the bottom of this, let alone calculate how many millions of dollars taxpayers lose in each step of the subcontracting process.

But the impacts of contracting waste go beyond just dollars and cents. Today four family members of the four murdered Blackwater employees will share their testimony with us. They believe Blackwater sent their relatives into Fallujah unprepared and without armored vehicles, a rear gunner for each vehicle, or heavy automatic weapons to defend against attacks.

Their experience tells them that taxpayer dollars never reached the security personnel on the ground. They believe that the money for protective equipment took a backseat to the multiple layers of contractor profits.

I don't know if we will be able to resolve that issue today, but I am deeply troubled by one document we have found in preparing for this hearing. The day before the four soldiers were killed, a Blackwater employee sent an e-mail alerting superiors that a lack of equipment, armored vehicles, and other safety equipment left the team unprepared to begin its mission. That warning was seemingly ignored and we need to explore that further.

Without objection, this email will be made part of the hearing record today.

I've already learned that sorting out the webs of subcontracts is confusing work. But our Committee has an absolute obligation to taxpayers to make sure their tax dollars are well spent and not siphoned off into billions of dollars of unnecessary overhead.

And even more important, we have an inviolate obligation to the men and women in harm's way - and to their families - to make certain that their safety doesn't take a backseat to corporate profits or wasteful spending.

I look forward to learning more from our witnesses this morning.

HENRY A. WAXMAN

Chairman

Committee on Oversight and Government Reform

2007 WL 417425 (F.D.C.H.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.