

2006 WL 1646976 (F.D.C.H.)　　　　　　　　　　　　　　　　　　　　　　　　　　　　Page 1
2006 WL 1646976 (F.D.C.H.)

```
                    Federal Document Clearing House
               Copyright (c) 2006 CQ Transcriptions, LLC
                                Testimony
                             June 13, 2006
                         House of Representatives
                            Government Reform
           National Security, Emerging Threats, and International Relations
        Private Security Firms Operating in Iraq
```

Statement of Chris Taylor
Vice President, Blackwater USA
Committee on House Government Reform
Subcommittee on National Security, Emerging Threats, and
International Relations
June 13, 2006
Private Security Firms: Standards, Cooperation, and Coordination
Thank you Chairman Shays, Congressman Kucinich and Committee
Members for this opportunity to discuss private security firms,
their current role, and how they perform their duties today.
Since the American Revolution, private security firms have played
an integral role in the successful development and defense of our
Nation. The role of the private security firm has not changed
that much over time. Providing specialized capabilities and surge
capacity to the U.S. Government in flexible, cost-effective
packages and building capacity for friendly foreign governments
continue to be the core competencies of our industry.
National and global security challenges demand innovative and
flexible solutions to be successful in the global war on terror.
As stated in the 2006 Quadrennial Defense Review, private
security firms are members of the Total Force. Contractors
benefit the government by augmenting existing capabilities,
improving response times, and freeing scarce military logistical
assets..
Blackwater is fortunate to have many who have already spent a
career in public service; some in the military, some in law
enforcement, and some in other government service, but all of
whom are committed to the same objectives that guided them during
public service. Many of these professionals in previous careers
earned Bronze Stars, Silver Stars, Purple Hearts, and even a Navy
Cross. These honorable men and women, though no longer serving in
an active-duty uniform, are as dedicated and committed to the
mission today as when they served on active duty. In fact, they
reaffirm their commitment to the oath they took to support and
defend the Constitution of the United States. These same
professionals now daily put themselves in harm's way in support
of U. S. and coalition missions, and fully support national
security and U. S. foreign policy.
Today, private security firms perform a number of roles from
executive protection and static security, to training partner
nations, to providing both ground and aviation logistics support
in dangerous environments. In the future, private security firms
will likely be called upon to support stability operations and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 1646976 (F.D.C.H.)                                                                                          Page 2
2006 WL 1646976 (F.D.C.H.)

peacekeeping efforts.

The majority of international legal controls are embodied in The Hague and Geneva Conventions, the applicable Additional Protocols, and the Universal Declaration of Human Rights. Blackwater has consulted human rights groups to assist in program development for human rights training and policies. Each Blackwater professional receives blocks of instruction in leadership, ethics, and international humanitarian law.

Because of the federal nature of the 'battlefield', our services support primarily federal entities. Private security firms therefore are accountable to many domestic federal statutes, regulations, and common law which include: Military Extraterritorial Jurisdiction Act (MEJA), War Crimes Act of 1996, Victims of Trafficking and Violence Protection Act of 2000, Anti-Torture Statute, Defense Trade Controls Act, Gun Control Act, Arms Export Control Act, Export Administration Regulations (EAR), International Traffic in Arms Regulations (ITAR), Defense Base Act (DBA), Federal Aviation Regulations, Defense Federal Acquisition Regulations (DFAR), Foreign Corrupt Practices Act (FCPA), and the General Orders of Central Command (CENTCOM), Multi-National Corps - Iraq (MNC-I), and Combined Joint Task Force (CJTF) 76.

We seek to exceed the expectations of our clients. I am pleased that Doug Brooks and the IPOA is here today. Blackwater is a member of the IPOA and I currently serve as the IPOA's Chairman. The IPOA Standards Committee is working diligently to develop industry standards. We are committed to defining the standards by which our independent contractors are credentialed as qualified to work in our industry, improving the federal contracting and oversight process, providing increased transparency in operations, and encouraging discussion of our industry so that it can become more fully integrated into the process of finding solutions to difficult challenges.

