## AGREEMENT FOR SECURITY SERVICES

This Agreement (hereinafter referred to as "Agreement") is made and entered into on this __12___ day of March, 2004 by and between Regency Hotel & Hospital Company, P.O. Box 700, Safat 13700 Kuwait (hereinafter referred to as "REGENCY"), and Blackwater Security Consulting, Inc., located at 850 Puddin Ridge Road, Moyock, North Carolina 27959 (hereinafter referred to as "BLACKWATER").

WHEREAS, REGENCY has signed an Agreement with ESS Support Services Worldwide, Eurest Support Services (Cyprus) International Limited 84 Nicou Pattichi Street, Maritania Building, 3070 Limassol, Cyprus, Postal Address: P.O. Box 52408, 4064 Limassol, Cyprus a contractor providing catering support services and design and build services to US Armed Forces and other US contracting agencies in Iraq and Kuwait hereinafter referred to as "ESS" and whereas REGENCY is desirous to obtain security services to support REGENCY's contract with ESS in Iraq, Kuwait, Jordan and Turkey (hereinafter collectively referred to as the "Territory"); and

WHEREAS, BLACKWATER has familiarized itself with the ESS and REGENCY operations and being professionally experienced in the security field of works to provide such services; and

WHEAREAS, REGENCY and BLACKWATER desire to enter into an agreement wherein BLACKWATER provides certain security services in support of the ESS Contracts and ESS operations in the Territory utilizing the specialized management, personnel and resources currently utilized by BLACKWATER in its business.

NOW, THEREFORE, in consideration of the mutual promises, agreements and covenants and for other good and valuable consideration, the receipt and sufficiency of which are acknowledged by the parties hereto, the parties hereto agree as follows:

### ARTICLE 1
### BLACKWATER RESPONSIBILITY & WORK SCOPE

1.1   BLACKWATER shall carry out Security Services, as defined below in this Section, for ESS in the Territory, including movement of ESS's staff, management and workforce throughout Kuwait and Iraq, and across country borders, including the borders of Iraq, Kuwait, Turkey and Jordon. BLACKWATER shall provide to ESS the following security services listed in Appendix A. (Appendix A, Provision of Security Services, is hereinafter referred to as the "Security Services"), at the quantities and unit prices contained in Appendix B.

1.2   BLACKWATER Conducting of Security Operations.

1.2.1   BLACKWATER is an independent contractor of REGENCY any and all employees of BLACKWATER shall in no way be deemed

1

LIU - BSC - 000366

employees of REGENCY for any purpose hereunder. REGENCY shall designate all Security Services to be performed hereunder in regard to the ultimate result to be obtained; however, BLACKWATER shall have complete and absolute control of the methods and details of the performance of such designated Security Services. All services provided hereunder shall be performed to the satisfaction of REGENCY and ESS. The Parties shall mutually define a service level agreement within thirty (30) days of mobilization which will enable performance to be measured by both parties.

1.2.2    BLACKWATER shall perform the work in a safe, proper and workmanlike manner in accordance with generally accepted current good practices of the security industry. The protective services detail will undergo a pre-deployment training mission to include Mission Standard Operational Procedures, adherence to standardized use of deadly force policies and rules of engagement. BLACKWATER will implement a Mission-Standard Operational Procedures manual that adheres to Diplomatic Security Protective Operations. BLACKWATER views the Security Services it will provide to ESS and REGENCY as a Law enforcement mission and will adhere to the Diplomatic Security Services type Deadly Force Policy and Rules of Engagement. REGENCY and ESS understand that such policies are subject to approval by the US Embassy, Chief of Mission, and are established by in Territory personnel.

1.2.3    BLACKWATER shall provide Security Services within the Territory in accordance with the instructions given by ESS; provided, however, that BLACKWATER shall, at all times, have complete authority and responsibility to make decisions regarding the suitability for movement required by ESS and the type and level of protection required for ESS personnel. Any such decisions made by BLACKWATER shall be based on weather, current threat activity in the Territory and all other factors which may affect the safe movement of ESS personnel.

1.2.4    BLACKWATER shall at all times be the sole judge of the safety and proprietary of ESS staff, management and workforce personnel movement and Security services, as well as the level and type of Security Services provided. BLACKWATER shall be under an absolute duty at all times to exercise its own reasonable discretion with respect to safe operations, movement of ESS personnel and the type and level of Security Services provided to ESS; and no direction given by ESS shall be deemed to lessen this duty or in any way to relieve BLACKWATER of this responsibility.

1.2.5    REGENCY and ESS understand and acknowledge that certain of the services set forth in this Article 1 may require licenses and prior

2

LIU - BSC - 000367

approval from various government agencies of the U.S. or other applicable jurisdictions. BLACKWATER shall endeavour to obtain, with REGENCY's and ESS's good faith cooperation, all such necessary approvals and licenses; provided, however, BLACKWATER shall not be responsible for any delay or non-performance caused by any act or omission of any government body.

## ARTICLE 2
## REGENCY RESPONSIBILITY

In order that BLACKWATER shall provide its Security Services in an expeditious, safe and professional manner, REGENCY shall:

2.1     Include BLACKWATER in ESS's anticipated movement planning of staff, management, and workforce so that BLACKWATER can plan protection security for these movements well in advance if possible. REGENCY will request that ESS provide a schedule of activities and movements in need of security services at least twenty four (24) hours in advance and for all missions of the BLACKWATER Protection Service Details. Emergency requirements (those with less than 24 hours notice) will be considered but cannot always be guaranteed because of the threat level in the Iraq environment or the inability to change prior commitments.

2.2     REGENCY or ESS will provide all BLACKWATER personnel operating in the Territory with housing and subsistence. If REGENCY, or ESS, is unable to provide such housing and subsistence to any individual BLACKWATER personnel providing Security Services to ESS in the Territory, REGENCY will provide a per diem allowance to each such BLACKWATER person. The amount of the per diem allowance shall be mutually agreed to by both parties, but in no event shall such per diem be less than the most recent published U.S. government JTR rates. The housing standard shall be single occupancy for supervisory level employees and double occupancy for all others. Subsistence shall mean three (3) meals per day and access to laundry facilities and international phone call services when appropriate and Internet access to the extent that such services are physically available; provided, however, that each individual security person (whether U.S. citizen or third country national) utilizing such services shall be individually responsible for all costs associated with such services to the extent, in other words, BLACKWATER, shall not be responsible for any costs associated with Subsistence services.

