IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BLACKWATER SECURITY CONSULTING, LLC, et al., <br><br> Plaintiffs, <br><br> v. <br><br> WESTCHESTER SURPLUS LINES INSURANCE CO., et al., <br><br> Defendants. | CIVIL ACTION <br><br> NO. 05-6020 (PBT) <br><br> Hon. Petrese B. Tucker <br><br> JURY TRIAL DEMANDED |

## ORDER

AND NOW, this ____ day of _____, 2007, upon consideration of defendant Liberty International Underwriters' Motion for Summary Judgment, and Plaintiffs' Response in Opposition thereto, it is hereby ORDERED that said motion is DENIED.

_____
The Honorable Petrese B. Tucker

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BLACKWATER SECURITY CONSULTING, LLC, et al., <br><br> Plaintiffs, <br><br> v. <br><br> WESTCHESTER SURPLUS LINES INSURANCE CO., et al., <br><br> Defendants. | CIVIL ACTION <br><br><br><br> NO. 05-6020 (PBT) <br><br><br><br><br> JURY TRIAL DEMANDED |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO LIBERTY INTERNATIONAL UNDERWRITERS' MOTION FOR SUMMARY JUDGMENT**

Dennis J. Valenza
Carol C. Carty
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA 19103-2921
P: 215.963.5000
F: 215.963.5001

Paul A. Zevnik
Howard T. Weir III
Morgan, Lewis & Bockius LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004
P: 202.739.3000
F: 202.739.3001

Dated: August 13, 2007           Attorneys for Plaintiffs

## TABLE OF CONTENTS

**Page**

I. INTRODUCTION ..................................................................................................... 1

    A. The Underlying Action ................................................................................ 2

    B. The Liberty Policy ....................................................................................... 3

    C. Notice To Liberty And This Insurance Coverage Action ........................... 4

II. SUMMARY JUDGMENT STANDARD ................................................................. 5

III. ARGUMENT ............................................................................................................ 5

    A. The *Nordan* Litigation Is Within the Coverage Terms Of The Liberty Policy ............................................................................................................ 5

        1. The reasonable expectation of Blackwater was that the Liberty Policy would provide coverage ....................................................... 5

        2. Well-established law on the interpretation of insurance contracts supports a finding of coverage for the *Nordan* Litigation ............ 6

        3. Criminals caused the Decedents' deaths, not the Iraqi government ........... 7

    B. The Cause Of The Loss Was Not A Conflict Between Sovereign Nations, So The War/Terrorism Exclusion Does Not Preclude Coverage ......................... 10

IV. CONCLUSION ...................................................................................................... 15

Plaintiffs Blackwater Security Consulting, LLC, and Blackwater Lodge and Training Center, Inc. (collectively, "Blackwater") respectfully submit this Response in Opposition to excess carrier Liberty International Underwriters' ("Liberty") Motion for Summary Judgment ("Motion"). Liberty incorrectly asserts that it is not obligated, pursuant to the insurance policy it issued and for which Blackwater paid substantial premiums, to pay any judgment or settlement on behalf of Blackwater in connection with the underlying action captioned *Nordan v. Blackwater Security Consulting LLC, et al.,* 05 CVS 000173, and related litigation (the "*Nordan* Litigation").

## I.     INTRODUCTION

Blackwater provides contract security to suppliers to the United States for its military operations presently being conducted in Iraq and elsewhere. Blackwater Lodge and Training Center, Inc. purchased from Liberty the Policy at issue here, defined below, to protect itself from claims such as those asserted in the *Nordan* Litigation. Blackwater promptly provided notice to Liberty of the *Nordan* Litigation and requested that Liberty agree to make its policy limits available in connection with that case. Because Liberty failed to do so, and reserved its rights to deny coverage, Blackwater filed the instant action against Liberty (and its other insurance carriers) seeking a declaratory judgment that Liberty is obligated, pursuant to the terms of the Policy, to provide insurance coverage for the *Nordan* Litigation. Liberty now moves for summary judgment on the basis that the War/Terrorism Exclusion of the Liberty Policy excludes any coverage for bodily injury or personal injury related to war and military action. Yet, well-established case law reflects that such Exclusion does not preclude indemnification to Blackwater for the *Nordan* Litigation.

