# EXHIBIT A

Dockets.Justia.com

FOCUS - 1 of 13 DOCUMENTS

Copyright 2007 Federal News Service, Inc.
All Rights Reserved
Federal News Service

October 2, 2007 Tuesday

**SECTION:** PRESS CONFERENCE OR SPEECH

**LENGTH:** 37488 words

**HEADLINE:** A HEARING OF THE HOUSE COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM;
SUBJECT: BLACKWATER USA; PRIVATE SECURITY CONTRACTING IN IRAQ & AFGHANISTAN;
CHAIRED BY: REPRESENTATIVE HENRY WAXMAN (D-CA);
WITNESS: ERIK PRINCE, CHAIRMAN, BLACKWATER USA;
LOCATION: 2154 RAYBURN HOUSE OFFICE BUILDING, WASHINGTON, D.C.

**BODY:**

A HEARING OF THE HOUSE COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM SUBJECT: BLACKWATER USA; PRIVATE SECURITY CONTRACTING IN IRAQ & AFGHANISTAN CHAIRED BY: REPRESENTATIVE HENRY WAXMAN (D-CA) WITNESS: ERIK PRINCE, CHAIRMAN, BLACKWATER USA LOCATION: 2154 RAYBURN HOUSE OFFICE BUILDING, WASHINGTON, D.C. TIME: 10:13 A.M. EDT DATE: TUESDAY, OCTOBER 2, 2007

REP. WAXMAN: (Raps gavel.) The meeting of the committee will come to order.

Over the past 25 years, a sophisticated campaign has been waged to privatize government services. The theory is that corporations can deliver government services better and at a lower cost than the government. Over the last six years, this theory has been put into practice. The result is that privatization has exploded. For every taxpayer's dollar spent on federal programs, over 40 cents now goes to private contractors. Our government now outsources even the oversight of the outsourcing.

At home, core government functions like tax collection and emergency response have been contracted out abroad. Companies like Halliburton and Blackwater have made billions performing tasks that used to be done by our nation's military forces. What's been missing is a serious evaluation of whether the promises of privatizing are actually realized. Inside our government it has become an article of faith that outsourcing is best.

Today we're going to examine the impact of privatization on our military forces. We will focus on a specific example: the outsourcing of military functions to Blackwater, a private military contractor providing protective services to U.S. officials in Iraq. We will seek to answer basic questions: Is Blackwater, a private -- is Blackwater, a private military contractor, helping or hurting our efforts in Iraq? Is the government doing enough to hold Blackwater accountable for alleged misconduct, and what are the costs to the federal taxpayers?

I want to thank Erik Prince, Blackwater's founder and CEO, for his cooperation in this hearing. As a general rule, children from wealthy and politically connected families no longer serve in the military. Mr. Prince is an exception. He enlisted in the Navy in 1992 and joined the Navy SEALS in 1993, where he served for four years, and we thank you for that service. In 1997, he saw an opportunity to start his own company, and created Blackwater. And has said, quote, "We're trying to do for the national security apparatus what FedEx did for the Postal Service," end quote.

There may be no federal contractor in America that has grown more rapidly than Blackwater over the last seven years. In 2000, Blackwater had just $204,000 in government contracts. Since then it has received over a billion dollars in federal contracts. More than half of these contracts were awarded without full and open competition. Privatizing is working exceptionally well for Blackwater. The question for this hearing is whether outsourcing to Blackwater is a

A HEARING OF THE HOUSE COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM; SUBJECT: BLACKWATER USA; PRIVATE SECURITY CONTRACTING IN IRAQ & AFGHANISTAN; CHAIRED BY: REPRESENTATIVE HENRY WAXMAN (D-CA); WI

good deal for the American taxpayer, whether it's a good deal for the military, and whether it's serving our national interests in Iraq.

The first part of that question is cost. We know that sergeants in the military generally cost the government between 50,000 (dollars) to $70,000 per year. We also know that a comparable position at Blackwater costs the federal government over $400,000 -- six times as much. Defense Secretary Gates testified about this problem last week. He said Blackwater charges the government so much that it can lure highly trained soldiers out of our forces to work for them. He is now taking the unprecedented step of considering whether to ask our troops to sign a non-compete agreement to prevent the U.S. military from becoming a taxpayer-funded training program for private contractors.