At Blackwater, recruiting and vetting begins with a self-selecting application process and thorough criminal background and credit checks. For those with prior government service, discharge and release documents are reviewed and verified. When a contract requires private security professionals to have a security clearance, the government then conducts an even more thorough background check. Third-country nationals also have background checks performed.

Blackwater USA (www.blackwaterusa.com) provides both contractually mandated and additional training to all of our security professionals. The additional training includes leadership, core values, ethics, and human rights courses. In any case, we ensure that each of our professionals conducts and passes all required training commensurate with the environment in which they will be working. Private security firms provide efficient, flexible, and innovative solutions to complex challenges, and can positively affect the strategic balance in favor of peace and security, and freedom and democracy everywhere. We should together look for ways to leverage the experience and commitment of these professional men and women toward that end.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 1646976 (F.D.C.H.) Page 3
2006 WL 1646976 (F.D.C.H.)

I hope my brief comments have helped to provide the Committee some increased understanding of private security firms and I look forward to answering any questions you may have.
1. What are the roles and missions of private security firms on the battlefield?
Private Security Firms (PSF) perform many roles on the battlefield. We are enabled to do so because of the vast experience of the professionals who come to work for us. While many academics and journalists do their very best to put different firms into different bins, the truth is that because the security environment has become so dynamic, PSFs are moving toward providing turnkey security, training, and ground/aviation logistics services. Traditionally, PSFs have performed personal security/executive protection operations, static security/force protection operations, operations center services, and security training and vulnerability assessments.
2. What international legal controls are in place for private security firms?
While companies do not have standing under international humanitarian law, individuals and people do. International humanitarian law is mostly embodied in The Hague and Geneva Conventions and the applicable Additional Protocols. Below are brief synopses of the international legal controls: The foundation of international treaties aimed at protecting human rights rests with The Hague Convention IV of 1907 and the Geneva Conventions. However, there is not any one 'Geneva Convention.' Like any other body of law, the laws of war have been assembled piecemeal. What follows is a basic and modernized reference to the most common protections and prohibitions as provided under the Hague Convention IV, the four 1949 Geneva Conventions, and the two 1977 protocols to the Geneva Conventions.
A. Hague Convention IV
The main prohibitions of the Hague Convention IV are outlined in Articles 23, 25, 27 and 28 of the Annex. One is not permitted to: 1) employ poison or poisoned weapons; 2) kill/wound treacherous individuals belonging to the hostile nation or army; or an enemy who, having laid down his arms, or having no means of defense, has surrendered; 3) employ arms, projectiles, or material calculated to cause unnecessary suffering; 4) make improper use of a flag of truce, of the national flag, or of the military insignia and the uniform of the enemy, as well as the distinctive badges of the Geneva Convention; 5) destroy or seize the enemy's property, unless such destruction or seizure be imperatively demanded by the necessities of war; 6) declare abolished, suspended, or inadmissible in a court of law the rights and actions of nations of the hostile party; and 7) destroy buildings dedicated to religion, art, science, or charitable purposes, historic monuments, hospitals and places where the sick and wounded are collected, provided they are not being used at the time for military purposes.
B. The Geneva Convention
The Geneva Convention safeguards so-called 'protected persons,' most simply described as detained civilians. Article 3 prohibitions include: 1) violence to life and person, in

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 1646976 (F.D.C.H.)                                                              Page 4
2006 WL 1646976 (F.D.C.H.)