2.3     REGENCY or ESS will provide BLACKWATER, at no cost to BLACKWATER with office space and equipment on ESS sites in Kuwait and Baghdad in order to support the necessary command and control elements of the BLACKWATER operation in support of ESS operations in the Territory. In the event that ESS is unable to provide office space and equipment at ESS sites,

3

LIU - BSC - 000368

REGENCY will provide optional space near ESS sites at REGENCY's discretion.

2.4    REGENCY, at no cost to BLACKWATER, will provide Kuwait visas, work permits and administration support for BLACKWATER personnel assigned to support ESS operations and working under the terms and conditions of this Agreement. This administrative support will be provided at REGENCY's expense.

## ARTICLE 3
## REGENCY PURCHASE OR LEASE OF OPERATIONS SUPPORT EQUIPMENT AND VEHICLES

REGENCY will purchase or lease the following equipment necessary for the Security Services (hereinafter referred to as the "Equipment") as part of the price charged per man per day as defined in Appendix B. These costs will be in the form of a fixed dollar amount, per man per day, as outlined in Appendix B, with some Equipment leased by and some items owned by REGENCY, but in every case Equipment purchase, maintenance and replacement is REGENCY's responsibility except as agreed to by the parties as delineated in Appendix B. REGENCY bears the risk of Equipment replacement and acquisition of new Equipment or replacement Equipment as required to perform the tasks outlined in this Agreement. REGENCY shall maintain ownership of all Equipment purchased by REGENCY during the Term of this Agreement, unless otherwise mutually agreed to by the parties. REGENCY will require and follow BLACKWATER guidance on the purchase of support items. It is BLACKWATER's responsibility to provide the final decision on types of support items to purchase or lease.

## ARTICLE 4
## CONTRACT AGREEMENT TERM

This Agreement is valid for a period of one (1) year from the date of the last Party's signature to this Agreement (the "Effective Date") and will automatically be renewed for an additional one-year period under the same terms and conditions unless cancelled with thirty (30) days written advance notice by either party. REGENCY shall have the right to terminate this Agreement or any portion hereof, upon thirty (30) days prior written notice in the event that ESS is given written notice by Kellogg, Brown & Root of cancellation of ESS's contracts, for any reason, or in the event that ESS receives written notice from Kellogg, Brown & Root that ESS is no longer allowed to use any form of private security services. Notice of cancellation will be sent by REGENCY to BLACKWATER at the address listed in this document. In the event of Cancellation BLACKWATER shall be paid its compensation for services performed to the date of cancellation plus notification period.

4

LIU - BSC - 000369



## ARTICLE 5
## SCHEDULE OF WORKS

BLACKWATER's Mobilization period is twenty-one (21) calendar days from the Effective Date of the mobilization payment. BLACKWATER shall receive the mutually agreed mobilization payment as outlined in Article 8 from REGENCY within ten (10) days of signing of this Agreement, provided REGENCY has received the mobilization payment from ESS within the timeframe identified in the Agreement between ESS and REGENCY; provided further that BLACKWATER is relieved from any responsibility under this agreement until it receives such mobilization payment.

BLACKWATER will provide to ESS Security protection security details on an as required basis throughout the term of the Agreement.

## ARTICLE 6
## INSURANCES & INDEMNIFICATION

6.1    Insurance.

    6.1.1    BLACKWATER will obtain and maintain in force at all times during the term of the Agreement insurance of the type and in the minimum amounts set forth on Appendix D attached to this Agreement and incorporated herein by reference. BLACKWATER will name REGENCY as an additional insured and will provide REGENCY with certificates of insurance as evidence of such coverage upon execution of this Agreement.

    6.1.2    BLACKWATER is required to maintain Defense Base Act ("DBA") insurance on all of its employees working in the provision of Security Services. BLACKWATER will make all reasonable efforts to obtain the lowest possible cost for this insurance either by obtaining the insurance through REGENCY sources or combining REGENCY efforts with ESS efforts to obtain the best possible cost for this insurance. The cost of this insurance shall be passed on at cost from REGENCY/BLACKWATER to ESS for payment of same. DBA insurance payment is part of the Advance Payment, as defined in Article 8.1 below, and paid in conjunction with the Advance Payment. If ESS can provide DBA insurance coverage through ESS insurance facilities, then ESS will provide to REGENCY/BLACKWATER pass through coverage via appropriate insurance industry documentation.

6.2    Indemnification.    BLACKWATER agrees to indemnify, defend and save REGENCY harmless from and against any and all claims, expenses, loss or liability whatsoever, including court costs and attorneys' fees, arising out of or in connection with the act or omissions of BLACKWATER, its employees and agents including breach of this Agreement; provided, however, BLACKWATER shall not be obligated to indemnify,

5

LIU - BSC - 000370

defend and hold REGENCY harmless for any claims, expenses, loss or liability arising solely out of or in connection with the negligent acts or omissions of REGENCY or ESS and their agents or employees. This provision shall survive the termination of this Agreement. REGENCY agrees to indemnify, defend and save BLACKWATER harmless from and against any and all claims, expenses, loss or liability whatsoever, including court costs and attorneys' fees, arising out of or in connection with the act or omissions of REGENCY, its employees, representatives, subcontractors, officers and agents including breach of this agreement; provided however, REGENCY shall not be obligated to indemnify, defend and hold BLACKWATER harmless for any claims, expenses, loss or liability arising solely out of or in connection with the negligent acts or omissions of BLACKWATER and its agents or employees. REGENCY understands and agrees that BLACKWATER is providing protective services in a volatile, hostile and extremely dangerous environment. Despite BLACKWATER performing protective services, there is simply no way to avert the high risk of injury or death to ESS and REGENCY personnel operating in this environment. This provision shall survive the termination of this Agreement.