### A. The Underlying Action.

On January 5, 2005, Richard P. Nordan, as Ancillary Administrator for the separate estates of Stephen S. Helvenston, Mike R. Teague, Jerko Gerald Zovko, and Wesley J.K. Batalona (collectively, "the Decedents"), filed the complaint captioned *Nordan v. Blackwater Security Consulting LLC, et al.*, Case No. 05 CVS 000173 ("*Nordan* Complaint"), in the Superior Court of North Carolina, Wake County against Blackwater and two individuals, Justin L. McQuown and Thomas Powell. *See Declaration of Dennis J. Valenza*, Exh. A. The *Nordan* Complaint seeks damages for wrongful death arising from the murders of the Decedents on or about March 31, 2004, by a group of Iraqis and/or individuals from other countries in the city of Fallujah. See *Valenza Decl.*, Exh. A, ¶¶ 12, 68-79. The *Nordan* Complaint also seeks to rescind the agreements entered into between Decedents and Blackwater. (*Id.* at ¶¶ 80-96).

Specifically, Richard Nordan alleges that "[a]s a proximate result of [Blackwater's, McQuown's and Powell's] intentional conduct, willful and wanton conduct, and/or negligence, as alleged herein, [the Decedents] were killed March 31, 2004." (*Id.* at ¶ 71). In addition, the complaint alleges that the Decedents were "providers of love, support, comfort, guidance, advice and companionship" to their respective survivors, including spouses, children, and other family members. (*Id.* at ¶¶ 72-75). And, the *Nordan* Complaint seeks damages because, "[a]s a proximate result of [Blackwater's alleged wrongful conduct] and the deaths of [the Decedents], [the Decedents' survivors], and each of them, sustained the loss of society, companionship, comfort, guidance, kindly offerings, advice, services, protection, care and assistance, as well as the net income of decedents, and each of them." (*Id.* at ¶ 76).

Among other alleged wrongful conduct, the *Nordan* Complaint alleges that Blackwater, Mr. McQuown and Mr. Powell, failed to provide the Decedents with "certain protections, tools, and information to allow [the Decedents] to do their jobs" in Iraq, and that those failures resulted

2

in the murder of the Decedents. (*Id.* at ¶ 13). These alleged failures include: (1) not providing the Decedents with the proper weapons and to allow them to test fire the weapons they were given; (2) not giving the requisite notice before the Decedents were sent on a mission; (3) not conducting a "Risk Assessment" prior to the mission; (4) not giving the Decedents the opportunity to review the mission routes; (5) not allowing the Decedents to review intelligence prior to the mission; (6) not giving the Decedents 21 days to acclimate to the region; (7) not providing armored vehicles; and (8) not providing the required number of team members for the security mission. (*Id.* at ¶¶ 13, 15, 34, 37-39, 51-53, 55, 57). With regard to Decedent Helvenston, the *Nordan* Complaint alleges that he was sent on the mission in Iraq despite the fact that he had taken ill after arriving in the area and was not physically able to perform that task. (*Id.* at ¶¶ 43-48). It is these alleged failures for which the *Nordan* Complaint seeks damages to the survivors of the Decedents and to hold Blackwater, Mr. McQuown and Mr. Powell liable for the wrongful death of the Decedents and seeks to rescind the agreements that the Decedents entered into with Blackwater. (*Id.* at ¶¶ 68-96).

**B.    The Liberty Policy.**

Liberty issued Commercial Umbrella Liability Policy No. LG1-B71-200233-014 to Blackwater Lodge and Training Center, Inc. for the policy period January 27, 2004 to January 23, 2005 (the "Liberty Policy" or "Policy"). *See Valenza Decl.*, Exh. B. The Liberty Policy provides $15,000,000 in coverage for each occurrence and $15,000,000 in the aggregate, for a premium of $145,000 per year. The Liberty Policy provides, in pertinent part:

3

### I. COVERAGE

We will pay on behalf of the "Insured" those sums in excess of the "Retained Limit" that the "Insured" becomes legally obligated to pay by reason of liability imposed by law or assumed by the "Insured" under an "Insured contract" because of **"bodily injury,"** "property damage," "personal injury," or "advertising injury" that takes place during the Policy Period and **is caused by an "occurrence" happening anywhere**. The amount we will pay for damages is limited as described below in the Insuring Agreement section II. Limits of Insurance.