There are also serious questions about Blackwater's performance. The September 16th shooting that killed at least 11 Iraqis is just the latest in a series of troubling Blackwater incidents. Earlier this year, our committee examined the company's mistakes in Fallujah where four contractors were killed and their bodies burned. That incident triggered a major battle in the Iraq war.

New documents indicate that there has been a total of 195 shooting incidents involving Blackwater forces since 2005. Blackwater's contract says the company is hired to provide defensive services, but in most of these incidents, it was Blackwater forces who fired first. We have also learned that 122 Blackwater employees, one- seventh of the company's current workforce in Iraq, have been terminated for improper conduct.

We have the best troops in the world. The men and women in our armed forces are extraordinarily able and dedicated. Their pay does not reflect their value, but they don't complain. So I have a high bar when I ask whether Blackwater and other private military contractors can meet the performance standards of our soldiers.

In recent days, military leaders have said that Blackwater's missteps in Iraq are going to hurt us badly. One senior U.S. military official said Blackwater's actions are creating resentment among Iraqis that, quote, "may be worse that Abu Ghraib," end quote. If these observations are true, they mean that our reliance on a private military contractor is backfiring.

The committee's investigation raises as many questions about the State Department's oversight of Blackwater as it does about Blackwater itself. On December 24th, 2006, a drunken Blackwater contractor shot the guard of the Iraqi vice president. This didn't happen out on a mission protecting diplomats; it occurred inside the protective Green Zone. If this had happened in the United States, the contractor would have been arrested and a criminal investigation launched. If a drunken U.S. soldier had killed an Iraqi guard, the soldier would have faced a court martial. But all that has happened to the Blackwater contractor is that he has lost his job.

The State Department advised Blackwater how much to pay the family to make the problem go away, and then allowed the contractor to leave Iraq just 36 hours after the shooting. Incredibly, internal e- mails documented debate over the size of the payment. The charge d'affaires recommended a $250,000, but this was cut to $15,000 because the Diplomatic Security Service said Iraqis would try to get themselves killed for such a large payout. Well, it's hard to read these e-mails and not come to the conclusion that the State Department is acting as Blackwater's enabler.

If Blackwater and other companies are really providing better service at a lower cost, the experiment of privatizing is working. But if the costs are higher and performance is worse, then I don't understand why we're doing this. It makes no sense to pay more for less. We will examine this issue today and facts, not ideology, need to guide us here.

Yesterday, the FBI announced that it launched a criminal investigation into Blackwater's actions on September 16. This morning the Justice Department sent a letter to the committee asking that in light of this development the committee not take testimony at this time about the events of September 16th. Our precedent on this committee is that Congress has an independent right to this information, but in this case Ranking Member Davis and I have conferred, and we have agreed to postpone any public discussion of this issue as we work with the Department to obtain the information that the committee lacks.

For the same reason, at the request of the Justice Department, I'll ask our witness, Mr. Prince, and our State Department witnesses on the second panel not to discuss the September 16th incident in this public setting today.

The last point I want to make is directed to the families of the Blackwater employees killed in Fallujah, and the families of the soldiers killed in a tragic and unnecessary accident with Blackwater Airlines, some of whom are here today. I know many of you believe that Blackwater has been unaccountable to anyone in our government. I want you to know that Blackwater will be accountable today.

A HEARING OF THE HOUSE COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM; SUBJECT: BLACKWATER USA; PRIVATE SECURITY CONTRACTING IN IRAQ & AFGHANISTAN; CHAIRED BY: REPRESENTATIVE HENRY WAXMAN (D-CA); WI

We'll be asking some tough questions about disturbing actions, and I also want to assure Mr. Prince that we will be fair. And we will not tolerate any demonstrations or disturbances from anyone attending this hearing. Thank you, and I am looking forward to Mr. Prince's testimony.

I want to recognize the ranking member, Mr. Davis.

REP. TOM DAVIS (R-VA): Thank you, Mr. Waxman.

Security contactors have been working at U.S. diplomatic posts for more than 20 years, but their extensive use in the midst of ongoing military conflict raises important new questions about the ability of government acquisition officials to manage and oversee those contracts, the vetting and training of security personnel, and how best to control and coordinate private security firms in a complex, highly dangerous battle space.

Contracts for the use of force in war also pose legitimate questions about the propriety of hiring private firms to perform such a public -- some would say inherently governmental -- function. But those complex questions won't be addressed responsibly by fixating on the operations of any one company, nor are we likely to learn much by focusing on one sensational incident still under investigation.