particular, murder of all kinds, mutilation, cruel treatment and torture; 2) the taking of hostages; 3) outrages upon personal dignity, in particular, humiliating and degrading treatment; and 4) executions without a trial. Detainees must at all times be humanely treated (Geneva III, art. 13; Geneva IV, art. 27). Detainees may be questioned, but any form of 'physical or mental coercion' is prohibited (Geneva III, art. 17; Geneva IV, art. 31). Women shall be protected from rape and any form of indecent assault (Geneva IV, art. 27). Torture or inhuman treatment of prisoners-of-war (Geneva III, arts. 17 & 87) or protected persons (Geneva IV, art. 32) are grave breaches of the Geneva Conventions and are considered war crimes (Geneva III, art. 130; Geneva IV, art. 147). Grave breaches include: 1) attacking a prisoner of war; 2) inhuman and degrading practices involving outrages upon personal dignity, based upon racial discrimination; 3) biological experiments on the wounded and sick, prisoners of war, and against civilians; 5) compelling a prisoner of war to serve in the hostile power's military forces; 6) any unlawful act which causes death or seriously endangers the health of a prisoner of war; 7) unlawful transfer, deportation or confinement of civilians, willful killing, hostage taking and torture; 8) attacking cultural objects when they are not located near a military target or used for the war effort; and 9) deprivation of the right to a fair trial. War crimes create an obligation on any state to prosecute the alleged perpetrators or turn them over to another state for prosecution. This obligation applies regardless of the nationality of the perpetrator, the nationality of the victim or the place where the act of torture or inhuman treatment was committed (Geneva III, art.129; Geneva IV, art. 146).
C. Other International Covenants and Conventions
The United States has ratified other international human rights instruments, such as the International Covenant on Civil and Political Rights and the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment. Under both treaties, torture and other mistreatment of persons in custody are also prohibited in all circumstances under international human rights law, which applies in both peacetime and wartime. See, e.g., art. 5 of the Rome Statute of the International Criminal Court. However, U.S. is not a party to the International Criminal Tribunal except pursuant to a treaty made under Article II, section 2, clause 2 of the U.S. Constitution on or after October 21, 1998, or to any statute enacted by Congress on or after October 21, 1998. 22 U.S.C. S. 262-1.
3. What United States statutes, regulations, or policy directives apply to private security firms?
Some U.S. statutes incorporate, for example, the Geneva Convention and the Hague Convention IV, into war crime and anti-torture statutes. These statutes apply to a national of the United States; generally, that term is used in section 101 of the Immigration and Nationality Act, 8 U.S.C. S. 1101. See, e.g., 18 U.S.C. S.S. 7, 32.
A. The Anti-Torture Statute
The Anti-Torture statute (18 U.S.C. S. 2340A) provides that if a national of the United States outside of the United States who 1)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 1646976 (F.D.C.H.)                                                                                    Page 5
2006 WL 1646976 (F.D.C.H.)

commits or attempts to commit torture shall be fined, imprisoned not more than 20 years, or both, and 2) if death results to any person due to this torture, shall be punished by death or imprisoned for any term of years or for life. This statute also applies to any person present in the United States irrespective of the nationality of the victim or alleged offender.

B. U.S. War Crimes Act of 1996

Similarly the U.S. War Crimes Act of 1996 (18 U.S.C. S. 2441) provides for criminal penalties, including up to life sentence or the death penalty, for war crimes--whether committed inside or outside the United States--if either the offender or the victim is a member of our Armed Forces or is a U.S. national. 'War crime' means any conduct that is 1) in violation of the Geneva Convention, or any convention to which the U.S. is a party; 2) prohibited by the Hague Convention IV; or 3) of a person who, in relation to an armed conflict and contrary to the provisions of the Protocol on Prohibitions or Restrictions on the Use of Mines, Booby-Traps and Other Devices as amended at Geneva on 3 May 1996 (Protocol II as amended on 3 May 1996), when the United States is a party to such Protocol, willfully kills or causes serious injury to civilians.