## ARTICLE 7
## TAXES

BLACKWATER shall be responsible for its own taxes, duties, stamps, and fees imposed by the United States Government in the United States. REGENCY shall be responsible for its own taxes, duties, stamps, and fees imposed by the Kuwaiti Government, Iraqi Government, Jordanian Government or the US CPA.

REGENCY shall be responsible for any taxes, duties, stamps, and fees imposed by the Kuwaiti Government, Iraqi Government, Jordanian Government, Turkish Government or the US CPA on BLACKWATER. BLACKWATER shall notify REGENCY within thirty (30) days of BLACKWATER becoming aware of or is notified that the Kuwaiti Government, Iraqi Government, Jordanian Government or the US CPA is going to impose taxes, duties, stamps, and/or fees on BLACKWATER. REGENCY shall pay the taxes, duties, stamps and/or fees imposed on BLACKWATER by the Kuwaiti Government, Iraqi Government, Jordanian Government or the US CPA directly to Governmental entity imposing the taxes, duties, stamps and/or fees or shall reimburse BLACKWATER through the monthly invoicing procedures in Article 8.

## ARTICLE 8
## PAYMENTS. TERMS OF PAYMENT & RECORDS MAINTENANCE

8.1    Advance Payment. As per Article 5, REGENCY shall pay to BLACKWATER within ten (10) days of the Effective Date of this Agreement an advance payment ("Advance Payment") consisting of:

8.1.1    Mobilization payment: $320,000 (three hundred and twenty thousand United States Dollars). See Appendix B for details.

6

LIU - BSC - 000371

8.1.2   DBA insurance payment, $ 407,751 (four hundred and seven thousand seven hundred and fifty one United States Dollars). See Article 6 for details.

As such, the total Advance Payment, payable within ten (10) days of the Effective Date of this Agreement, shall be $727,751 (seven hundred twenty seven thousand seven hundred fifty one United States Dollars), which includes the DBA insurance payment. In consideration for this Advance Payment, BLACKWATER, will credit REGENCY one-twelfth (1/12) of the total Mobilization Payment against each monthly billing for twelve (12) consecutive monthly billing periods following the Effective Date of this Agreement, thus reducing the total amount billed to REGENCY in twelve (12) equal amounts. See Appendix C for monthly billing sample.

8.2   Terms and Method of Payment, Invoicing & Substantiating Documents.   Billing periods shall be based on calendar months for the duration of this Agreement, see Appendix C. BLACKWATER shall provide a complete invoice to REGENCY within three (3) days (or as soon thereafter as is reasonable practicable) after the end of the monthly billing period.   The invoice shall be accompanied by appropriate supporting documentation to validate expensed items as outlined in Appendix B.   REGENCY shall make payment to BLACKWATER within thirty (30) days of receipt of BLACKWATER's monthly invoices.

In the event that there are disputed invoice items, the payment terms remain in force for the items not in dispute.

REGENCY shall pay BLACKWATER by wire transfer of funds in United States Dollars to BLACKWATER's designated bank account. BLACKWATER will provide REGENCY under separate cover its banking information.

8.3   Maintenance of Records.   BLACKWATER shall maintain a true and correct set of records pertaining to work performed and services provided hereunder and all transactions related thereto throughout the Term of this Agreement. BLACKWATER further agrees to retain all such records for a period of not less than two years after termination of this Agreement. REGENCY may upon reasonable notice and other terms time audit any and all records of BLACKWATER relative to the work performed hereunder and all transactions related thereto for the sole purpose of determining compliance with the terms and conditions of this Agreement, as well as the invoices submitted and prices paid throughout the Term of this Agreement.

## ARTICLE 9
## WORK SITE ACCESS

Work site access to ESS locations and areas remain ESS responsibility. REGENCY will request ESS provide unhindered access to ESS sites for BLACKWATER, subject to ESS client approval, throughout the term of this Agreement to fulfill the Security

7

LIU - BSC - 000372

Services. REGENCY understands that without such access, BLACKWATER may be unable to effectively provide the Security Services.

## ARTICLE 10
## INSTRUCTION & DECISIONS

10.1    REGENCY will delegate its designated representative ("Designated Representative") in writing to the BLACKWATER within five (5) days of the Effective Date of this Agreement. All decisions and/or instructions issued by the REGENCY Designated Representative to BLACKWATER will be binding on BLACKWATER under the terms and conditions of this Agreement. The BLACKWATER Iraq Security Manager and Kuwait Security Manager will coordinate all actions regarding security operations through the ESS Owner Representative as well as the REGENCY Owner Representative. BLACKWATER will delegate its Iraq Security Manager and Kuwait Security Manager in writing to REGENCY within five (5) days of the Effective Date of this Agreement.

10.2    Communications Policy and Instructions. Each party agrees that it will not, without the prior written consent of the other, issue any press release or announcement or otherwise disclose the existence or nature of this Agreement and/or proposed or contemplated business arrangement(s), transaction(s), negotiation(s), or other related jointly discussed business pursuits. The two parties mutually agree to develop a standard operating procedure (SOP) in regard to the handling of press inquiries.

10.3    Accident and Incident Reporting Procedures. Due to the nature of the services being provided and the area of operations where the services will be provided, from time to time the parties may have to report on accidents or incidents involving REGENCY provided equipment or incidents involving BLACKWATER personnel and/or REGENCY provided equipment. Therefore, within thirty (30) days of execution of this Agreement the parties mutually agree to develop standard operating procedures to address accident and incident reporting.

## ARTICLE 11
## GOVERNING LAW & SETTLEMENT OF DISPUTES

11.1    Any disputes of any nature which arise between the parties, with regard to the interpretation of this Agreement or relative to the performance of any of the contractual obligations, whether such disputes arise before, during or after the execution of the Agreement, shall, if possible, be amicably settled. Notice of a dispute shall be served by one party upon the other by written notice.