*Id.*, Liberty Policy, Page 1 of 19 (emphasis added).

### C.    Notice To Liberty And This Insurance Coverage Action.

Blackwater promptly provided notice to Liberty of the *Nordan* Litigation by letter dated January 6, 2005 to its broker. See *Valenza Decl.*, Exh. C. Some seven months later, by letter dated August 31, 2005, Liberty denied coverage on the grounds that the terms of the War/Terrorism Exclusion in the Policy bars coverage under the Liberty Policy. *See Valenza Decl.*, Exh. D at 9. Specifically, Liberty claimed that with respect to the War portion of the exclusion, because the killing of the decedents constituted bodily injury that arose from or is related to War and Military Action, the exclusion bars coverage under the Liberty Policy. *Id.*

On November 16, 2005, Blackwater brought this action against Liberty, as well Westchester Surplus Lines Insurance Company, Fidelity & Casualty Company (now known as Continental Insurance Company) and Evanston Insurance Company, seeking insurance coverage for the *Nordan* Litigation. Blackwater seeks a declaratory judgment that all of the defendant insurers, including Liberty, are obligated, pursuant to the terms of their respective policies, to provide coverage to Blackwater for the *Nordan* Litigation. (*Coverage Complaint,* ¶¶ 67-70). On July 11, 2007, Blackwater filed motions for partial summary judgment on the duty to defend in connection with the policies that Westchester, Continental and Evanston issued to Blackwater, and these motions are currently pending before the Court.

4

II.  **SUMMARY JUDGMENT STANDARD**

Federal Rule of Civil Procedure 56 provides that summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). There is no genuine issue "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986). In reviewing a summary judgment motion, all reasonable inferences are viewed in the light most favorable to the non-moving party. *Jung v. Nationwide Mut. Fire Ins. Co.*, 949 F. Supp. 353, 355 (E.D. Pa. 1997). Summary judgment should be granted only where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden at trial." *Kute v. United States*, 1999 WL 72877, *2 (M.D. Pa. Jan. 14, 1999) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).

III.  **ARGUMENT**

    A.    **The *Nordan* Litigation Is Within the Coverage Terms Of The Liberty Policy.**

        1.    **The reasonable expectation of Blackwater was that the Liberty Policy would provide coverage.**

The reasonable expectation of the insured is the focal point in interpreting the contract language of insurance policies. *Collister v. Nationwide Life Ins. Co.*, 479 Pa. 579, 594, 388 A.2d 1346, 1353 (1978), *cert. denied*, 439 U.S. 1089, 99 S.Ct. 871, 59 L. Ed.2d 55 (1979); *Winters v. Erie Ins. Group*, 367 Pa. Super. 253, 257-258, 532 A.2d 885, 887 (1987). An insurer has a duty to indemnify its insured if it is established that the insured's damages are within the policy's coverage. *Caplan v. Fellheimer, Eichen, Braverman & Kaskey*, 68 F.3d 828, 831 (3d Cir. 1995).

5

Blackwater's Policy provides that Liberty is obligated to pay on behalf of its insured Blackwater those sums in excess of the "Retained Limit" that Blackwater becomes legally obligated to pay by reason of liability imposed by law or assumed by Blackwater under an "Insured contract" because of "bodily injury" that is caused by an "occurrence" happening anywhere in the world. (Exh. A, Liberty Policy, p. 1 of 19.) Blackwater is:

> a professional military, law enforcement, security, peacekeeping, and stability operations firm who provides turnkey solutions. We assist with the development of national and global security policies and military transformation plans. We can train, equip and deploy public safety and military professionals, build live-fire indoor/outdoor ranges, MOUT facilities and shoot houses, create ground and aviation operations and logistics support packages, develop and execute canine solutions for patrol and explosive detection, and can design and build facilities both domestically and in austere environments abroad.

Blackwater website, at http://www.blackwaterusa.com/about/. Blackwater's business was no secret to Liberty, nor was the reason Blackwater purchased this insurance, given the nature of the business. Accordingly, Blackwater had a reasonable expectation that it would be covered for the *Nordan* Litigation.