So we appreciate Chairman Waxman agreeing to add testimony from State Department witnesses today. They will discuss overall management of the competitively awarded, worldwide personnel protective services contract under which Blackwater and two other firms provide security services in Iraq. And we take the chairman at his word there will be additional hearings to examine the broader range of important oversight issues implicated in the use of security contractors in hostile environments.

Contractor personnel working in support of diplomatic and military activities abroad have become an inescapable fact of modern life. Today they provide everything from logistics and engineering services to food preparation, laundry, housing, construction and, of course, security. They offer invaluable surge capacity and contingent capabilities federal agencies can't afford to keep in house. By some estimates, the number of private contractors now exceeds total U.S. military personnel in Iraq.

But the presence of so many foreigners, particularly so many with guns, offends some Iraqis and gives others a pretext to incite mistrust and violence. To paraphrase the title of one recent study of the phenomena, Iraqis fear they can't live with private security contractors. U.S. personnel believe they can't live without them. So it's critical the Departments of State and Defense get it right when they contract for sensitive security services in someone else's sovereign territory. However you define success in Iraq, from stay the course to immediate withdrawal and every scenario in between, security contractors are going to play an integral part. The inevitable redeployment of U.S. military units out of the current urban battle space will only increase the need for well-trained and well-managed private security forces to fill that vacuum and protect diplomatic and reconstruction efforts. As the lead editorial of this morning's Washington Post concluded, it is foolish to propose the elimination of private security firms in Iraq and Afghanistan, at least in the short term.

Contract documents and incident reports reviewed by the committee suggest the State Department is trying to get it right. There's clear evidence of proactive management and oversight of security contractors in Iraq. The State Department requires specific qualifications and rigorous, ongoing training for all contract security personnel, including extensive prior security experience and firearms proficiency. Those hired must also undergo background investigations and qualify for a security clearance. And the contract contains carefully crafted, comprehensive provisions on standards of conduct for security personnel, strict rules for the use of any type of force and extensive reporting requirements when any incident occurs.

But State Department oversight of security contractors seems to have some blind spots as well. There is little aggregate or comparative data on contractor performance, so it's impossible to know if one company's rate of weapons-related incidents is the product of a dangerous cowboy culture or the predictable result of conducting higher-risk missions. In incidents of erratic and dangerous behavior by security personnel from all the companies involved, not just Blackwater, are handled with little or no regard to Iraqi law. Usually the bad actor is simply whisked out of the country, whether the offense is a civilian casualty, negligent discharge of a weapon, alcohol or drug abuse or destruction of property.

To date, there has not been a single, successful prosecution of a security provider in Iraq for criminal misconduct. Iraqis understandably resent our preaching about the rule of law when so visible an element of the U.S. presence there appears to be above the law. That's why the events of September 16th spark such an outcry by the Iraqi government

A HEARING OF THE HOUSE COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM; SUBJECT: BLACKWATER USA; PRIVATE SECURITY CONTRACTING IN IRAQ & AFGHANISTAN; CHAIRED BY: REPRESENTATIVE HENRY WAXMAN (D-CA); WI

And probably one of the reasons why is there's some bad news for the other side. Today -- it's on page 15 -- it's a 48 percent drop in deaths in Iraq in one month. They don't want that good news to get out. But on the front page, you want the other killings by Blackwater, the contractors we're going after today.

Now, if they're really intent on going after the contractors, then -- and I don't know what happened on the 16th. I don't know what happened in other incidents. But if they're really intent on going after criminal misconduct, then we have a letter from the Department of Justice; we have some words about not interfering in this process, but we are interfering with both a Department of State investigation and a criminal misconduct investigation, potentially criminal charges. And let me -- let me quote from some of the words: "This presents serious challenges for any potential criminal prosecution," and then they cite case law.

So my concern -- (gavel sounds) -- if we really want to do this, we should not -- we should not be holding this hearing. Therefore I move that the committee do now adjourn.

REP. WAXMAN: A motion's before us to adjourn. All those in favor of the motion, say aye. (Aye.) Opposed, no. (No.) The nos have it; the motion is defeated.

We have a witness now and I'd like to call forward Erik Prince, who is the head of the Prince Group LLC and Blackwater USA. Mr. Prince, please come forward. Mr. Prince, it's the practice of this committee that all witnesses take an oath before they testify

(The witness is sworn in.)