C. Military Extraterritorial Jurisdiction Act

In addition, Blackwater, as a contractor accompanying a deployed force, would be subject to the Military Extraterritorial Jurisdiction Act ('MEJA') (18 U.S.C. S.S. 3261 - 3267). MEJA applies to all Department of Defense ('DoD') contractors and subcontractors and their dependents. It was expanded to cover contractors of any other Federal agency, or any provisional authority, to the extent such employment relates to supporting the mission of the DoD overseas. The law does not, however, apply to a national of or resident in the host nation (e.g. an Iraqi national). MEJA provides for jurisdiction in U.S. Federal court to prosecute acts that would be felonies if they had occurred in the special maritime and territorial jurisdiction of the United States, such as 1) murder (including attempt); 2) manslaughter (including attempt); 3) maiming; 4) sexual exploitation of minors; 5) aggravated sexual abuse stalking; 6) receiving or sending child pornography; 7) destruction of real or personal property; 8) theft, robbery, burglary; 9) receiving stolen property; 10) drunk driving; and 11) manufacture, sale or possession of a switchblade knife.

D. Victims of Trafficking and Violence Protection Act of 2000, Public Law 106- 386, and codified at 22 U.S.C. S. 7102 _

To keep itself 'ahead of the curve,' Blackwater's implemented company policy that prohibits all human trafficking is consistent with the Victims of Trafficking and Violence Protection Act of 2000, Public Law 106-386, and codified at 22 U.S.C. S. 7102, that was cited in National Security Presidential Directive/NSPD-22, which decreed that all U.S. government departments will take a zero tolerance approach to trafficking in persons. The proposed DFARS implementing clause for use in contracts outside the United States would require contractors, such as Blackwater and Presidential Airways, to establish policy and procedures for combating human trafficking in persons and to notify the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 1646976 (F.D.C.H.) Page 6
2006 WL 1646976 (F.D.C.H.)

contracting officer of any violations and corrective action taken. This clause also requires the contractor to manage effectively its subcontractors and to take remedial action against any subcontractor that violates policy against trafficking in persons. Possible consequences of a contractor's noncompliance with this proposed clause would include suspension or debarment, suspension of contract payments, loss of award fee, and termination of contractor for default or cause. A January 30, 2004 Deputy Secretary of Defense Memorandum stated that provisions should be incorporated in overseas service contracts that prohibit any activities on the part of the contractor employees that support or promote trafficking in persons and that impose suitable penalties on contractors who fail to monitor the conduct of their employees. NSPD-22 used the definitions in 22 U.S.C. S. 7102.

E. Gun Control Act

As government contractors and given the nature of the services that Blackwater and Presidential Airways provide, both entities are subject to the Gun Control Act by the terms of Defense Federal Acquisition Regulations Supplement ('DFARS') S. 225.7040, General Order No. 1A - United States Central Command, as amended 9 August 2003, General Order No. 1 - Multi- National Corps - Iraq, dated 12 February 2005, General Order No. 1 - Combined/Joint Task Force (CJTF) 76, dated 15 May 2004, and DoD Instruction No. 3020.41 (October 2005).

The Gun Control Act (18 U.S.C. S. 921 et seq.), in part, bans unlicensed individuals from acquiring handguns outside their State of residence, although long guns (rifles and shotguns) may (under Federal law) be acquired from Federally licensed firearms dealers located in other States, provided this is allowed by both the State of purchase and the State of residence. The following categories of individuals are prohibited from purchasing and owning firearms: 1) anyone who has been convicted in any court of a crime punishable by imprisonment for a term exceeding 1 year; 2) anyone who is a fugitive from justice; 3) anyone who is an unlawful user of or addicted to any controlled substance; 4) anyone who has been adjudicated as a mental defective or has been committed to a mental institution; 5) any alien illegally or unlawfully in the United States or an alien admitted to the United States under a nonimmigrant visa; 6) anyone who has been discharged from the U.S. Armed Forces under dishonorable conditions; 7) anyone who, having been a citizen of the United States, has renounced his or her citizenship; 8) anyone that is subject to a court order that restrains the person from harassing, stalking, or threatening an intimate partner or child of such intimate partner; and 9) anyone who has been convicted of a misdemeanor crime of domestic violence. 18 U.S.C. S.S. 922, 924, 931.