11.2    Any dispute which cannot, in the opinion of either party, be amicably settled arising in connection with the present Agreement shall be finally settled by binding

8

arbitration. Within thirty (30) days of a party's notice to arbitrate, each party will appoint one arbitrator, with a third arbitrator to be appointed and mutually agreed between the two parties' appointed arbitrators. If the parties are unable to agree on the appointment of arbitrators within one (1) month of the non-complaining party's receipt of the complaining party's dispute, the appointment shall be subject to the ruling of the International Chamber of Commerce, in Paris, France.

11.3    Arbitration shall be conducted in accordance with the Rules of Arbitration of the International Chamber of Commerce and shall be held in Washington, D.C., and conducted in the English language.

11.4    The validity and construction of this Agreement shall be governed by the Laws of the State of North Carolina.

11.5    This Agreement shall not be construed to present any contractual or legal relationship with any third party.

## ARTICLE 12
## TERMINATION, EXTENSION & EXPANSION

12.1    Termination.

12.1.1    In the event of non-performance of any term or condition of this Agreement by BLACKWATER, BLACKWATER will be given written notice of the non-performance. BLACKWATER will be given thirty (30) days from the date that the non-performance notice was received to rectify the noted non-performance; provided, that provided, that if the noted "non-performance" is not capable of being cured within such thirty (30) days and BLACKWATER is in good faith attempting to cure and rectify such non-performance, then BLACKWATER shall be given a reasonable time to cure such non-performance (such time not to exceed ninety (90) days). In the event the non-performance issue is not corrected within this thirty (30) (or other applicable time period) day period, REGENCY may exercise its right to terminate this Agreement. BLACKWATER may cancel this agreement upon thirty (30) days written notice for "non performance" or material breach by REGENCY, including failure to make payment to BLACKWATER on the terms and conditions set forth in this Agreement. REGENCY will be given written notice of the non-performance. REGENCY will be given thirty (30) days to rectify the noted "non performance"; provided, that if the noted "non-performance" is not capable of being cured within such thirty (30) days and REGENCY is in good faith attempting to cure and rectify such non-performance, then REGENCY shall be given a reasonable time to cure such non-performance (such time not to exceed ninety (90) days); provided, however, that the initial thirty (30) day time period shall not be extended upon REGENCY's failure to make payment to BLACKWATER on the terms and conditions set forth in this Agreement shall. In the event the non-performance issue is not corrected within a thirty (30) day period (or other applicable time period) BLACKWATER may exercise its right to cancel this Agreement.

LIU - BSC - 000374

United States Consumer Price Index for this period and or other unforeseeable and uncontrollable events that may, upon mutual agreement of the parties, require an economic price adjustment.

12.3    Expansion of Security Services. REGENCY, at its discretion, may add security team members by individual category as defined in Appendix A and B.

12.4    Terms of Mobilization and Demobilization of Personnel.

12.4.1    The initial mobilization of a minimum of thirty four (34) Security Personnel, as defined in Appendix A, will remain constant for ninety (90) days following the Effective Date of this Agreement before any changes are made.

12.4.2    The initial increase of the number of Security Personnel, as defined in Appendix A, including T1s, T2s and/or T3s, may occur thirty (30) days following the payment of the Mobilization Payment set forth in Section 8.1.1. Demobilization of additional Security Personnel, as defined in Appendix A, may occur sixty (60) days following the Effective Date of mobilization of the individual.

12.4.3    Demobilization of the original thirty four (34) Security Personnel, as defined in Appendix A, may occur after the initial (90) ninety-day period and this demobilization will require thirty (30) days.

### ARTICLE 13
### FORCE MAJEURE

Both parties acknowledge that the Security Services are taking place in an area defined as a "War Zone" as defined by the parties, therefore the Force Majeure is defined in principle as acts of God, or actions taken by ruling authorities or military forces in charge of the Territories where operations are taking place.

Upon the occurrence of Force Majeure event, BLACKWATER shall notify REGENCY within 24 hours of such event stating the cause and probable consequences.

Where the case of Force Majeure remains unresolved for a period exceeding fourteen (14) days, the parties shall agree on alternative arrangements to continue performance of the Security Services under this Agreement. If no agreement or resolution has been reached

LIU - BSC - 000375

within ninety (90) days from notification, REGENCY shall have the right to terminate the Agreement.

## ARTICLE 14
## CONFIDENTIALITY

Each party to this Agreement shall regard and treat all information concerning the other party's operations which are obtained by the other party in the course of rendering services hereunder as confidential and shall not divulge any such information to any third party and shall not permit any of its officers, agents, representatives, employees or subcontractors to do so. The obligations regarding the confidentiality of information as set out in this Article 14 shall survive the termination of this Agreement for five (5) years regardless of the causes or reason for such termination by either party hereto.

14.1    With respect to any information, during the term of this Agreement, ("Disclosure Period"), which at the time of disclosure by the disclosing party ("Owner") is "Proprietary Information" to, the party receiving such information ("Recipient") agrees the Recipient shall – (1) use any Proprietary Information it receives from the party transmitting Proprietary Information only for the purposes contemplated by this Agreement and shall not otherwise use such Proprietary Information for its own benefit and (2) shall maintain such Proprietary Information in confidence, and not disclose it to any other person, corporation, or other entity. Recipient shall restrict disclosure of the information only to its employees who have the need to know, and instruct its employees that such information is proprietary to the Owner. Examples of "Proprietary Information" include, but are not limited to, information as to any of the Party's customers, prices, sales techniques, estimating and pricing systems, internal cost controls, production processes and methods, product planning and development programs, marketing plans, product information, inventions, blueprints, sketches and drawings, technical and business concepts, training programs, manuals, materials and information related to or associated with the Party's business in any manner or respect.

14.2    In the event Owner verbally discloses its Proprietary Information to Recipient, Owner agrees to identify the information as Proprietary Information at the time of such verbal disclosure.