    **2. Well-established law on the interpretation of insurance contracts supports a finding of coverage for the *Nordan* Litigation.**

It is well-established that exclusions are to be strictly construed against the insurer, as are ambiguities in the policy. *Selko v. Home Ins. Co.*, 139 F.3d 146, 152 (3d Cir. 1998). An insurer cannot enforce an exclusion unless the insurer has explained the exclusion to the policyholder or if the policyholder was otherwise made aware of it. *Aetna Life and Cas. Co. v. McCabe*, 556 F. Supp. 1342, 1352 n.6 (E.D. Pa. 1983). Significantly, courts have alerted insurance companies for decades that policy language concerning losses occurring during wartime should be strictly construed. *See, e.g., Queen Ins. Co. of Am. v. Globe Rutgers Fire Ins. Co.*, 263 U.S. 487 (1924) (where ships traveling in WW I convoy collided, Supreme Court determined immediate cause of the loss was not "war" after focusing on the cause nearest to the loss).

### 3. Criminals caused the Decedents' deaths, not the Iraqi government.

An examination of the cases Liberty cites to support its argument that the War/Terrorism Exclusion precludes coverage for the *Nordan* Litigation reveals that the Exclusion does not actually preclude coverage based on the facts here. Liberty cites four cases to support its argument that the War/Terrorism Exclusion applies: *Lamar v. John Hancock Mut. Life Ins. Co.*, 249 N.C. 643, 107 S.E.2d 65 (1959); *Cohen v. Monumental Life Ins. Co.*, 17 N.C. App. 584, 194 S.E.2d 867 (1973); *Stankus v. New York Life Ins. Co.*, 312 Mass. 366, 44 N.E.2d 687 (1942); and *Gagliormella v. Metropolitan Life Ins. Co.*, 122 F. Supp. 246 (D. Mass. 1954). Motion at 14-18. In *Lamar*, a reserve officer in the U.S. Army was killed during an armed conflict between the armed forces of the U.S. and those of North Korea. In *Cohen*, a serviceman in the U.S. Air Force was killed in Thailand while engaged in a military operation during the Vietnam conflict. In *Stankus*, a U.S. navy officer was killed when his ship was sunk by a German torpedo. In *Gagliormella*, a private in the U.S. Marine Corps. was killed in action in Korea.

All four of these cases involved a situation where a life insurance company had issued a policy to someone in the United States military. In three of the four cases, the beneficiary of the life insurance policy was seeking additional death benefits, but the life insurance precluded the additional benefits if the serviceman was killed during "war." In all four cases the decedents had died due to the involvement of the armed forces of recognized nations with whom the United States was at war.

The facts here are easily distinguishable. First, the Liberty policy is not a life insurance policy that was issued on the life of military servicemen. Rather, the Policy is a broad general commercial umbrella policy that was issued to provide coverage to a private company, Blackwater, that, as Liberty well knew or should have through underwriting due diligence, provides security services all over the world in dangerous environments. Second, this is not a

7

situation where the decedents were U.S. servicemen. Rather, the decedents were contractors for a private security company. Third, in the cases Liberty cites, the decedents perished when the U.S. military was in conflict with the armed forces of another country. Indeed, Liberty's cases actually support a finding of coverage for Blackwater in that they define war as a "conflict between the armed forces of two nations under authority of their respective governments." *See, e.g.*, *Stankus*, 312 Mass. at 369. The individuals who killed the Decedents were not part of the armed forces of any government and were clearly comprised in large part of a crazed mob of Fallujah residents.

A case more analogous to the instant situation is *Shneiderman v. Metropolitan Cas. Co. of N.Y.*, 14 A.D.2d 284 (N.Y.App.Div. 1961), which also involved a life insurance policy though not one issued to U.S. military personnel. In *Shneiderman*, the policy at issue covered the life of a photographer-journalist who was killed in the Suez Canal zone when the jeep in which he was traveling was fired upon.

The litigation arose after the beneficiary sought the death benefits, and the carrier argued that the exclusory provision that the insurance "does not cover death…caused by war or any act of war…" applied. *Shneiderman*, 14 A.D.2d at 285. The New York court considered the policy as a whole and construed it liberally to give effect to the purpose for which it was written, and determined there was coverage. The court found it of particular significance that the defendant insurer wrote the policy with the understanding that the insured's occupation was that of photographer-journalist, and the premium would have been different if the insured had changed his occupation to a less hazardous one. Further, the policy was generally intended to include indemnity for disability and loss of life caused by any accidental bodily injury resulting from any hazard incident to the insured's occupation. Significantly, just as in the instant matter, the court

8

focused on the fact that the direct cause of death was not the war or an act of war but an unexplained act of violence, and that though there was supposed to be a cease fire agreed upon by the warring nations, there were spasmodic incidents of violence in the war area. 14 A.D.2d at 290-91.