REP. WAXMAN: The record will indicate that the witness answered in the affirmative.

I do want to say, Mr. Prince, that there have been press reports over the past two weeks regarding the recent incident in -- on September 16th, and there have been conflicting accounts of what actually happened on the ground. I know that you were prepared to address this incident today, as did our other witnesses and, no doubt, our members did too. So I just want to note that -- for the record, that the request to refrain from public comment came from the Justice Department, not Mr. Prince and not from anyone else. And I want to thank him for complying with that Justice Department request. I know you've been prepared to talk about it, but we would ask you please not to go into that incident.

MR. PRINCE: (Off mike.)

REP. WAXMAN: Before you begin -- just push the button on the mike.

MR. PRINCE: Is that better?

REP. WAXMAN: Okay. Please proceed however you see fit.

MR. PRINCE: Chairman Waxman, Congressman Davis, members of the committee, my name is Erik Prince and I am the chairman and CEO of the Prince Group and Blackwater USA. Blackwater is a team of dedicated professionals who provide training to America's military and law enforcement communities and risk their lives to protect Americans in harm's way overseas.

Under the direction and oversight of the United States government, Blackwater provides an opportunity for military and law enforcement veterans with a record of honorable service to continue their support to the United States. Words alone cannot express the respect I have for these brave men and women who -- who volunteer to defend United States personnel, facilities, and diplomatic missions. I am proud to be there to represent them today.

After almost five years in active service as a U.S. Navy SEAL, I founded Blackwater in 1997. I wanted to offer the military and law enforcement communities assistance by providing expert instruction and world-class training venues.

Ten years later, Blackwater trains approximately 500 members of the military and law enforcement agencies every day. After 9/11 when the U.S. began its stabilization efforts in Afghanistan and in Iraq, the United States government called up on Blackwater to fill a need for protective services in hostile areas. Blackwater responded immediately. We are extremely proud of answering that call and supporting our country.

Blackwater personnel supporting our country's overseas missions are all military and law enforcement veterans, many of whom have recent military deployments. No individual protected by Blackwater has ever been killed or seriously injured. There is no better evidence of the skill and dedication of these men. At the same time, 30 brave men have made the ultimate sacrifice while working for Blackwater and its affiliates. Numerous others have been wounded

A HEARING OF THE HOUSE COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM; SUBJECT: BLACKWATER USA; PRIVATE SECURITY CONTRACTING IN IRAQ & AFGHANISTAN; CHAIRED BY: REPRESENTATIVE HENRY WAXMAN (D-CA); WI

REP. WAXMAN: (Sounds gavel.) Mr. McHenry --

REP. MCHENRY: I think that is a very important number that we need to discuss here, Mr. Chairman. And that should be, you know, a testament to the service of these former veterans -- these veterans --

REP. WAXMAN: The five minutes that was yielded to you --

REP. MCHENRY: -- that are currently working for Blackwater.

I'm happy to yield back to the ranking member.

REP. T. DAVIS: Mr. Prince, let me just continue with that. Are there any other security firms in Iraq that provide services that involve as much danger as your escort services that your company provides in Baghdad?

MR. PRINCE: Sir, we certainly have a high-profile mission.

We protect the U.S. ambassador. We protect all the diplomats in the greater Baghdad area, which is the hottest part of the country by far.

REP. T. DAVIS: How is your firm paid under the current task order contract for security details? Is it by the mission, by the hour, or some other method? How do you bill the government?

MR. PRINCE: It's generally billed on a -- per man-day, for every day that the operator's in the country.

REP. T. DAVIS: Is it a cost-plus-fee? Or is it just on a -- like a time and material?

MR. PRINCE: It's blended. Most of it is firm-fixed price. There's a few things that are directly cost-reimbursable, like insurance.

REP. T. DAVIS: Does the contract provide for monetary penalties for any performance difficulties, like the shooting incidents that were reported to have occurred and the like?

MR. PRINCE: Yes, there's all sorts of penalty clauses if we don't have it fully manned, if they're not happy with the leadership. We are very responsive. If there's someone that doesn't agree or is not operating within the standards of the Department of State, they have two decisions: window or aisle.

REP. T. DAVIS: Do you work just for the Department of State? Or do you work for Defense Department as well?