F. Arms Export Control Act and Export Administration Regulations

Blackwater is also subject to the Arms Export Control Act (22 U.S.C. S. 2778), which controls the export of defense articles and services. Blackwater must register with the Department of State when exporting or importing any defense articles or defense services as defined by this Act. Any willful violation of this

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 1646976 (F.D.C.H.) Page 7
2006 WL 1646976 (F.D.C.H.)

statute, or any rule or regulation issued under either section, or who willfully, in a registration or license application or required report, makes any untrue statement of a material fact or omits to state a material fact required to be stated therein, is subject to a fine for each violation of not more than $1,000,000 or imprisonment of not more than ten years, or both. 22 U.S.C. S. 2778(c). In addition, the Department of Commerce Bureau of Industry and Security ('BIS') is responsible for implementing and enforcing the Export Administration Regulations ('EAR'), which regulate the export and re-export of most commercial items. Items that BIS regulates are often referred to as 'dual-use' - items that have both commercial and military or proliferation applications - but purely commercial items without an obvious military use are also subject to the EAR. 22 C.F.R. Part 730. Criminal penalties for willful violations of EAR may result in a fine of up to the greater of $1,000,000 or five times the value of the exports for each violation; for knowing violations, a fine of up to the greater of $50,000 or five times the value of the exports for each violation. 22 C.F.R. S. 764.3(b). Administrative penalties for violations of EAR include: 1) the denial of export privileges; 2) the exclusion from practice; and/or 3) the imposition of a fine of up to $11,000 for each violation, except that the fine for violations involving items controlled for national security reasons is up to $120,000 for each violation. 22 C.F.R. S. 764.3(a).

G. Foreign Corrupt Practices Act of 1977

The Foreign Corrupt Practices Act (FCPA) prohibits payments or offering items of value to a foreign government official, government agency, political party, or political candidate in exchange for a business favor or when likewise intended to influence the action taken by any such individual or agency or to gain any competitive or improper business advantage. The Act applies to company personnel, any, and all of its consultants and agent.

H. Other U.S. Laws

Other statutes pertaining to accountability include the Defense Base Act, (42 U.S.C. S.S. 1651-1654) ('DBA') and the Inspector General Act of 1978. As a U. S. government contractor deployed overseas, Blackwater is mandated to secure DBA insurance benefits for personnel working overseas. As a government contractor, Blackwater is also subject to the Inspector General Act of 1978, (5 U.S.C. Appx S. 1 et seq.) as amended. Under this Act, an Inspector General is authorized to conduct independent and objective audits, investigations and inspections of government contracts. In order to perform this duty, the Inspector General may have direct access to all records and information of the agency; issue subpoenas for information and documents outside the agency; and administer oaths for taking testimony. For example, upon receipt of a complaint, the Inspector General shall conduct an initial inquiry. FAR S. 3.905. If the complaint should be investigated, the Inspector General shall conduct an investigation and provide a written report of findings to the head of the agency or designee. Id.

H. Federal Aviation Regulations

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 1646976 (F.D.C.H.)                                                     Page 8
2006 WL 1646976 (F.D.C.H.)