14.3    The parties agree that information shall not be deemed proprietary and the Recipient shall have no obligation with respect to any such information which is already known to Recipient free of any obligation of confidence; has been published or was otherwise publicly known when Owner disclosed it to Recipient; or is rightfully received by Recipient; or is rightfully received by Recipient from a third party; or becomes publicly available through no wrongful act by Recipient; or is hereafter furnished by Owner to others without a similar restriction on disclosure; or is independently developed by the Recipient (or its agents) without breach of this Agreement.

LIU - BSC - 000376

Recipient shall immediately notify Owner. Upon Owner's request, Recipient shall cooperate with Owner in contesting such a disclosure. Except in connection with failure to discharge responsibilities set forth in the preceding sentence, Recipient shall not be liable in damages for any disclosure of Owner's Proprietary Information pursuant to judicial action or Government regulations.

14.7    Nothing contained in this Agreement shall be construed as granting to either party any express or implied rights by license or otherwise to or in any of the other party's patents or unpatented inventions.

REGENCY agrees that during the term of the Agreement and for a period of one year following termination of this Agreement, REGENCY will not solicit or attempt to solicit any person or entity who is a director, officer, independent contractor, contractor, employee or agent of BLACKWATER or any of its subsidiaries to perform services for any entity other than BLACKWATER or in any way interfere with the relationship between any customer, supplier, licensee, licensor, franchisee or business relation and BLACKWATER or any of its subsidiaries without the prior written consent of BLACKWATER. BLACKWATER agrees that during the term of the Agreement and for a period of one year following termination of this Agreement, BLACKWATER will not solicit or attempt to solicit any person or entity who is a director, officer, employee or agent of REGENCY or any of its subsidiaries to perform services for any entity other than REGENCY or in any way interfere with the relationship between any customer, supplier, licensee, licensor, franchisee or business relation and REGENCY or any of its Subsidiaries without the prior written consent of REGENCY.

## ARTICLE 15
## SEVERABILITY

In case of any one or more of the provisions contained in this Agreement should be held or determined to be invalid, illegal or unenforceable in any respect, the legality and enforceability of the remaining provision(s) or underlying rights and obligation referred to herein should not in any way be effected, modified or impaired hereby.

Page 12 of 23

LIU - BSC - 000377



## ARTICLE 16
## NOTICES

Any notices and other communication provided for or permitted hereunder will be made by hand delivery, registered or certified mail (return receipt requested), facsimile transmission or overnight air courier guaranteeing next-day delivery as follows:

REGENCY:      Regency Hotel and Hospital Company
              P.O. Box 700, Safat 13700
              Kuwait City, Kuwait
              Telephone: +965-572-3100
              Fax: +965-572-3884
              Email: ins@al-sane.net
              Attn: Mr. Jameel A. R. Al Sane, Chairman


BLACKWATER:   Blackwater USA
              850 Puddin Ridge Road
              Moyock, North Carolina 27959 USA
              Telephone: (252) 435-0011
              Fax:    (252) 435-6388
              Email: garyj@blackwaterusa.com
              Attn: Mr. Gary Jackson, President

Either party hereto may change the above-designated address for notice hereunder upon giving the other party thirty (30) days written notice of such change. All such notices and communications will be deemed to have been duly given: at the time delivered by hand, if personally delivered; five (5) business days after being deposited in the mail, postage prepaid (registered or certified and return receipt requested), if mailed; when receipt acknowledged by confirmation sheet, if telecopied; the next business day after timely delivery to the courier, if sent by overnight courier, guaranteeing next-day delivery.

## ARTICLE 17
## EXTENT OF THE AGREEMENT

This Agreement sets forth the full and complete understanding of the parties as to the Agreement described above. This Agreement represents the entire and integrated Agreement between the parties and supersedes all prior negotiations, representations or agreements either written or oral. This Agreement may only be amended by written instrument signed by both parties. Nothing in this Agreement is intended to benefit any third party.

## ARTICLE 18
## ASSIGNMENT

This Agreement may not be assigned by BLACKWATER without the prior written consent of REGENCY, which consent may be withheld due to the nature of the Security Services provided and the Territory in which they are provided.

G./x.

LIU - BSC - 000378

## ARTICLE 19
### LIMITATION ON AUTHORITY / RELATIONSHIP OF THE PARTIES

The Agreement is not intended to constitute, create, give effect to, or otherwise recognize a joint venture, partnership, employment relationship or formal business entity of any kind. Nothing in this Agreement shall be construed as providing for the sharing of profits or losses arising out of the efforts of either or both parties. Neither party shall have authority to bind the other except to the extent authorized herein. Each party shall remain as independent contractors at all times and neither party shall act as the agent for the other party.

## ARTICLE 20
### COMPLIANCE WITH LAWS

The parties shall comply and shall cause its directors, officers, and employees, representatives, agents and contractors to comply with all applicable laws, regulation and administrative requirements and shall save "the other party" harmless from any failure to do so. The parties hereby agree to comply with all relevant and applicable U.S. regulations that may be applicable under this Agreement or any subcontract awarded thereto.
BLACKWATER shall comply with any and all applicable laws, rules and regulation that may be applicable to its operations.

## ARTICLE 21
### WAIVER AND CONSTRUCTION

A waiver of any failure to perform under the Agreement will neither be construed as nor constitute a waiver of any subsequent failure. Any exhibits referred to herein are made a part of the Agreement by reference. The Agreement may be executed in several counterparts, each of which will be deemed an original.
IN WITNESS WHEREOF, the parties have acknowledged their agreement to the foregoing terms and conditions by executing this Agreement below.

Signed by:                              Signed by:
Regency Hotel & Hospital Company        Blackwater Security Consulting, Inc.


Name: Jameel A. R. Al Sane              Name: Gary Jackson
Title: Chairman & Managing Director     Title: President
Date:                                   Date:  03·12·04


Appendix A:    Provision of Security Services
Appendix B:    Schedule of Rates, Supplies and Services
Appendix C:    Sample Monthly Invoice

LIU - BSC - 000379



## PROVISION OF SECUIRTY SERVICES

Based on currently known ESS requirements and area of operations threat analysis, thirty four (34) vetted US Ex-pat professional Security Personnel, as defined in Section 3.0 of this Appendix A below, will form the core of the security organization that will support ESS operations in the Territory.  Individual security teams will be task organized to provide optimal protection based on current threat analysis and data, on the ground experience and deterrence capability.  This total number of Security Personnel will allow modification of individual team composition based on the region requiring support, thus providing ESS with a fluid, flexible solution across the board with tactically sound and mission capable Personal Security Details.