Just as in *Shneiderman*, the proximate cause of the loss here was murder and an incident of violence. *See id.* at 291. The Policy is to be construed liberally to give effect to its intended purpose. Also, Blackwater's premiums would have been adjusted if it engaged in safer activities, and the Policy was intended to include indemnity for loss of life caused by bodily injury resulting from a hazard incident to Blackwater's professional activities.

Liberty incorrectly contends – with absolutely no supporting evidence – that the Decedents were killed by military forces, and claims that "insurgents" are encompassed by either "warlike action by a military force" or "insurrection, rebellion, revolution." Motion at 17-18. Liberty fails to recognize the modifying phrase after "warlike action by a military force" in the Policy, as such action must be "by any government, sovereign or other authority using military personnel or other agents." *See* Motion at 17. As best as can be ascertained, Iraqi criminals killed the Decedents, and they certainly were not part of the military of any sovereign nation as is required for the War/Terrorism Exclusion to apply. Indeed, there was no presence of any Iraqi governmental or sovereign authority when the murders occurred. Further, as explained below, their actions were not part of any "insurrection, rebellion, [or] revolution." Indeed, as the news reels make gruesomely plain, their deaths were caused by local mob action confined to a certain neighborhood of a certain city, not by uniformed troops of a sovereign nation.

### B.   The Cause Of The Loss Was Not A Conflict Between Sovereign Nations, So The War/Terrorism Exclusion Does Not Preclude Coverage.

The most well known case relevant to the applicability of the War/Terrorism Exclusion to the *Nordan* Litigation is *Pan American World Airways v. Aetna Casualty & Surety Co.*, 505 F.2d 989 (2d Cir. 1974). In *Pan Am.*, a U. S. airline brought an action to recover against its insurers for its aircraft which was destroyed by hijackers who were members of a Palestinian organization known as the Popular Front for the Liberation of Palestine ("PFLP"). The relevant policy language excluded coverage for "war, invasion, civil war, revolution, rebellion, insurrection or warlike operations, whether there be a declaration of war or not…[and] strikes, riots, civil commotion." 505 F.2d 989 at 994. The U.S. District Court for the Southern District of New York held that the "war risk" exclusion did not apply, and found the insurers liable for the loss. The Second Circuit agreed that the war-risk exclusion did not apply.

The Second Circuit held that, "**war is a course of hostility engaged in by entities that have at least significant attributes of sovereignty**. Under international law war is waged by states or state-like entities." 505 F.2d at 1012 (emphasis added). The court determined that the loss of the Pan American 747 was in no sense caused by any "war" being waged by or between recognized states, as the Palestinian group had never claimed to be a state and it was not acting on behalf of a state. *Id.* at 1013. Further, the PFLP occupied ground in Jordan, but was not a de facto government, and so it was not a "military or usurped power." *Id.* at 1009.

Just as in the instant matter, the insurers in the *Pan Am.* case relied on the exclusionary language for "insurrection, rebellion and revolution." Both the district court and Second Circuit focused on "insurrection" based on the rationale that "insurrection" presents the key issue because "rebellion" and "revolution" are the progressive stages in the development of civil unrest, the most rudimentary form of which is "insurrection." *Id.* at 1017. "Insurrection" was

defined as: "(1) a violent uprising by a group or movement (2) acting for the specific purpose of overthrowing the constituted government and seizing its powers." *Id.*[1] Though the PFLP was a group, the district court decided, and the Second Circuit affirmed, that the insurers did not support their burden of proving that at the time of the loss the PFLP intended to overthrow King Hussein, and that even if the PFLP was fighting Hussein, it was fighting for its survival rather than Hussein's overthrow. Alternatively, it found that any insurrection in Jordan did not proximately cause the loss of the 747. *Id.* at 1018.