MR. PRINCE: In Iraq, we essentially work for the Department of State. There's one or two folks here or there in a consultant-type position, but nothing significant, nothing armed.

REP. T. DAVIS: Yeah, it's important for the committee to understand there are two different contracting entities that are contracting in Iraq, and State -- you work for State.

Do you think the contract provisions and the State Department contract management personnel provide sufficient guidance for the use of force under the contract?

MR. PRINCE: Yes, sir, we've seen the full gamut of contracting and contract management in the stabilization section or stabilization phase of the Iraq War, and there's a whole host of differences in oversight. And I will tell you, State Department is the highest. They are the GE-like buyers, the most sophisticated oversight standards that we have to comply with on the front end for our personnel and management in the field.

REP. T. DAVIS: When your teams are operating on the ground in Baghdad, what entity has the authority to control your activities? Is it the State Department? Or is it the military commander who's responsible for the battlespace?

MR. PRINCE: We work for the RSO, the regional security officer. He's the chief security official for the State Department in Iraq.

REP. T. DAVIS: So it's the State Department ultimately -- (off mike) -- contracting.

MR. PRINCE: Yes.

REP. T. DAVIS: And can you describe the process that's followed under the contract when a shooting incident occurs? And how many employees -- have you dismissed any employees for shooting incidents under your security contracts in Iraq? And what happens to dismissed employees? Are they sent out of Iraq?

MR. PRINCE: Okay, I mean --

A HEARING OF THE HOUSE COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM; SUBJECT: BLACKWATER USA; PRIVATE SECURITY CONTRACTING IN IRAQ & AFGHANISTAN; CHAIRED BY: REPRESENTATIVE HENRY WAXMAN (D-CA); WI

back of every one of your vehicles in both Arabic and English, there is a warning to not go within 100 meters of that vehicle. Is that correct?

MR. PRINCE: That's right, sir.

REP. BURTON: And if somebody's coming at your vehicle at a high rate of speed, do your employees have any actions that they should take, especially if it might be a car bomb or something like that?

MR. PRINCE: Yes, sir. There's generally lights and sirens on the vehicles -- air horn. The personnel whose security sector is facing back towards that oncoming threat will be giving hand signals, audible yelling stop -- "qif," Arabic for stop. There's a pen flare which is a signaling device kind of like a bottle rocket. It's a device used for a pilot to signal his whereabouts on the ground to be rescued. But it's a bright incendiary device that flies by the vehicle or it hits the vehicle. It's not lethal at all, but it definitely -- you know something's happening. Water bottles are sometimes thrown at vehicles to warn them off. If you have to go beyond that, they take shots into the radiator. You hear that hitting the car, it disables the car, you definitely know something's happening. If they go beyond that, they spider the windshield. You put a round through the center of the windshield away from the occupants so the safety glass of the windshield makes it difficult to see through. Only after that do they actually direct any shots toward the driver. So there's a whole use-of-force continuum.

REP. BURTON: The questions that I've heard today from the other side indicate that there ought to be perfection in your organization. Now, you're a Navy SEAL, and you've served in the military. Do you believe that any kind of military operation of this type or any type can be absolutely perfect all the time?

MR. PRINCE: I'm afraid not, sir. We strive for perfection. We try to drive towards the highest standards. But the fog of war and accidents and the bad guys just have to get lucky once.

REP. BURTON: I think it's very important that everybody who's involved in this hearing today understand that you have high public officials, congressmen and others, who you have to protect. And you've indicated that nobody's been killed or hurt under your protection. And yet you're going through all kinds of zones where there's car bombs going off, small-arms fire, cars coming at you at high rates of speed. Can you explain to me why in the world there wouldn't be some precautions taken when those sorts of things take place?

MR. PRINCE: Again, the bad guys have figured out killing Americans is big media. I think they're trying to drive us out. They try to drive to the heart of American resolve and will to stay there, so we have to provide that protective screen. We only play defense, and our job is to get those reconstruction officials, those people that are trying to weave the fabric of Iraq back together, to get them away from that X, the places where the bad guys, the terrorists have decided to kill them that day.

REP. BURTON: One of the members on the other side indicated that when there is a firefight or when there's a car bomb go off or something, there's an attack on your convoy, that you don't stay there. Can you explain to me what would happen if you stayed there when you were under attack?