As an air carrier certificated under Part 119 of the Federal
Aviation Regulations (the 'FARs') to conduct operations under
Part 135 of the FARs, Blackwater affiliates are generally subject
to statutes and regulations that, among other things, establish
requirements, compliance obligations and accountability for
safety, training, maintenance and operation of the aircraft,
including oversight by the Federal Aviation Administration, the
National Safety Transportation Board, and the Department of
Homeland Security. See 49 U.S.C. S. 101 et seq.; 6 U.S.C. S. 101
et seq.
United States Regulations/Policy Statements
A. DFARS S. 252.225-7040 -- Contractors Supporting a Force
Deployed for Contingency, Humanitarian, Peacekeeping, or Combat
Operations (June 2005)
Blackwater must comply with the above referenced clause in the
DFARS and in their contracts.
This clause requires, among other things, compliance with
applicable: 1) United States, host country, and third country
national laws; 2) treaties and international agreements; 3)
United States regulations, directives, instructions, policies,
and procedures; and 4) orders, directives, and instructions
issued by the Combatant Commander relating to force protection,
security, health, safety, or relations and interaction with local
nationals. Blackwater must incorporate the requirements of DFARS
225.7040 in all subcontracts that require subcontractor personnel
to provide support in the theater of operations to U.S. military
forces deployed outside the United States in -- (1) contingency
operations; (2) humanitarian or peacekeeping operations; or (3)
other military operations or exercises designated by the
Combatant Commander.
These regulations and contract clause also require Blackwater to
ensure that prior to deploying personnel to support the U.S.
government: 1) all required security and background checks are
complete and acceptable; 2) all personnel meet minimum medical
requirements; 3) all necessary passports, visas, other documents,
and Geneva Conventions card have been issued; and 4) country and
theater clearances have been obtained for relevant personnel in
accordance with DoD Directive 4500.54, Official Temporary Duty
Abroad, and DoD 4500.54-G, DoD Foreign Clearance Guide. In
addition, Blackwater must always maintain a current list of
personnel deployed in support of the theater of operations.
Additionally, Blackwater professional contractor personnel
supporting U. S. forces outside of the United States are
prohibited from wearing military clothing unless specifically
authorized in writing by the Combatant Commander. If authorized,
Blackwater must wear distinctive patches, armbands, nametags, or
headgear, to be distinguishable from military personnel,
consistent with force protection measures and the Geneva
Conventions. Moreover, should Blackwater professional contractor
personnel be authorized to carry weapons in performing their
duties in the theater of operations, Blackwater shall ensure that
such authorized personnel 1) are adequately trained; 2) are not
barred to possess weapons by the Gun Control Act; and 3) adhere
to all orders issued by the U.S. government.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 1646976 (F.D.C.H.)                                                                                    Page 9
2006 WL 1646976 (F.D.C.H.)

Blackwater is also responsible for next of kin notification and personnel recovery should one of its personnel die, require evacuation due to injury, or is missing, captured, or abducted.
B. DoD Instruction 3020.41 - Contractor Personnel Authorized to Accompany the U. S. Armed Forces
Blackwater is subject to DoD Instruction 3020.41 when under contract with the Department of Defense. This Instruction serves as DoD policy for all contractors to include Host Nation (HN) personnel and Third Country Nationals (TCN).
C. General Order No. 1A - United States Central Command, as amended 9 August 2003; General Order No. 1 - Multi-National Corps - Iraq, dated 12 February 2005; General Order No. 1 - Combined/Joint Task Force (CJTF) 76, dated 15 May 2004
Blackwater is also subject to General Order No. 1 issued by various commands. These General Orders, made applicable pursuant to DFARS 225.7040 discussed above, outline slightly different prohibitions. However, these three General Orders generally prohibit Blackwater personnel from engaging in the certain activities deemed prejudicial to good order. Some of the more prominent prohibited activities include: 1) purchase, possession, use or sale of privately owned firearms, ammunition, explosives, or the introduction of these items into USCENTOM AOR or MNC-1 AOR; 2) introduction, possession, sale, transfer or consumption of any alcoholic beverage within Kuwait, Saudi Arabia, Pakistan, Afghanistan, and Iraq; 3) sale, transfer, or consumption of any controlled substances; 4) gambling; 5) introduction, possession, sale, creation or display of any pornographic or sexually explicit photograph, videotapes, movie, drawing, book or magazine, or similar representations; 6) removing, possessing, selling, or destroying artifacts or national treasures; and 7) intimate relations between those individual not married to each other.
4. What types of established standards are in place for private security firms?
Blackwater demands from all employees and independent contractors that they meet the standards we set for ourselves and for our customers. The spectrum of these standards ranges from grooming standards to training, to legal accountability and most everything between. Training standards are generally contractually mandated and the contracting agency will most often have a representative on site to ensure that the required training is being conducted to the expected level of competency. Additionally, for those who have honorably served in the armed forces or law enforcement for at least four years but lack the specific job skills for some of our programs, Blackwater runs the 'Blackwater Academy'; an 8-week professional program that gives to qualified applicants the skills to safely and professionally participate in our overseas operations. This program has been remarkably successful. Blackwater also has created the 'Independent Contractor Handbook' which details to each security professional mandates and expectations while working with Blackwater. A copy of this handbook is included in the testimony package.
Additionally, as members of the International Peace Operations