Further to BLACKWATER's analysis of ESS requirements and the current threat in the Iraqi theater of operations as evidenced by the recent incidents against civilian entities in Fallujah, Ar Ramadi, Al Taji and Al Hillah, there are areas in Iraq that will require a minimum of three Security Personnel per vehicle.  The current and foreseeable future threat will remain consistent and dangerous.  Therefore, to provide tactically sound and fully mission capable Protective Security Details, the minimum team size is six operators with a minimum of two vehicles to support ESS movements.

To enhance security and reduce the potential threat to ESS management and staff movements, it is understood that the standard process for scheduling support requires twenty four (24) hours advance notification prior to any movement.  Emergency movements will be handled on a case by case basis.  It is also understood that emergency movements can impact previously scheduled support requirements.
BLACKWATER's Security Personnel for ESS will be composed of:

| Type of Operator | Number |
|---|---|
| T1 | 2  (includes management team) |
| T2 | 12 (includes management team) |
| T3 | 20 |
| | |
| Personnel Total | 34 |

### 1.1.1 Innovative Processes

### 1.1.1.1 Management
BLACKWATER's management team is committed to proactively work with REGENCY and ESS management to:

- Manage costs and reduce them where and when possible and practical.
- Reduce the threat to ESS management staff and employees through efficient planning of movements along with task organized protection details to meet constantly changing threats.
- Develop, test and implement a plan or plans to employ vetted Iraqi security forces and or other security forces composed of other nationalities overtime, but only with REGENCY and ESS management prior approval.  With the first review of these plans at sixty (60) days following mobilization.

LIU - BSC - 000380



- Provide BLACKWATER captured or acquired data on each ESS movement to REGENCY so that REGENCY can maintain a movement statistics database for BLACKWATER. This will provide REGENCY and BLACKWATER with the potential to enhance movement planning efficiency and thus cost effectiveness of security and ESS operations. This will also provide historical data to ESS for future operations planning and costing.

### 1.1.1.2 U.S. DoD, U.S. CPA and Contractor Access Control Cards for Iraq and Kuwait.

BLACKWATER will coordinate the appropriate level badges for authorized ESS management and staff personnel needed to gain access to U.S. Department of Defense (DoD) and U.S. Coalition Provisional Authority (CPA) facilities and areas. This will significantly enhance the efficiency of ESS personnel by reducing the time required and wasted in gaining access to applicable facilities in the Territory, and crossing borders within the Territory. The cost is included.

### 1.1.13 Aviation Services

Aviation support services offered to ESS will be priced separately as required and negotiated.

### 1.1.14 Communications

In addition to the typical mode of communications REGENCY/BLACKWATER will provide additional means of communication to ensure ESS management remains constantly up-to-date with operational issues. These additional means of communication consist of, but may not be limited to:

- Supporting a secure web site with real time data which will provide movement request submission and tracking of movement requests, information bulletins, current security environment analysis reports, news flashes or critical notices, contact information and any other information determined necessary by ESS. REGENCY will develop this secure website and implement the website.
- Providing a Bi-weekly intelligence assessment briefing / meeting overview with ESS management.
- Supporting Operational Management meetings with REGENCY and ESS management personnel on a bi-weekly basis.
- On REGENCY initiated or authored correspondence to the BLACKWATER Iraq Security Manager, Kuwait Security Manager or designated BLACKWATER Program Manager. REGENCY shall copy the BLACKWATER Director of Operations and the Deputy Director of Operations.

### 1.1.15 Continuous Ability to Field Operational Security Teams

BLACKWATER maintains the ability to field additional operational security teams organized to meet the ever changing security threats in the Territory in order to provide the most professional security services possible.

### 2.0 Support Solution

BLACKWATER's support solution is based on discussions with REGENCY, ESS Support Services management, and ESS Design and Build management's request to provide pricing on a per person support basis, not including costs for housing, subsistence, vehicles and large equipment items.

LIU - BSC - 000381



**Security Organization Composition:**

| Type of Operator | Number |
|---|---|
| T1 | 2 |
| T2 | 12 |
| T3 | 20 |
| Personnel Total | 34 |

The following services and support items are the execution responsibility of BLACKWATER:

| ITEM |
|---|

**Services**

- Command & Control
  - o 24 x 7 Command Centers in Kuwait and Iraq to provide Command and Control of all security operations provided for ESS.
- Security & Threat Assessment
  - o Review of:
    - Current security plans.
    - Current contracts and standard contracting documents.
    - Standard Operating Procedures (SOPs)
    - Current Training Programs
  - o Site visits to all or planned ESS facilities located in Kuwait and Iraq. Site visits will include but not be limited to:
    - Schedule and meet with each site's management personnel.
    - Schedule and meet with each site's current security personnel and other key location personnel and organizations.
  - o Prepare a risk assessment based on accepted risk management principles.
    - Develop a risk matrix.
    - Recommend risk monitoring, training, and reporting plan options.
    - Make recommendations for improvement of security operations.
  - o Develop Security Procedures and Evacuation Plans
    - Staffing requirements
    - Training needs and integration into the overall security strategy plan.
    - Requirements for standardized operating procedures.
    - Risk Management and Security Implementation strategies with Cost options

Planning Support

- This will be in the form of route planning, movement of personnel, safety of ESS personnel, recommended safe housing areas, and other areas jointly agreed upon by ESS and REGENCY/BLACKWATER.

- Training for ESS personnel
  - o What to do when attacked during a convoy movement. Training for management personnel and workforce.
  - o Defensive Driving Class for managers working in Kuwait.
  - o Defensive Driving Class for ESS drivers going to Iraq.