Indeed, based on the facts underlying the *Nordan* Litigation, it is clear that the killing of the Decedents was not due to any "war" or "insurrection." The murderers of the Nordan Decedents were rogue killers and/or certain Fallujah citizenry and had no attributes of sovereignty. In *Pan Am.*, the organization Popular Front for the Liberation of Palestine was involved, yet here there was no group involved but rather random criminals, and the criminals were not acting to overthrow any government or seize governmental powers. Just as in *Pan Am.*, since there was no "insurrection," it follows there was no "rebellion" or "revolution." Indeed, the undisputed facts in the instant case are far stronger and more compelling than the facts of the *Pan Am.* case.

A case on which the Second Circuit relied in *Pan Am.*, *Airlift Int'l v. U.S.*, 335 F.Supp. 442 (S.D.Fla. 1971), is also instructive here. In *Airlift Int'l*, the Southern District of Florida considered whether to permit recovery under a "war risk" policy that insured against loss or

---

[1] In *Younis Bros. & Co. v. Cigna Worldwide Ins. Co.*, 899 F.Supp. 1385 (E.D. Pa. 1995), *aff'd*, 91 F.3d 13 (3d Cir. 1996), this Court concluded, and the Third Circuit agreed, that an "insurrection" was the cause of the fire and looting losses to the insured's property and business. *Younis* is distinguishable from the instant case, however, as the evidence in *Younis* indicated that the leaders of the armed movements had stated an intention to overthrow the existing government and seize power, whereas at the time of the Decedents' murders, there was no sovereign government in Iraq that the murderers were trying to overthrow. *See Younis*, 91 F.3d 13, 15.

11

damage due to or resulting from war or warlike operations. The plaintiffs were the owners of an aircraft, which was operating under a U.S. Military Airlift Command contract and had on board general cargo, four crew members and three passengers. *Airlift Int'l*, 335 F.Supp. at 445. There was a mid-air collision in June 1967 over the Republic of Vietnam involving a military aircraft that was returning from its reconnaissance mission and plaintiffs' aircraft. *Id.* The court considered whether the damage was proximately caused by "a risk of war or warlike operations" and held that neither aircraft was on a warlike operation and that, even if they were, the accident was not caused by a warlike operation, and so the mid-air collision and subsequent loss did not result from a result a peril or risk of war. *Id.* at 446-47.

In *Holiday Inns Inc. v. Aetna Ins. Co.*, the Southern District of New York applied the rationale of *Pan Am.*, and held that a war risk exclusion did not apply to damage inflicted on the insured hotel in Beirut, Lebanon during events that politicians and journalists had labeled a "civil war." *Holiday Inns Inc. v. Aetna Ins. Co.*, 571 F.Supp. 1460 (S.D.N.Y. 1983). The policy at issue contained an exclusion of loss or damage:

> if such loss or damage either in origin or extent is directly or indirectly, proximately or remotely, occasioned by or contributed to by any of the following occurrences, or, either in origin or extent, directly or indirectly, proximately or remotely, arises out of or in connection with … **[w]ar**, invasion, act of foreign enemy, hostilities or warlike operations (whether war be declared or not), civil war, mutiny, **insurrection, revolution**, conspiracy, military or usurped power.

*Holiday Inns*, 571 F.Supp. at 1463 (emphasis added).

The court found that the insurer failed to establish that the damage to the hotel fell within the excluded perils of "war," "insurrection" or "revolution," as well as "civil war." The court emphasized that it had to consider what certain words mean "for insurance purposes," and noted that:

12

> Comparable reasoning appears in *Spinney's (1948) Ltd. v. Royal Insurance Co. Ltd.*, supra, a case which like that at bar involved the violence in Lebanon in 1975 and 1976. Mr. Justice Mustill was asked by one of the litigants to inquire of the Secretary of State for Foreign Affairs whether the situation in Lebanon constituted a "civil war" (that being an excluded peril under the policy in suit). The judge declined to do so:
>
> "The issue is not whether the events in Lebanon were recognized by the United Kingdom as amounting to a civil war in the sense in which the term is used in Public Internal Law…**The question here is whether there was a civil war within the meaning of the policy. The two questions are not the same, and a pronouncement by the Secretary of State on one will not suffice to decide the other**…When deciding whether the excepted perils apply, the ascertainment of primary facts is only one step in the process. The real problem is to interpret what was happening, in the light of the words used in the policy.... Answering the question would require the Secretary of State to ascertain the meaning of the words used in the policy, and unless the Court could be sure that the Secretary of State and the Court were adopting the same interpretation, the exercise would serve only to confuse...." [1980] 1 Lloyd's L.Rep. at 426.