MR. PRINCE: Again, there would be a lot more firefight, there would be a lot more shooting. Our job is to get them off the x. The x is what we refer to in our business about the preplanned ambush site where bad guys have planned to kill you. So our job is to get them away from that x, to get them to a safe place. So we can't stay and secure the terrorist's crime scene investigation.

REP. BURTON: You're in a war zone.

MR. PRINCE: Yes, sir.

REP. BURTON: No, so the instructions -- I want to get this straight. If your people come under fire or there's a car bomb or a RPG fired at them, they're supposed to turn around, under some rules, and get out of there to protect the people that they're guarding.

MR. PRINCE: Yes, sir. Defensive fire, sufficient force to extricate ourselves from that dangerous situation.

We're not there to achieve firepower dominance or to drive the insurgents back. We're there to get our package away from danger.

REP. BURTON: Thank you.

REP. WAXMAN: The gentleman's time has expired.

A HEARING OF THE HOUSE COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM; SUBJECT: BLACKWATER USA; PRIVATE SECURITY CONTRACTING IN IRAQ & AFGHANISTAN; CHAIRED BY: REPRESENTATIVE HENRY WAXMAN (D-CA); WI

I've been to Iraq 18 times. I've been outside the umbrella four times. It is one dangerous place. I have seen films where vehicles come up to our troops or to our security people, and they're blown up in it. You have done an amazing task. And there is a huge difference from being a police officer or a protective and being the military -- a totally different role. I've had no one in the military say to me, "I want to guard all these civilians." And the last thing you want is to have humvees and Army take civilians who are meeting other civilians, like our State Department, with that kind of precedent. And the military would not do it. They're not going to be in a Suburban. They're going to be in what their protocol requires. The protocol is totally different. We need security people who do their job. Thank you for doing a perfect job in protecting the people you're required to protect.

I yield back.

MR. PRINCE: Thank you, sir. It's an honor to do the work.

REP. WAXMAN: (Strikes gavel.) The gentleman's time has expired.

Before I recognize Mr. Davis, I want to put in the record a statement from the special inspector general in Iraq from July '04 that indicates that the security guards in two helicopters for Bremer sole source directed the security for the inner ring (of the ?) republican presidential compound Al-Rashid Hotel, sole sourced the security for Al-Rashid Hotel, sole sourced to Blackwater.

REP. SHAYS: I reserve my right to (check ?). What the gentleman said -- was that under Bremer or after Bremer?

REP. WAXMAN: This was in '04, so it would have been --

REP. SHAYS: So it was under Mr. Bremer, not since we transferred power to the Iraqis?

REP. WAXMAN: I don't know the answer, as this document only refers to the period of time --

REP. SHAYS: I know, Mr. Bremer (sic). I yield -- I don't object.

REP.    : Mr. Chairman, may I have a minute, please? May I have a minute, please? One minute, please? Thank you.

REP. WAXMAN: We'll take -- oh -- yes.

(Long pause.)

REP.    : Thank you, sir.

REP. WAXMAN: Thank you.

Mr. Davis.

REP. DANNY K. DAVIS (D-IL): Thank you, Mr. Chairman.

Mr. Prince, throughout your testimony and in other comments attributed to you, you have praised the Blackwater personnel on the ground in Iraq, but mistakes do in fact happen. You do admit that Blackwater personnel have shot and killed innocent civilians, don't you?

MR. PRINCE: No, sir. I disagree with that. I think there's been times when guys are using defensive force to protect themselves, to protect the packages, trying to get away from danger, there could be ricochets, there are traffic accidents, yes. This is war. You know, since 2005 we've conducted in excess of 16,000 missions in Iraq, and 195 incidences with weapons discharge. In that time, did a ricochet hurt or kill an innocent person? That's entirely possible. Again, we do not have the luxury of staying behind to do that terrorist crime scene investigation to figure out what happened.

REP. D. DAVIS: Well, according to a document we obtained from the State Department, on June 25th, 2005, Blackwater guards shot and killed an innocent man who was standing by the side of the street. His death left six children alone with no one to provide them support. Are you familiar with this incident?

MR. PRINCE: I'm somewhat familiar with that incident. I believe what happened, there was a car bomb -- or a potential car bomb had rapidly approached our convoy. I believe our (guy/guys ?) shot rounds at the car, not at the driver, to warn them off. One of those rounds, as I understand, penetrated through the far side of the car, ricocheted and injured that innocent -- or killed that innocent man.