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 1646976 (F.D.C.H.)                                                                                        Page 10
2006 WL 1646976 (F.D.C.H.)

Association, we openly vow to uphold and conduct ourselves per the IPOA Code of Conduct. The Standards Committee of the IPOA is working diligently to institutionalize our business, humanitarian, and legal standards as well. Further, it should be noted that there are significant market forces at play in this industry in that failure comes quickest to those who openly violate sound business principles and disregard the moral, ethical and legal high ground. Once you have been labeled as a company who is guilty of these violations, you are no longer considered a viable solution to very complex challenges.

5. How do private security firms vet their employees?

Blackwater has a rigorous screening process both for U. S. independent contractors and for third country and local nation nationals.

All U. S. citizens who wish to apply to Blackwater first go through a self-selecting application process online. Once they have completed the online application, they then send a resume and participate in a phone screening so that our professional recruiters and detailers can make a determination of fit. If an applicant's resume contains the skills required for a specific project, we then conduct a reference check, a document check (DD-214s/retirement documents, etc.) and a credit and NCIC criminal background check. If the applicant has no 'hits' then he or she may then be asked to come to Blackwater so that our professional trainers can further evaluate the applicant's skills. If our trainers determine that the applicant has the basic skills necessary, then the applicant is asked to interview with our recruiters and program managers. If a particular program requires a security clearance, the applicant completes an SF-86 National Security Questionnaire and the government proceeds with a security clearance background check. If the applicant obtains a security clearance, he then may undergo a psychological testing regimen to evaluate further his fitness for work in our industry. If all of these requirements are met, the applicant may then join a training class, and even then, he is subject to peer and instructor reviews. The vetting process continues while an independent contractor is performing his duties. If he is determined to be a bad fit by his peers or leadership team, he is removed from that contract.

The process for third country nationals and local nationals is much the same. In the countries where we recruit honorable, qualified professionals, we have local companies assisting us in the vetting process. We collect all of the same information and take a digital photograph of each TCN/LN applicant. We conduct local records checks and if necessary, submit certain TCNs/LNs for 'public trust' clearances. TCNs and LNs are required to meet the same training requirements and are held to the same performance standards as all of our professionals.

6. What type of training do private security firms provide their employees?

The majority of training provided to private security professionals is contractually mandated. In many cases, the contract comes with a curriculum that must be taught and is generally supervised by an authorized representative of the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 1646976 (F.D.C.H.) Page 11
2006 WL 1646976 (F.D.C.H.)

contracting entity. At Blackwater, we go far beyond what is required by any contract. We spend significant time on leadership, ethics, and core values training.
We provide instruction on the individual and collective responsibilities under international humanitarian law, and we explain the company's responsibilities to our security professionals and our clients. This training, of course, is in addition to the hundreds of hours of job-related training our professionals receive in firearms training and safe handling, security tactics, tactical driving, personal defense, rules of engagement and the continuum of force, regional and cultural awareness, local law and customs, and a plethora of other classes. All of this training is to ensure that each of our professionals is prepared to do his job in a safe, legal, professional manner.

   CHRIS TAYLOR

   Vice President

   Blackwater Usa

2006 WL 1646976 (F.D.C.H.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.