LIU - BSC - 000382

| ITEM |
|---|
|    o  Training courses to implement ESS Security Standard Operating Procedures. |
|    o  Threat briefings for Kuwait and Iraq. What to look for and techniques for safe movement within Kuwait. |
|    o  Medical refresher training in CPR and basic CPR training for ESS Managers |
|    o  Pre-deployment mission training |
| • Security Escort Teams |
| • Recovery Team: Recovery Teams will perform recovery of assets as required in a safe, timely and most feasible manner as deemed cost effective by BLACKWATER and ESS. |
| • Intelligence Information Program |
|    o  Intelligence Summary Bulletin fax and secure web site database updates |
|    o  BLACKWATER must provide REGENCY with daily intelligence reporting in electronic format for each physical location/area in which BLACKWATER is providing security services for ESS. There will be verbal briefings daily between designated ESS and BLACKWATER/ REGENCY representatives and weekly written or electronic assessments. |
|    o  Bi-weekly threat assessment briefing for ESS Management |
| Management Interface Methods |
| • Bi-weekly Assessment briefings |
| • Daily Program Manager Update/Interface |
| Administration |
| • Coordinate Iraq / US CPA issued weapons cards |
| • Training of Blackwater Personnel |
| • Provide administration of the security program. This includes responsibility for interface with REGENCY personnel and staff and management and responsibility of BLACKWATER staff assigned to this contract. This function is to take care of all the personal and administrative needs of BLACKWATER staff that may arise, with REGENCY providing assistance when and where needed. |

*Table 1, Service and Support Items*

## 2.1 Transition Plan

### 2.1.1 Phase I – Mobilization

- After payment of the Mobilization Payment set forth in Section 8.1.1., BLACKWATER will mobilize the agreed to security operation. Within twenty one (21) days, based on the following estimates BLACKWATER will:
  - o Notice of award (NOA) +1: A planning and coordination Cell is activated in Kuwait and Iraq. Transition coordination begins with ESS management.
  - o NOA-Day + 2: Initiate badging process for designated ESS personnel.
  - o NOA-Day + 21: Effective start date of the effort.

### 2.1.2 Phase II – VIP / Staff Movement Operations

- Conduct security procedures training classes for ESS personnel being escorted to Iraq.
- Provide threat update briefings/bulletins and/or emails to ESS management personnel. This information will also be entered into databases supporting the secure web site, available 24x7. Procedures to be coordinated and developed with REGENCY.

LIU – BSC – 000383

- Provide protection and security escort services as required to ESS.
- Provide Security process improvement recommendations as required to ESS.

## 3.0 Security Personnel Vetting Process

Enlist United States citizens as qualified security personnel or non-United States citizens as qualified personnel, each with T1, T2 or T3 levels of experience (hereinafter collectively referred to as "Security Personnel"). Considering the level of skill and experience of BLACKWATER upon which ESS is relying to provide the Security Services, BLACKWATER shall, upon its own determination, when and where appropriate, enlist former NATO personnel with military special operations skills and experience. ESS will have the option of rejecting candidates presented for security of ESS personnel, after consultation with REGENCY, if ESS deems them inappropriate.

BLACKWATER will vet non-United States citizens to serve as "Security Personnel. The vetting of these non-United States citizens will be done as a planned event. BLACKWATER and REGENCY will mutually agree on a method to recover the costs of this vetting and recruitment process from ESS.

All BLACKWATER T1, T2, and T3 personnel go through an extensive vetting and pre-deployment vetting process as follows:

- Individual completes standard US government Standard Form 86, Application for security clearance.
- Individual submits resume along with US Department of Defense (DD) Form 214; Official Military Service Record summary.
- Background checks are conducted both with the former military service and National law enforcement authorities.
- Individual is retained.
- Individual goes through pre-deployment training. This pre-deployment training process is used to "weed out" any personnel who cannot pass our Team's physical, mental and emotional testing.
- Individual is re-qualified on their personal weapons, life saving techniques, defensive driving techniques and briefed on the current situation in Iraq.
- Individual is deployed.

LIU - BSC - 000384

## Schedule of Rates, Supplies and Services

**Table 1.**

| Item Number | Schedule of Supplies and Services | Unit | Unit Price | Quantity | Frequency | Amount |
|---|---|---|---|---|---|---|
| 1 | T1 Personnel | 1 | $ 1,075 | 2 | 365 | $ 784,750 |
| 2 | T2 Personnel | 1 | $ 945 | 12 | 365 | $ 4,139,100 |
| 3 | T3 Personnel | 1 | $ 815 | 20 | 365 | $ 5,949,500 |
|  | Sub-Total |  |  | 34 |  | $10,873,350 |
| 4 | Rotation Travel (See Note 1) | 1 | $ 3,500 | 34 | 1 | $ 119,000 |
| 5 | Miscellaneous | 1 | $89,976 |  |  | $ 89,976 |
|  | Total Contract Value |  |  |  |  | $11,082,326 |
| 6 | Mobilization Payment | 1 |  |  |  | $ 320,000 |
|  | Sub-total |  |  |  |  | $10,762,326 |
| 7 | Monthly Estimated Invoice Base Includes items: 1,2,3,4,5 |  |  |  |  | $896,860.50 |

**Note:**

1. The initial travel for the original thirty four Security Personnel mobilized to meet the requirements of this Agreement will be handled by BLACKWATER, with the cost covered in the mobilization payment at a rate of $3,500 (three thousand five hundred United States Dollars) per man per rotation.

   For the subsequent travel rotations (rotation 2 through 6 and thereafter) of Security personnel, REGENCY shall be responsible for travel rotations. In the event BLACKWATER has to pay for a travel rotation after the initial travel rotation, then BLACKWATER will invoice REGENCY at cost of the rotation plus 15% (fifteen percent) handling fee.

2. These rates do not include the cost of DBA insurance. These rates are subject to unforeseeable and uncontrollable events that may, upon mutual agreement of the parties to the Agreement, require adjustment.