*Holiday Inns*, 571 F.Supp. at 1464.

The court went on to hold that, "for insurance purposes," "war" exists between sovereign or quasi-sovereign entities, and "war" does not include conflicts waged by guerrilla groups. *Id.* at 1465. Here, Liberty's reliance upon the War/Terrorism Exclusion fails just as it did in *Pan Am.* and *Holiday Inns*, because the criminal murderers certainly did not belong to any group that had been accorded by a state "the rights of a government." *See id.* No sovereign nation gave them financial support or even recognized them. *See id.* (discussing how in *Pan Am.* the court held the "war" exclusion inapplicable because "the hijackers who constituted the efficient physical cause of the loss 'were the agents of a radical political group, rather than a sovereign government.'")

The court also discussed the definition of "insurrection" and explained that an intent to overthrow the established government is essential to the existence of an insurrection. *Id.* at 1466. The burden of proof is on the insurer, and it is not sufficient for the insurer to prove a set of circumstances from which the requisite intent is one of several plausible conclusions that a

reasonable fact-finder could draw. Indeed, the insurer must prove the existence of intent, and its proof must negate the existence of differing intents or purposes which, if present, would result in policy coverage. *Id.* In the instant case, it is clear that the Iraqi insurgents did not have the requisite intent of overthrowing any established government when they murdered the Decedents.

It is noteworthy that though various commentators and politicians referred to the violence as a "civil war," and "civil war" was a specific exclusion in the policy at issue in *Holiday Inns*, the court held there was no "civil war" for insurance purposes because there was a lack of proof of a specific intent to overthrow the established government. *Id.* at 1466, 1494. Though there was prolonged violence and much bloodshed, and it was during the course of the violence when the Holiday Inn was damaged, the responsible group was not acting for the specific purpose of overthrowing the Lebanese government. *Id.* at 1497. The wrongdoers did not proclaim a casting off of allegiance to a government, and they did not proclaim or seek to establish a government of their own. *Id.* The court concluded that an attack upon a series of hotels in West Beirut was neither an attack upon the existing government of Lebanon nor an effort to set up another government, and so did not constitute "civil war." *Id.*

14

IV.  **CONCLUSION**

Based on the foregoing, Liberty International Underwriters has an obligation under its Policy to provide indemnification for any losses Blackwater may incur in connection with the underlying *Nordan* Litigation. Accordingly, Blackwater respectfully requests that this Court deny Liberty International Underwriters' Motion for Summary Judgment.

Respectfully submitted,

*/s/ Carol C. Carty*
Dennis J. Valenza
Carol C. Carty
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA 19103-2921
P: 215.963.5000
F: 215.963.5001

Paul A. Zevnik
Howard T. Weir III
Morgan, Lewis & Bockius LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004
P: 202.739.3000
F: 202.739.3001

Dated: August 13, 2007                Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was served upon all counsel of record on August 13, 2007, by electronic filing and/or by mailing, first-class, postage prepaid, a true and correct copy thereof to the following:

Francis J. Deasey, Esq.
Michael F. Schleigh, Esq.
Deasey, Mahoney & Valentini
1601 Market Street, Suite 3400
Philadelphia, PA 19103

John C. Sullivan, Esq.
Post & Schell PC
1600 John F. Kennedy Blvd
Four Penn Center
Philadelphia, PA 19103-2808

L.D. Simmons, II, Esq.
Helms Mulliss & Wicker PLLC
201 North Tryon Street
Charlotte, NC 28202

Francis P. Burns, III, Esq.
Lavin O'Neil Ricci Cedrone & Disipio
190 North Independence Mall West
6th & Race Streets, Suite 500
Philadelphia, PA 19106

Ronald P. Schiller, Esq.
DLA Piper Rudnick Gray Cary LLP
One Liberty Place, Suite 4900
1650 Market Street
Philadelphia, PA 19103

Thomas T. Locke, Esq.
Seyfarth Shaw LLP
815 Connecticut Ave. NW
Washington, DC 20006-4004

_____
Carol C. Carty