**Table 2.**

Upon signing of this agreement, REGENCY will provide to BLACKWATER equipment for thirty four (34) personnel to include:

| Item number | Quantity | Item Description |
|---|---|---|
| 1 | 12 | Vehicles, Security, with protection kit |
| 2 | 12 | Vehicle Emergency repair Kits |
| 3 | 12 | GPS for vehicles |
| 4 | 12 | Medical Kits for vehicles |
| 5 | 12 | Satellite Phone |
| 6 | 12 | GSM Phone |
| 7 | 15 | Vehicle Radio |
| 8 | 2 | Base Radio |
| 9 | 2 | Laptop and printer |



LIU - BSC - 000385

| 10 | 1 | Power Point projector |
| 11 | 2 | Digital camera |
| 12 | 4 | GPS V (with charger) |
|  | 1 | V-SAT or ADSL service, as appropriate. REGENCY will provide appropriate communication Service (V-Sat, ADSL) to BLACKWATER in Baghdad and Kuwait. |
| 13 | 12 | Heavy weapons |
| 14 | 12 | Heavy weapons ammunition 100rds/mo/man |
| 15 | 6 | AN PVS 9 |
| 16 | 6 | PVS 14s Mono Scope with weapons |

Table 3.

BLACKWATER is responsible for procuring and maintaining the items listed in Table 3.

| 1 | 34 | Individual Personnel Weapons. The cost of these items is calculated into the per man per day rate listed in Table 1, Appendix |
| 2 | 34 | Personal weapons ammunition 500rds/mo/man. The cost of these items is calculated into the per man per day rate listed in Table 1, Appendix |
| 3 | 38 | Individual personnel Radio. BLACKWATER will invoice REGENCY for the cost of these items. |
| 4 | 34 | Individual personnel Body Armour. BLACKWATER will invoice REGENCY for the cost of these items. |

Table 4.

For the addition of one T1, T2, T3 or T5 each individual is entitled to the following items in accordance with Tables 2 and 3 above:

| Item number | Quantity | Item Description |
| --- | --- | --- |
| 1 | 1 | Individual personnel weapon. The cost of these items is calculated into the per man per day rate listed in Table 1, Appendix. |
| 2 | 1 | Individual personnel ammunition 500rds/mo/man. The cost of these items is calculated into the per man per day rate listed in Table 1, Appendix |
| 3 | 1 | Individual personnel Body armour. BLACKWATER will invoice REGENCY for the cost of these items. |
| 4 | 1 | Individual personnel radio. BLACKWATER will invoice REGENCY for the cost of these items. |

Page 21 of 23

LIU - BSC - 000386

Table 5.

When a protection security detail unit (3 personnel and one vehicle) is added, the following items are included in accordance with Table 2 above:

| Item number | Quantity | Item Description |
|---|---|---|
| 1 | 1 | Vehicles, Security |
| 2 | 1 | Vehicle Emergency repair Kits |
| 3 | 1 | GPS for vehicles |
| 4 | 1 | Medical Kits |
| 5 | 1 | Satellite Phone |
| 6 | 1 | GSM Phone |
| 7 | 1 | Vehicle Radio |

Table 6.

Miscellaneous:
BLACKWATER will cover its internal Administrative Support requirements in Baghdad and Kuwait.

| Item number | Quantity | Item Description |
|---|---|---|
| 1 | 1 | Administrative Support Baghdad |
| 2 | 1 | Administrative Support Kuwait |

LIU - BSC - 000387

## SAMPLE INVOICE

Actual invoice will be charged on actual numbers of T1's, T2's and T3's required according to the operational needs as outlined by REGENCY. As previously stated the amounts for the T1's, T2's and T3's is fixed for the duration of this contract with the number varying monthly.

ESS has agreed to provide housing and subsistence for the duration of this contract. There will be a 1/12th credit to REGENCY on the invoices for the first (12) twelve months of this agreement for the mobilization costs. Sample invoice shown below.

### INVOICE

| Item Number | Schedule of Supplies and Services | Unit | Unit Price | Quantity | Frequency | Amount |
|---|---|---|---|---|---|---|
| 1 | T1 Personnel | 1 | $1,075 | 2 | 30 | $ 64,500 |
| 2 | T2 Personnel | 1 | $ 945 | 12 | 30 | $ 340,200 |
| 3 | T3 Personnel | 1 | $ 815 | 20 | 30 | $ 489,000 |
| 4 | Subsistence (if needed) | | | | | |
| 5 | Rotation Travel | | | | | |
| 6 | Miscellaneous | | | | | |
| 7 | Credit Mobilization Payment | 1 | | | | ($26,666.66) |
| | Total Estimated Base Invoice | | | | | $867,033.34 |

LIU - BSC - 000388

### ARTICLE 12
## LIMITATION ON AUTHORITY / RELATIONSHIP OF THE PARTIES

The Agreement is not intended to constitute, create, give effect to, or otherwise recognize a joint venture, partnership, employment relationship or formal business entity of any kind arising out of the efforts of either or both parties. Neither party shall have authority to bind the other except to the extent authorized herein. Each party shall remain as independent contractors at all times and neither party shall act as the agent for the other party.

20. The parties hereby agree to comply with all relevant and applicable U.S. regulations that may be applicable under this Agreement or any subcontract awarded thereto. BLACKWATER shall comply with any and all applicable laws, rules and regulation that may be applicable to its operations.

### ARTICLE 21
## WAIVER AND CONSTRUCTION

A waiver of any failure to perform under the Agreement will neither be construed as nor constitute a waiver of any subsequent failure. Any exhibits referred to herein, are made a part of the Agreement for reference. This Agreement may be executed in several counterparts, each of which will be deemed an original.

IN WITNESS WHEREOF, the parties have acknowledged their agreement to the foregoing terms and conditions by executing this Agreement below.

Signed by:                                    Signed by:

Name: Emirate Hotel & Manzilat Chemeans       BLACKWATER USA

Name: Essam A. R. Al Saud                      Name: Gary Jackson
Title: Chairman & Managing Director            Title: President
Date: 14/3/2004                                Date: 03.12.04

Appendix A:   Provision of Security Services
Appendix B:   Schedule of Rates, Supplies and Services
Appendix C:   Sample Monthly Invoice